# E-filing

1 **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2 Name ___RUVALCABA, JOSE___
    (Last)      (First)     (Initial)

3 **FILED**

4 Prisoner Number ___H-21975___

Institutional Address ___P.O. BOX 689, SOLEDAD, CA 93960-0689___

5 MAY 1 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6 ========================================================

**UNITED STATES DISTRICT COURT**
7 **NORTHERN DISTRICT OF CALIFORNIA**

8 ___JOSE RUVALCABA,___
(Enter the full name of plaintiff in this action.)

9 **CV** ) **08** ) **2483**

vs.

10        Case No. _____
       (To be provided by the clerk of court) **CRB**

___BEN CURRY, WARDEN,___

11 **PETITION FOR A WRIT**
**OF HABEAS CORPUS**

12 _____

13 _____

14 _____
(Enter the full name of respondent(s) or jailor in this action) **(PR)**

15

16 ================================================================

Read Comments Carefully Before Filling In

17 When and Where to File

18      You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1  Who to Name as Respondent

2          You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6          If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11          1. What sentence are you challenging in this petition?

12              (a)     Name and location of court that imposed sentence (for example; Alameda

13                      County Superior Court, Oakland):

14          CONTRA COSTA SUPERIOR COURT _____ CONTRA COSTA

15                      Court                                   Location

16              (b)     Case number, if known _____ 9101528 _____

17              (c)     Date and terms of sentence __ 5/5/90 ____ 7 YEARS TO LIFE

18              (d)     Are you now in custody serving this term? (Custody means being in jail, on

19                      parole or probation, etc.)              Yes _X__   No _____

20                      Where?

21                      Name of Institution: _CORRECTIONAL TRAINING FACILITY_

22                      Address: _P.O. Box 686, SOLEDAD, CA 93960_

23          2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26      __664/187 PC_____    -      ATTEMPTED MURDER_____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS       - 2 -

3. Did you have any of the following?

| | | |
|---|---|---|
| Arraignment: | Yes __X__ | No _____ |
| Preliminary Hearing: | Yes __X__ | No _____ |
| Motion to Suppress: | Yes __X__ | No _____ |

4. How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone_____    Judge alone on a transcript _____

6. Did you testify at your trial?                        Yes __X__    No _____

7. Did you have an attorney at the following proceedings:

| | | | |
|---|---|---|---|
| (a) | Arraignment | Yes __X__ | No _____ |
| (b) | Preliminary hearing | Yes __X__ | No _____ |
| (c) | Time of plea | Yes __X__ | No _____ |
| (d) | Trial | Yes __X__ | No _____ |
| (e) | Sentencing | Yes __X__ | No _____ |
| (f) | Appeal | Yes __X__ | No _____ |
| (g) | Other post-conviction proceeding | Yes _____ | No __X__ |

8. Did you appeal your conviction?                        Yes _____    No _____

    (a)    If you did, to what court(s) did you appeal?

| | | |
|---|---|---|
| Court of Appeal | Yes _____ | No _____ |
| Year: _____    Result:_____ | | |
| Supreme Court of California | Yes _____ | No _____ |
| Year: _____    Result:_____ | | |
| Any other court | Yes _____ | No _____ |
| Year: _____    Result:_____ | | |

    (b)    If you appealed, were the grounds the same as those that you are raising in this

| | | | |
|---|---|---|---|
| 1 | | petition? | Yes _____ No _____ |

(c) Was there an opinion?                    Yes _____ No _____

(d) Did you seek permission to file a late appeal under Rule 31(a)?

Yes _____ No _____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                    Yes _____ No  X

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.   Name of Court: ___ CALIFORNIA SUPREME COURT _____

Type of Proceeding: __ HABEAS CORPUS _____

Grounds raised (Be brief but specific):

a. ___ SAME AS HERE _____

b. _____

c. _____

d. _____

Result: ___ DENIED _____ Date of Result: 3/19/08

II.  Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS      - 4 -

1    a._____

2    b._____

3    c._____

4    d._____

5    Result: _____Date of Result:_____

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10    b._____

11    c._____

12    d._____

13    Result: _____Date of Result:_____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No_____

24    Name and location of court: _____

25    **B. GROUNDS FOR RELIEF**

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27    support each claim. For example, what legal right or privilege were you denied? What happened?

28    Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One:_____SEE ATTACHED_____

6   _____

7       Supporting Facts:_____SEE ATTACHED_____

8   _____

9   _____

10  _____

11      Claim Two:_____

12  _____

13      Supporting Facts:_____

14  _____

15  _____

16  _____

17      Claim Three:_____

18  _____

19      Supporting Facts:_____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

**THE BOARD VIOLA. .D PETITIONER'S RIGHT TO ∟ .E PROCESS BECAUSE THE DENIAL OF PAROLE IS NOT SUPPORTED BY THE THE EVIDENCE. THE BOARD'S SOLE RELIANCE ON THE COMMITMENT OFFENSE TO DENY PAROLE LONG AFTER HE SERVED HIS MINIMUM SENTENCE DOES NOT CONSTITUTE "SOME EVIDENCE" AS REQUIRED BY DUE PROCESS. THE DECISION WAS ARBITRARY AND CAPRICIOUS.**

## A. <u>BACKGROUND</u>

"In the spring of 1990, Ruvalcaba (Petitioner) and victim June Hidalgo, began a romantic relationship. During the following two to three months, the two spent a great deal of time together, evenings and weekends. During this time, the two became intimate physically and in late April, the defendant asked the victim to marry him. Approximately two weeks later, the victim told Ruvalcaba that she no longer wanted to go out with him. Ruvalcaba became extremely upset, crying and locking himself in the bedroom all night. The following day, May 4, 1990, Ruvalcaba came out of his room to help his brother with a stalled vehicle. This was when Ruvalcaba acquired the handgun used in the attempted homicide locating the gun in his uncle's toolbox. After starting the stalled vehicle, Ruvalcaba set out to the victim's home and contacted the victim's grandmother. He went to a mutual friend's home, Corey, who stated that he and other friends at the apartment were waiting for June to arrive. While there, the victim called and, after speaking to her friends, the defendant got on the telephone asking her why she was breaking up with him. The victim told him that she no longer wanted to speak to him and hung up on him. Ruvalcaba began to cry and told his friends, 'I'm going to get that bitch,' and 'Nice knowing you guys.' He then followed Stacey Cushman, one of their mutual friends, from the apartment to the Mt. Diablo High School tennis courts where she and June had earlier agreed to meet. Upon the arrival of the victim at the parking lot of the high school on a motorcycle driven by Ron Adams, Ruvalcaba drove up in his car, exited the vehicle with a gun in his hand. The victim cried out, 'Jose, no!' and bent down, cowering and putting her hand protectively over her head. Ruvalcaba pulled the trigger but no bullet came out. He then fired three more times, hitting the victim through her hand and entering the rear of her head. She collapsed and the defendant then shot himself in the head as well. Both were transported to John Muir Trauma Center. The victim was in a coma for ten days and remained hospitalized for two months. As a result of the bullet wound to her head, June Hidalgo sustained permanent serious visual impairment. She has no direct vision and can no longer see shapes in detail, nor can she read. Ruvalcaba sustained a head wound that affected his speech, necessitating extensive speech therapy." HT: 23

## B. <u>EVIDENCE IN SUPPORT OF PAROLE</u>

Sentence:      7 years to life
MEPD:          October 30, 1998
Time served:      17 years
MATRIX FOR 664/187PC:      10-11-12 years

Self Help programs:

| | |
|---|---|
| 12/95 | Laubach Literacy |
| 5/26/96 | AA Chrono to present |
| 7/21/97 | Ethics and Values |
| 10/22/97 | Personal Devotion Discipline |
| 4/27/98 | Time and Money Management |
| 4/13/01 | Peer Education |
| 08/2002 | IMPACT workshop |
| 10/5/06 | Cage Your Rage |
| 02/2007 | Alternatives to Violence |

Education/Vocation:

| | |
|---|---|
| 3/31/98 | Vocational Auto Body |
| 2/23/99 | Received GED |
| 2/06/02 | Advance Business Application |
| 08/2003 | Information technologies |

2004 PSYCH REPORT BY DR. ZIKA: "In this clinician's opinion, the inmate is completely prepared to be released on parole, and it is my expectation that he will comply with all of the conditions of parole without difficulty." (EXH. B)

2006 PSYCH REPORT BY DR. MACOMBER: "In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, social relationships and other factors to determine current risk level on parole. He obtained a score of 0.8 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 99 of them. This is an extremely low risk level. As a result, he poses no more risk to society than the average citizen in the community. In fact, based upon his self-understanding, life experiences, growth and maturity over the years, he probably poses less risk to society than the average citizen in the community." (EXH. B)

## C. **THE BOARD'S DECISION**

Presiding Commissioner Mike PRIZMICH: "We are going to deny you and we are going to deny you for one year.

But if you would hear us out, we believe that there's no question in our mind that you feel horribly sorry for the events that occurred, as you should because you have correctly pointed out that you certainly destroyed that woman's life. Sir, you've destroyed your own life. You have a potential that has gone untapped other than you've come to grips with this horrible crime, you know, that you did. That's at least something in terms of you.

Your family has suffered, you know, and her family has certainly suffered. Your friends that were surrounding this have all suffered and I think you have a wonderful grasp of all that.

So, the panel has reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole

and would pose an unreasc .able risk of danger to society o. threat to public safety if released from prison.

The offense was carried out in an especially cruel manner. Your intention was the ultimate form of possession, whether you like that word or not.

The offense was carried out dispassionately.

The offense was carried out in a manner in which demonstrates disregard for human suffering. The motive was jealousy, possessiveness. Again, maybe words that you don't like, sir, but in fact, that's what occurred. You tried to ultimately remove her from society and remove yourself from society, which is the ultimate selfish act on the part of you and we're glad to see that you've come to grips with that because that's the first part of becoming a better human being.

We note that you have virtually no criminal record. You have no juvenile record, nor adult record, sir. So there is no escalation pattern. This seemed to be some form of isolated event.

You've done well while in prison. We want to note that there was one 115 that was some 11 years ago. We've heard your explanation as to that 115. It sounds reasonable.

I specifically asked you questions about AA. You have a good grasp of the steps. Your effort to write that sweet letter to the victim we think is a, you know, is a manifestation of what the 12 steps have taught you.

We note in your psychological reports, the last several, they seem to be favorable toward you. There is no question that you've come to grips with the crime.

We do recognize that you have done an extensive amount of work with regard to your parole plans. You have two vocations that are well·sought after vocations.

You've got plans with respect to an INS situation that may come into play to live down in a number of places in Mexico with relatives.

So sir, we'd like you to have you do some more self-help work, some more AA work, some more delving yourself into Jose and you know, what, rather than just thinking about and doing some work on what you can do when you meet a similar, because I guarantee you will, a frustrating situation." HT: 113

## D. DUE PROCESS IN THE PAROLE CONTEXT

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. U.S. Const. Amends. V, XIV. It is now settled that California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007) (citing Sass v. Calif. Bd. Of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002). Due process accordingly requires that a parole board premise its decision on "some evidence in the record" such that it is not arbitrary. Sass, 461 F.3d at 1128-29 (quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)). The "some evidence"

standard is clearly establi\_ .d federal law in the parole cor\_ .t for purposes of section 2254(d). Id. at 1129.

The Supreme Court set forth the "some evidence" standard in Superintendent v. Hill, which concerned the revocation of "good time" credits towards parole based on inmate misconduct. 472 U.S. at 455. The Court rested its holding upon the foundation laid in Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974). As the Court noted, Wolff required, among other things, that an inmate receive "a written statement by the fact finder of the evidence relied on and the reasons" for the deprivation of his good time credits. Hill, 472 U.S. at 454 (citing Wolff, 418 U.S. at 565). The Court then added to Wolff: "[R]evocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record." Hill, 472 U.S. at 455 (quoting Wolff, 418 U.S. at 558).

The "some evidence" standard does not permit the court to "reweigh the evidence." Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994). Instead, the inquiry is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Hill, 472 U.S. at 455-56. While this test is minimally stringent, it must at minimum protect an inmate's "strong interest in assuring that the loss of [parole] is not imposed arbitrarily." Id. at 454.

Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904. Relevant in this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the board. See Pedro v. Oregon Parole Bd., 825 F.2d 1396, 1399 (9th Cir. 1987).

## E. **STATE PAROLE STANDARDS**

California prescribes indeterminate sentences for non-capital murders: 25 years to life for first degree murder and 15 years to life for second degree murder. Cal. Penal Code section 190. 7 to life for attempted murder. Cal. PC section 664/187. One year prior to the expiration of a prisoner's minimum sentence, a BPH panel meets with the inmate and "set[s] a release date unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy incarceration." Cal. Penal Code section 3401(a). Regardless of the length of

time served, "a life prisone. _hall be found unsuitable for a_  _enied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. Section 2402(a).

California's parole scheme requires both the Governor and the BPH have "some evidence" that the inmate will be a continuing threat to society in order to deny parole. See In re Dannenberg, 34 Cal.4th 1061, 1095 (2005).

## F. **ANALYSIS**

The critical issue in this case is whether Petitioner's commitment offense alone can satisfy the "some evidence" standard more than 17 years after he committed the offense. Under the circumstances of this case, Petitioner submits that it cannot.

The Ninth Circuit's recent opinion in Irons shed some light on whether reliance on an immutable factor such as the commitment offense violates due process. Although the court affirmed the BPH's denial of parole for Irons, it made clear that "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Irons, 479 F.3d at 665 (citation and footnote omitted). In two earlier cases, Biggs and Sass, the court had also affirmed the BPH's denial of parole, but made contradictory observations on the effect of continued denial of parole based solely on unchanging factors such as the inmate's commitment offense and/or prior criminal history. Compare Biggs, 334 F.3d at 917 ("continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation") with Sass, 461 F.3d at 1129 ("it is not our function to speculate about how future parole hearings could proceed"). Irons limited the holdings of Biggs, Sass and itself to inmates deemed unsuitable prior to the expiration of their minimum sentences and held the door open for inmates deemed unsuitable after the expiration of their minimum sentences: "All we held in [Biggs and Sass,] and all we hold today, ... is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Id. Petitioner was deemed unsuitable by the Board more than 9 years after the expiration of his 7 year minimum sentence.

Biggs, Sass and Irons resemble one another factually. All three involved inmates who had not yet served their minimum prison sentences, and all three involved convicted murderers, although the severity of each differed. In all three cases, the Board relied solely on the inmate's immutable commitment offense and/or prior criminal history in denying parole.

Biggs presented the most serious offense of the three. Biggs was convicted of first-degree felony murder for participating on a 1981 plot to kill a witness in a criminal proceeding against his employer. Biggs, 334 F.3d at 912. While Biggs refused to actually kill the victim, he lured the victim into a trap, "was present at the location during the murder, paid money to the co-conspirators, and returned with the killers in an attempt to better conceal the body." Id. at 912, 916. Biggs was convicted for first-degree murder and sentenced to 25 years to life in prison with the possibility of parole. Id. at 912.

Sass' offense was less grave, despite the numerosity of his convictions. In 1988, after causing a fatal automobile accident while driving under the influence of alcohol, Sass was convicted of second-degree murder, gross vehicular manslaughter, hit-and-run death, causing injury while driving under the influence, and felony drunk driving. Sass, 461 F.3d at 1125, 1130. Leading up to the commitment offense, Sass had seven DUI's. Id. at 1130, n.1. Sass was sentenced to 15 years to life in prison with possibility of parole. Id. at 1130.

Irons' offense falls somewhere between those in Biggs and Sass. In 1985, Irons was living in the home of a couple, with another tenant, John Nicholson. The couple suspected that Nicholson was dealing drugs and was stealing from them. Irons shared their suspicions. He confronted Nicholson and an angry argument ensued in which Nicholson denied responsibility for the thefts. Irons went to his room, retrieved his gun, and then went to Nicholson's room where he fired 12 rounds into Nicholson and, after Nicholson complained that he was in pain, stabbed him twice in the back. He then wrapped Nicholson's body in a sleeping bag and left it in the room for the ten days it took him to procure a car. Irons then took the body to the coast, weighed it down, and disposed of it in the ocean.

When the police found the body their investigation led them to ... arrest the owner of the house. Irons intervened, explained to the police that they had the wrong person, and confessed to the killing. Irons, 479 F.3d at 660. Irons was convicted of

second-degree murder and sentenced to 17 years to life in prison with the possibility of parole. Id. Prior to his conviction, he had no criminal record. Id.

Even under the Board's version of the facts, much distinguishes this case from Biggs, Sass and Irons, and pushes it beyond the point at which sole reliance on the commitment offense may be said to comport with due process. For one, Petitioner's offense in of itself is objectively less probative of future recidivism and continuing danger to society than the offenses in Biggs, Sass and Irons.

In Biggs, the Petitioner engaged in a murderous plot to save his employer from prosecution and perpetuate his criminal activity; Biggs demonstrated an anti-social willingness to not only participate in and conceal a murder, but also to disrupt the criminal justice system that protects society against such crimes. Because the murder resulted from callous forethought and conspiracy, Biggs demonstrated a lack of a moral compass that would endanger society were he released. In Sass, the petitioner killed someone as a result of his alcoholism and despite his having received seven prior DUI's; only a total recovery from his substance abuse could ensure society's safety upon release. In Irons, while the petitioner eventually turned himself in, he callously stabbed his victim after complaining of his twelve gunshot wounds and then carried out a plan over the course of ten days to dispose of the body. Though arguably less severe than Biggs' crime, Irons' crime suggest a similar lack of moral compass.

In the instant case, while a modicum of forethought was involved, there is no evidence in the record, the Petitioner was bent on deceiving the authorities as in Biggs. And while Biggs' motive was to sabotage a criminal prosecution, which is among the most dubious motives possible, Petitioner sought only to bring to an end his romantic entanglement. Unlike in Sass, Petitioner has no, let alone seven, similar offenses on his record. And unlike Irons, Petitioner did nothing so callous as firing twelve rounds into his victim and then stabbing him to quiet his complaining. Petitioner made no effort to conceal his crime; he immediately shot himself. In sum, Petitioner's offense was not the ultimate and most serious of a long string of similar crimes as was the case in Sass, nor does Petitioner's offense suggest the lack of a moral compass exhibited in Biggs and Irons.

Another critical difference between this case and Biggs, Sass and Irons is that Petitioner has served a substantial amount of time beyond his minimum sentence. This court must consider that at some point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of

"unreasonable risk of dan₋ to society" recedes below the '₋ ₋ie evidence" required by due process to support denial of parole. See Irons, 479 F.3d at 665. A decision to deny parole based solely on an inmate's commitment offense that can no longer be considered probative of dangerousness to society would be arbitrary and not comport with the "some evidence" standard. See Hill, 472 U.S. at 545-55, 547. This is one of those cases. When the Board denied the grant of parole in 2007, Petitioner had served more than 17 years in prison and exceeded his 7-year minimum sentence by more than ten years. (Petitioner has now served more than 17 years in prison.) Needless to say, Petitioner's lengthy detention has diminished the probative value of his commitment offense. In fact, not only has Petitioner's incarceration eclipsed his 7-year minimum term for attempted degree murder, but it also has eclipsed the 15-year minimum term he would have received had he been convicted of second-degree murder.

Petitioner's commitment offense would be a sufficient basis to deny parole if it indicated a risk of re-offending and of a danger to society. It does not. What underlies Petitioner's commitment offense is a series of exercises in poor judgment. Whether Petitioner is currently dangerous enough to society to preclude his parole depends on whether his judgment is likely to fail him as gravely as it did when he embarked on the conduct that led him to kill in 1990. By itself, however, Petitioner's exercise of poor judgment at age 22 is not probative, absent any more recent indicators, of his exercise of poor judgment again at his nearing the age of 40. Not only did the Board fail to point to any such indicators, but Petitioner's ultimately positive prison record over the past decade and a half indicates that he is suitable for parole.

## G. **OTHER RELEVANT DECISIONS**

Petitioner respectfully requests that the Court take a look and compare this case with others where the circumstances were more aggravated, yet reviewing courts found that due process was violated and the "some evidence" standard not met.

The Court in In re Wen Lee (2006) 143 Cal.App.4th 1400, [a multiple victims case with one person dead], found that Lee's crimes were not "especially heinous, atrocious or cruel." Additionally, the Court held, "Besides not being especially atrocious, heinous or callous, Lee's crimes have little, if any, predictive value for

future criminality. Simply from the passing of time, Lee's crimes **almost 20 years ago** have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had committed them five or ten years ago." Further, "The test is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.

In In re Jeffrey Elkins, 2006 DJDAR 14489, Elkins beat his victim over the head with a baseball bat, robbed him, put the body in his car trunk and drove to a remote area where he dumped the body. He was convicted by a jury in 1980. **He served 26 years**. The Court wrote, "The commitment offense, this court has observed, is an unsuitability factor that is immutable and whose predictive value 'may be very questionable after a long period of time.' (Scott II, supra, 133 Cal.App.4th at pp. 594-595, fn. Omitted.) We have also noted, as has our Supreme Court, strong legal and scientific support that 'predictions of future dangerousness are exceedingly unreliable,' even where the passage of time is not a factor and the assessment is made by an expert. Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation. A parole hearing does not ordinarily provide a prisoner a very good opportunity to show his offense was not committed 'in an especially heinous, atrocious or cruel manner,' even if such evidence exists and the prisoner is willing to run the risk his effort to make such a showing will be seen as unwillingness to accept responsibility and therefore evidence of unsuitability."

"Our case, while resting on state due process (Cal. Const., art. I, section 7, subd. (a)), compares favorably to cases affording habeas corpus relief on federal due process grounds, against parole denials for California inmates with exemplary post-offense records who had been sentenced to terms of at least 15 years to life for second degree murder . In one, the same inmate earlier involved in our Supreme Court's decision in Rosenkrantz had offended at age 18, shooting a younger brother's friend [while lying in wait] who had revealed the inmate's homosexuality to the

inmate's intolerant father. The inmate's 'perfect prison record and gains of nearly **two decades** included, like Elkins' act of jeopardizing his own safety to protect a correctional officer, saving the life of a fellow inmate. The Court found due process violated when the former Board of Prison Terms denied parole, as it had before, based solely on the gravity of the commitment offense. (Rosenkrantz v. Marshall (C.D. Cal. 2006 444 F.Supp.2d 1063, 1065, 1070.)

"In a second such case, former Governor Davis had reversed a BPT suitability determination, stressing principally the gravity of the commitment offense. (Martin v. Marshall (2006) 431 F.Supp.2d 1038) After first finding no support for other grounds, the court turned to the factors surrounding and preceding the offense, which included the 26-year-old petitioner fleeing the scene of his fatally shooting a drug dealer acquaintance and bystander in a blaze of gunfire at a restaurant, wounding yet another bystander, and without seeking medical assistance for any of his victims. The court reasoned: 'Petitioner has surpassed his minimum sentence, and has already been found suitable for parole by two decision-making bodies ... He has been in prison for approximately 26 years and has taken advantage of numerous rehabilitation and enrichment programs. He has exceeded his minimum sentence by approximately six years ... The Governor's sole reliance on the circumstance of the offense and conduct prior to the offense, constitutes a due process violation.'"

"A third instructive case is Irons v. Warden of Solano (2005) 358 F.Supp.936 (Irons) (app. pending sub nom. Irons v. Carey (9th Cir. 2005) 408 F.3d 1165, No. 05-15275), where an inmate serving 17 years to life was found unsuitable for parole at his 5th hearing before the BPT. The facts of the offense, again, in many respects far worse than those before us. The petitioner killed a fellow boarder after an argument in which the victim denied stealing from the landlords, as the landlords had claimed. The petitioner loaded a handgun, went to the victim's room, fired 12 rounds into him, said he was going to let him bleed to death and, when the victim complained of the pain, took out a buck knife and stabbed him twice in the back. The petitioner later borrowed a car and drove the body to an isolated coastal location where he released it into the surf. The BPT had relied exclusively on the facts of the commitment offense and the petitioner's drug use at the time. The Court wrote:

'Important in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole ... The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial.' ... **After 15 or so years** in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not posses those attributes, the predictive ability of the circumstances of the crime is near zero."

In <u>Rio v. BPT Commissioners</u>, ND No. C 05-1483 MPH (Dec. 2006), a case involving a petitioner convicted of second degree murder even though not the actual shooter, Judge Patel wrote: "The BPT considered the circumstances of the murder and concluded that it was an carried out in a cruel and callous manner, carried out in a manner which demonstrates exceptionally callous disregard for human suffering, and was done for a trivial motive." Rio and his crime partners Amaro and Willie went to Roberto Hernandez's apartment under the pretense of purchasing jewelry. During the robbery, Willie shot Hernandez in the back of the head. The Judge went on to say, "There was not sufficient evidence to support the finding that the circumstances of the commitment offense tended to show unsuitability. The BPT looked at the killing without any attention paid to Rio's role in that killing. The BPT's approach fails to distinguish between the actual killer and those who may be held liable based on their role in the crime such as aiding and abetting or under a felony murder theory as it rates all of them the same on the dangerousness scale. Not only does that approach seem contrary to common sense, it also is contrary to the wording of the regulation. The regulation calls for the BPT to consider whether 'the prisoner committed the offense in an especially heinous, atrocious or cruel manner,' indicating that the focus is on the parole candidate's particular actions in the killing ... Here, Rio was present when his crime partner killed the victim. The evidence also was that Rio was there for a robbery and the shooting of the victim was rather

unexpected to Rio. There was no evidence that Rio was the leader of the criminal episode, and no evidence that Rio directed the killing or otherwise urged the killer to kill. Under the circumstances, his crime partner's execution-style killing does not provide some evidence that Rio 'committed the offense in an especially heinous, atrocious or cruel manner.' The state may hold a person criminally liable when his crime partner kills during a robbery, but the BPT has a different chore. The BPT is charged with determining whether a prisoner is suitable for parole, not whether he may be held liable for the killing in the first place. **The evidence in the record does not support a finding that Rio committed the offense in an especially heinous, atrocious or cruel manner."**

Finally, In <u>Willis v. Kane</u>, 2007 WL 1232060 (N.D.Cal.), Willis killed his 19-month old daughter in 1983. He hit her several times in the head and failed to obtain medical help when she exhibited signs of distress. After the baby was dead, Willis disposed of her body by first hiding it in a closet and then putting it in a dumpster. The BPH found Willis unsuitable for parole, relying primarily on the circumstances of the offense. The BPH also stated that Willis had not sufficiently participated in beneficial self-help and therapy programming and that he did not have realistic parole plans. The Court **granted relief** and noted that "[W]hen the totality of circumstances are considered, Willis' 1983 crime did not provide sufficient evidence to find him unsuitable for parole in 2003. Willis' case is the kind of case <u>Biggs</u> and <u>Irons</u> cautioned about: the continued reliance on the immutable events of the crime to deny parole for present dangerousness despite the candidate's exemplary behavior in prison, favorable current psychological reports, and the absence of any other violence or criminal record." The Court also noted that Willis apparently had been in custody even longer than his **18 years** in the state prison system because he had earned credits for time spent in custody before his arrival in the state prison system. When Willis was denied parole in 2003, it was the **seventh time** he was found unsuitable for parole. *It appears that the commitment offense was the paramount reason at each decision, as Willis' otherwise favorable profile had not changed in years: almost discipline-free in prison, no substance abuse problem, a stable social history and no criminal activity other than the murder.*

## CONCLUSION

The Board's decision was arbitrary and capricious. The Petitioner did not receive a fair hearing, nor will he ever.

Petitioner submits and contends that the finding of unsuitability was arbitrary and capricious:

1). Due to the Board carrying out it's political function of adhering to a no or anti-parole policy;

2). Due to the Board's acting contrary to the intent and spirit of PC § 3041 (a);

3). Due to basing its decisions on unsupported allegations; and

4). Due to the Board's refusal to adhere to aforementioned decisions and the controlling authorities.

Petitioner prays this Court order him released and /or discharged, or at the very least, direct the Board to issue a decision within ten (10) days granting parole, setting his term "uniformly" as mandated by the legislature.

### H. PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis.

2. Appoint Counsel.

3. Conduct an Evidentiary Hearing.

4. Order Petitioner's appearance before the Court.

5. Order Petitioner taken back before the Board for a finding of suitability within ten (10) days, or in the alternative, order Petitioner released forthwith;

6. Declaratory relief, and

7. Any other relief this Court deems fair, just and appropriate.

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3  of these cases:

4  _____

5  _____

6  _____

7  Do you have an attorney for this petition?                    Yes____      No  X

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _____ _05 -12-08_____

14              Date                              Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 7 -

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _____ JOSE RUVALCABA _____, declare:

I am over 18 years of age and a party to this action. I am a resident of _____

_____ CORRECTIONAL TRAINING FACILITY-SOLEDAD _____ Prison,

in the county of _____ MONTEREY _____,

State of California. My prison address is: P.O. BOX 689, SOLEDAD, CA 93960 ,

_____.

On_____,
          (DATE)

I served the attached: _____ PETITION FOR WRIT OF HABEAS CORPUS _____

_____
(DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

OFFICE OF THE ATTORNEY GENERAL
455 GOLDEN GATE AVE., SUITE 11000
SAN FRANCISCO, CA 94102-7004

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on __05-12-08__                    _____
          (DATE)                              (DECLARANT'S SIGNATURE)

Civ-69 (Rev. 9/97)                                    ::ODMA\PCDOCS\WORDPERFECT\22832\1

-9-

S155922

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JOSE RUVALCABA on Habeas Corpus

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

MAR **1 9** 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

# EXHIBIT A
# (2007 HEARING TRANSCRIPT)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life      )        CDC Number:   H-21975
Term Parole Consideration      )
Hearing of:                    )
                               )
JOSE RUVALCABA                 )        INMATE COPY
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2007

1:06 P.M.


PANEL PRESENT:

MIKE PRIZMICH, Presiding Commissioner
RUFUS MORRIS, Deputy Commissioner

OTHERS PRESENT:

JOSE RUVALCABA, Inmate
MARY ANN TARDIFF, Attorney for Inmate
JOHN COPE, Deputy District Attorney


CORRECTIONS TO THE DECISION HAVE BEEN MADE

              No      See Review of Hearing
              Yes     Transcript Memorandum




Heather Whittington, Capitol Electronic Reporting

# I N D E X

Page

Proceedings........................................     3

Case Factors.......................................    22

Pre-Commitment Factors.............................    32

Post-Commitment Factors............................    41

Parole Plans.......................................    69

Closing Statements.................................    93

Recess.............................................   112

Decision...........................................   113

Adjournment........................................   125

Transcript Certification...........................   126

1               **P R O C E E D I N G S**

2     **PRESIDING COMMISSIONER PRIZMICH:** Good afternoon,

3 Mr. Ruvalcaba.

4     **INMATE RUVALCABA:** Good afternoon, Sir.

5     **PRESIDING COMMISSIONER PRIZMICH:** Did I say that

6 right, sir?

7     **INMATE RUVALCABA:** Yes, Sir, yes.

8     **PRESIDING COMMISSIONER PRIZMICH:** Sir, this is a

9 Subsequent Parole Consideration Hearing for Jose

10 Ruvalcaba, sorry, CDC number H as in Henry 21975.

11 Today's date is 5/9/07 and the time is 1:06. We're

12 located at CTF, Soledad.

13     The inmate was received on 1/28/92, committed

14 from Contra Costa County. The life term began on

15 1/28/92. The inmate's minimum eligible parole date is

16 10/30/98.

17     The controlling offense for which the inmate is

18 committed is set forth in case number 9101528, that's

19 9101528, charging count one of attempted murder, Penal

20 Code section 664187.

21     The inmate received a term of, and Mr. Ruvalcaba,

22 I want to let you know that we're having a little bit of

23 discussion, your Attorney, the DA, and myself, relative

24 to your life term. It's a little bit confusing, so what

25 we're going to do, I'm going to call it seven years to

1  life because that's what all the other Hearing Panels

2  have decided, that it's seven years to life, but there

3  was sufficient concern on our part that I'm going to ask

4  for Board of Parole Hearings to look into and calculate

5  your term to make sure we have this correct.

6      So I just wanted to let you know, but right now

7  and for purposes of this hearing, it's a life term plus

8  seven, it looks like.  Is that fairly stated?  Okay.

9      Sir, we're going to go around the room right now.

10  I know you've been through these hearings before.  We're

11  going to go around the room and identify ourselves.

12      **INMATE RUVALCABA:**  Yes, Sir.

13      **PRESIDING COMMISSIONER PRIZMICH:**  And that's for

14  purposes of later transcription.  The lady or the guy

15  that transcribes this needs to know who's talking at any

16  given time.  So the way we're going to do that is I'm

17  going to introduce myself, saying my first name and

18  saying my last name and I'm going to spell my last name.

19  And we're going to do that same thing right on around

20  the room to my left until it gets to you, sir, and

21  you'll say your first name, say your last name, spell

22  your last name, and then provide us with your CDC

23  number, okay.

24      **INMATE RUVALCABA:**  Yes, Sir.

25      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  My name

1   is Mike Prizmich, P-R-I-Z-M-I-C-H.

2   **DEPUTY COMMISSIONER MORRIS:** Rufus Morris, that's

3   M-O-double R-I-S, Deputy Commissioner.

4   **DEPUTY DISTRICT ATTORNEY COPE:** John Cope, I'm

5   sorry, John Cope, C-O-P-E, Contra Costa County DA.

6   **ATTORNEY TARDIFF:** Mary Ann Tardiff, T-A-R-D-I-

7   double F, Attorney for Mr. Ruvalcaba.

8   **INMATE RUVALCABA:** My name is Jose, Jose

9   Ruvalcaba. My last name is R-U-V-A-L-C-A-B-A and my CDC

10   number is H-21975.

11   **PRESIDING COMMISSIONER PRIZMICH:** Okay. Thank

12   you, sir. For purposes of the record, allow it to

13   reflect that there are two correctional officers in the

14   room. They are not participating other than for

15   security purposes.

16   Sir, you have sitting in front of you a piece of

17   paper that's taped down to the desk. Could you read

18   that aloud for us? We're not intending to embarrass you

19   in any way. We just want to make sure we're evaluating

20   your ADA rights and making sure everybody gets that

21   down. So if you'd read that, I'd appreciate it.

22   **INMATE RUVALCABA:**

23   "Okay, ADA, Americans with Disability Act.

24   The Americans with Disability Act, ADA, is a law

25   to help people with disabilities. Disabilities

1    are problems that make it harder for some people

2    to see, hear, breathe, talk, walk, learn, think,

3    work, and take care of themselves than it is for

4    others.  Nobody can be kept out of public places

5    or activities because of disabilities.

6         "If you have a disability, you have the

7    right to ask for help to get ready to BPT

8    Hearing, get the hearing, talk, read forms and

9    papers, and understand the hearing process.  BPT

10   will look at what you've asked for to make sure

11   that you have the disability that is covered by

12   the ADA and that you have asked the right kind of

13   help.

14        "If you don't get help and if you don't

15   think you got the kind of help you need, ask the

16   BPT 1074 grievance form.  You can also get help

17   to fill it out."

18   **PRESIDING COMMISSIONER PRIZMICH:**  Okay, sir.  You

19   read that.  Did you understand what you read?

20   **INMATE RUVALCABA:**  Yes, Sir.

21   **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  And on

22   the last one of the words there, you said it was a

23   grievance, that's a grievance form.

24   **INMATE RUVALCABA:**  Grievance, okay.

25   **PRESIDING COMMISSIONER PRIZMICH:**  Do you know

1    what a grievance is?

2         **INMATE RUVALCABA:** Okay.

3         **PRESIDING COMMISSIONER PRIZMICH:** So if you have

4    an objection to something, you can -- You can take issue

5    with that and try to voice your concerns with it.  I

6    just want to make sure you understand.

7         **INMATE RUVALCABA:** Okay.  I understand, Sir.

8         **PRESIDING COMMISSIONER PRIZMICH:** Okay.  With

9    that, I want to note that you signed a BPT form 1073.

10   Now, that's the form that they go over with you to

11   determine if you have any ADA rights that need to be

12   addressing.  And in that form, we note that you did not

13   identify any ADA issues that you need assistance with,

14   except for there's a note right here and I want to make

15   sure we have this right.

16        The reason you request a Spanish interpreter was

17   solely for the purpose of interpreting the letters; is

18   that understanding, is that correct, sir?

19        **INMATE RUVALCABA:** Yes, Sir, yes.

20        **PRESIDING COMMISSIONER PRIZMICH:** So you

21   understand what we're saying here.

22        **INMATE RUVALCABA:** Sir, yes.

23        **PRESIDING COMMISSIONER PRIZMICH:** It's just that

24   some of the letters that you got on your behalf were

25   written in Spanish and either you didn't understand it

*Capitol Electronic Reporting*

1   or you wanted to make sure we understood it; is that --

2   Is that accurate?

3        **INMATE RUVALCABA:** Yes, Sir.  Yes, Sir.

4        **PRESIDING COMMISSIONER PRIZMICH:** Okay.  All

5   right.  I just wanted to make sure because there's this

6   note here and I don't want to -- I don't want to leave

7   that dangling there without you getting all the rights

8   that are due you.

9        Sir, did I note the date that you signed?  I

10   should do that.  1/31/07 is when you signed that.

11        I'm going to ask you some more questions designed

12   to explore whether there are issues that you may have

13   with regard to Americans with Disabilities Act.  So I'm

14   going to ask you some questions.  Would you just

15   respond?  I'd appreciate that.

16        Sir, can you -- Do you have any difficulty

17   walking a distance of 100 yards or more?

18        **INMATE RUVALCABA:** Well, after I had my back

19   surgery, I've been having troubles with my nerves on my

20   knees and on the bottom of my foot.

21        **PRESIDING COMMISSIONER PRIZMICH:** Okay.

22        **INMATE RUVALCABA:** But I can, I be walking right

23   here.  I'll be going to the yard and walk a lot, so.

24        **PRESIDING COMMISSIONER PRIZMICH:** Okay.  You can

25   walk.

1            INMATE RUVALCABA:  Yeah, I can walk.

2            PRESIDING COMMISSIONER PRIZMICH:  It's just that

3    it causes you some difficulty?

4            INMATE RUVALCABA:  Yeah, difficulty.

5            PRESIDING COMMISSIONER PRIZMICH:  But that

6    wouldn't have any impact on this hearing here today, do

7    you think?

8            INMATE RUVALCABA:  No, of course not.  No, Sir.

9            PRESIDING COMMISSIONER PRIZMICH:  No, okay.  Do

10   you have any difficulty walking up and down stairs?  I

11   would imagine there is some difficulty for you as well.

12           INMATE RUVALCABA:  In some way.  Yeah, I get pain

13   on my knees sometimes when I walk up and down the

14   stairs.

15           PRESIDING COMMISSIONER PRIZMICH:  Okay.

16           INMATE RUVALCABA:  But I don't -- I don't use my

17   hand to grab the rail or that, you know.  Well, back

18   then it was kind of difficult.  Now I can do it better

19   because I get -- My knees have got straightened up a

20   little bit.

21           PRESIDING COMMISSIONER PRIZMICH:  Okay.  All

22   right, good.  I noticed when you read your ADA form you

23   didn't use glasses.  Do you need glasses to see in any

24   way, shape, or form?

25           INMATE RUVALCABA:  No, Sir.

1       **PRESIDING COMMISSIONER PRIZMICH:**   You don't need

2    to see distance with glasses or up close or anything?

3       **INMATE RUVALCABA:**   I think I'm okay on that

4    problem.

5       **PRESIDING COMMISSIONER PRIZMICH:**   You're okay.

6    Okay.  And you had no trouble reading that, I guess,

7    huh.  You can see okay.

8       **INMATE RUVALCABA:**   No, I'm okay (indiscernible).

9       **PRESIDING COMMISSIONER PRIZMICH:**   Sir, do you

10   have any hearing impairments or difficulties?

11      **INMATE RUVALCABA:**   No.

12      **PRESIDING COMMISSIONER PRIZMICH:**   When we were

13   going around introducing ourselves, when we went around

14   the room, you could hear all of us talking pretty

15   easily?

16      **INMATE RUVALCABA:**   Yes, yes, I did, Sir.

17      **PRESIDING COMMISSIONER PRIZMICH:**   And I would ask

18   you, sir, that if one or more of us, if we -- If our --

19   If our voices start getting lower that you can't hear,

20   that you'd let us know in a polite way obviously.  But

21   you let us know you're not hearing us and we'll do the

22   same for you.  We want to make sure everybody is heard

23   and --

24      **INMATE RUVALCABA:**   Okay, thank you, Sir.

25      **PRESIDING COMMISSIONER PRIZMICH:**   Have you ever

 1  been included in the Triple-CMS or EOP mental health

 2  program, sir?

 3          **INMATE RUVALCABA:**  I don't think so, no.  Only

 4  medication I've been using is just for the pain I be

 5  getting on my --

 6          **PRESIDING COMMISSIONER PRIZMICH:**  For your back?

 7          **INMATE RUVALCABA:**  Yeah, yeah.

 8          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

 9  right.  But you've had no -- You've had no involvement

10  with Triple-CMS or EOP?

11          **INMATE RUVALCABA:**  No, no, Sir.  No.

12          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

13  right.  Have you ever taken any psychotropic medication

14  either in prison or out in the street?

15          **INMATE RUVALCABA:**  No, no, Sir.

16          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Sir, how

17  far did you get in school?

18          **INMATE RUVALCABA:**  Well, in Mexico I went to --

19  It's either nine and then when they -- When they brought

20  me here to this country, they put me on high school and

21  they put me on 10.  And I did 10 and I did 11, but I did

22  a lot of ESLs in those two years that I went to high

23  school.

24          **PRESIDING COMMISSIONER PRIZMICH:**  English as a

25  Second Language?

1           **INMATE RUVALCABA:**  Yes, Sir, yes.

2           **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  So you

3    believe that currently you've gotten to 11th grade?

4           **INMATE RUVALCABA:**  Yes, Sir, yes.

5           **PRESIDING COMMISSIONER PRIZMICH:**  Is that -- Did

6    you -- Have you -- You didn't graduate then?

7           **INMATE RUVALCABA:**  No, no, Sir.

8           **PRESIDING COMMISSIONER PRIZMICH:**  What about

9    since in prison?  Did you get your GED?

10          **INMATE RUVALCABA:**  I went and got my GED in here,

11   yes, Sir.

12          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Okay.

13   While you were in school, either in Mexico or up here in

14   the 10th and 11th grade, did you take any Special

15   Education classes, sir?

16          **INMATE RUVALCABA:**  Not exactly, no.

17          **PRESIDING COMMISSIONER PRIZMICH:**  Other than your

18   --

19          **INMATE RUVALCABA:**  Just the normal stuff, yes.

20          **PRESIDING COMMISSIONER PRIZMICH:**  The language

21   barrier that you were learning under.  Okay.

22          **INMATE RUVALCABA:**  Yes, Sir.

23          **PRESIDING COMMISSIONER PRIZMICH:**  All right.

24   Sir, do you suffer from any disabilities that you could

25   think of that might prevent you from fully participating

1    in this hearing today?

2          **INMATE RUVALCABA:**  No, I'm okay on that.

3          **PRESIDING COMMISSIONER PRIZMICH:**  You're okay?

4          **INMATE RUVALCABA:**  Yes, Sir.

5          **PRESIDING COMMISSIONER PRIZMICH:**  Is there any --

6    There was a little question in your mind.  Is there

7    something that we should know?

8          **INMATE RUVALCABA:**  No.  The pain I receive, I get

9    every day.  I begin pain since 2002, since I messed up

10   my legs doing exercise in the yard.  Since then, the

11   rest is normal.

12         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.

13         **INMATE RUVALCABA:**  I can sit and walk at a normal

14   pace, you know.

15         **PRESIDING COMMISSIONER PRIZMICH:**  Well, I'll tell

16   you.  When you get to our age, you'll have other pains

17   that get to deal with.

18         **INMATE RUVALCABA:**  Okay, okay, Sir.

19         **PRESIDING COMMISSIONER PRIZMICH:**  And it's a lot

20   of fun.  Ms. Tardiff, have your client's ADA rights been

21   addressed?

22         **ATTORNEY TARDIFF:**  Yes.

23         **PRESIDING COMMISSIONER PRIZMICH:**  Sir, I'm going

24   to explain to you what the hearing process is here

25   today.  So if you'd just bear with me, I'm going to do

```
 1   some reading and outline what we'll be doing here today.

 2         This hearing is being conducted pursuant to Penal

 3   Code section 3041 and 3042 and the rules and regulations

 4   of the Board of Parole Hearings governing Parole

 5   Consideration Hearings for life inmates.  The purpose of

 6   today's hearing is to consider your suitability for

 7   parole, sir.

 8         To accomplish this, we will consider the number

 9   and nature of crimes you were committed for, your prior

10   criminal and social history, and your behavior and

11   programming since your commitment.

12         We've had an opportunity to review your central

13   file and you will be given an opportunity to correct and

14   clarify that record.  We will consider your progress

15   since your commitment, your Counselor's report, and your

16   psychological reports.

17         Do you understand this thus far, sir?

18         INMATE RUVALCABA:  Yes, Sir, yes.

19         PRESIDING COMMISSIONER PRIZMICH:  Okay.  Sir, any

20   changes in your parole plans, and I understand that we

21   have, you know, some parole plans here and it looks like

22   you have a (indiscernible) you're going to be giving me.

23   We'll get -- We'll receive that in just a minute.  Any

24   changes in your parole plans should be brought to our

25   attention today.  So we want to make sure you get credit
```

```
 1  for all the work that you've done with regard to parole,
 2  so the newest stuff is really what we need to look at.
 3       Sir, we will reach a decision today and inform
 4  you whether or not we find you suitable for parole and
 5  we will provide you with the reasons for our decision.
 6  If you are found suitable for parole, your length of
 7  confinement will be explained to you.
 8       Before we go any further, I want to advise you
 9  that we expect you, sir, to be totally honest with us
10  today.  Not only is honesty just a good practice to
11  follow, in this particular case, if you are not found
12  suitable for parole in this hearing today, the
13  information you provide us and the information you have
14  provided us in the past will form the foundation for
15  future hearings.
16       So if you're -- If you're stretching the truth or
17  not being truthful, it could affect you in an adverse
18  way and we wouldn't want that to happen and certainly
19  you wouldn't.
20       Nothing that happens here today will change the
21  finding of the court.  We're not here to retry your
22  case.  Now, sir, we may ask you some questions about the
23  case.  You may choose to answer those or not, but our
24  sole purpose for asking you those questions or any
25  questions here today is to try to determine on our part
```

1  if you're suitable for parole.

2       So that's the whole basis of us looking into it.

3  So we may talk about the crime, but we're not here to

4  retry it.

5       The hearing will be conducted in two phases.  I

6  will discuss with you the crime you were committed for,

7  your prior criminal and social history, your parole

8  plans, and any letters of support or opposition that may

9  be on file.

10      Deputy Commissioner Morris will discuss with you

11  your progress since your commitment, your Counselor's

12  report, and your psychological evaluation, sir.

13      Once this is concluded, that is, once we've

14  covered all this information, the Commissioner and

15  myself may have other questions to ask of you regarding

16  what we've just covered.  We'll give the District

17  Attorney from Contra Costa County an opportunity to ask

18  you questions, sir.  And we'll give your Attorney an

19  opportunity to ask you questions.

20      Once all that's done, once we've kind of got all

21  that information out, the DA from Contra Costa will be

22  given an opportunity to make a closing statement, your

23  Attorney will be given an opportunity to make a closing

24  statement, and you, sir, will be given an opportunity to

25  make a closing statement.  Your closing statement should

1    address us as to why you feel you're suitable for

2    parole, okay.

3         Once that's all completed, we will recess for

4    deliberations, wherein we'll consider all the

5    information that we received, both written and verbally

6    today, and determine whether you're suitable for parole

7    and call you back in and provide you with that decision.

8         The California Code of Regulations states that

9    regardless of the time served, a life inmate shall be

10   found unsuitable for and denied parole if in the

11   judgment of the Parole Panel the inmate would pose an

12   unreasonable risk of danger to society if released from

13   prison.

14        Sir, you have certain rights.  Those rights

15   include the right to a timely notice of this hearing,

16   the right to review your central file, and the right to

17   present relevant documents.  And I'm going to ask you

18   first, sir, and then I'm going to ask your Attorney.

19   Did you have an opportunity to review your central file?

20        **INMATE RUVALCABA:**  Yes, I did, Sir.

21        **PRESIDING COMMISSIONER PRIZMICH:**  And was that

22   time that was allotted for your review of the central

23   file adequate for you to understand what's in it?

24        **INMATE RUVALCABA:**  Yes, Sir.

25        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  And I'll

18

1   ask your Attorney, have your client's rights been met in

2   this regard?

3        **ATTORNEY TARDIFF:**   They have.

4        **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   You also

5   have the right to be heard by an impartial Panel.   Now,

6   the Panel consists of the man to my left and myself.

7   We're the ones that will hear the information today,

8   read the reports and the letters, and decide on your

9   parole future.   Do you have any objection to this Panel

10  at all, sir?

11       **INMATE RUVALCABA:**   No, Sir.

12       **PRESIDING COMMISSIONER PRIZMICH:**   Okay, ma'am?

13       **ATTORNEY TARDIFF:**   No objection.

14       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   You will

15  receive a copy of our written tentative decision today.

16  This decision is subject to review by the Decision

17  Review Unit, by the entire Board of Parole Hearings at a

18  meeting held as a body.   The decision will become

19  effective within approximately 120 days and it's also

20  subject to review by the Governor.   A copy of the

21  tentative decision and a copy of the transcript of this

22  hearing will be sent to you.

23       As of May 2004, there were some major changes in

24  the hearing procedure.   Prior to May 2004, we would

25  render a decision, like we're going to do today, and if

1   you didn't agree with that decision, you could appeal

2   our decision to the Board of Parole Hearings.

3        What changed was you can still make the appeal,

4   but you do it to court as opposed to the Board of Parole

5   Hearings.  So everything else remains the same.  You

6   just appeal it to court.  If at the conclusion of this

7   hearing you feel there's some issues that need

8   addressing, certainly talk to your Attorney.

9        If there's a decision to appeal it, you can talk

10   to her about that or in the alternative, if you'd like

11   to look it up yourself, you can look in the prison law

12   library under Administrative Appeals, Correspondences,

13   and Grievances concerning the Board of Parole Hearings.

14   And you can find all the details on how to make that

15   appeal.

16        Sir, I want to advise you that you need not admit

17   nor discuss your offense today if you don't wish to.

18   However, the Panel does accept as true the findings of

19   the court and you're invited to discuss the facts and

20   the circumstances of the offense if you so desire.

21        The Board will consider any prior statements, as

22   I've said before, that you've made relative to this in

23   making our decision regarding your parole.

24        I'm going to ask Commissioner Morris if there's

25   any confidential material that exists in the inmate's

1   file and will we be utilizing it if there is some.

2   **DEPUTY COMMISSIONER MORRIS:** The confidential

3   file does not have any material in it.  As such, we will

4   not be using any confidential material.

5   **PRESIDING COMMISSIONER PRIZMICH:** Okay.  All

6   right.  Sir, what I'm going to do now is I have a --

7   This is a -- The State has numbers on every single form

8   it puts out and this one is number 1008.  And I'm going

9   to -- This is a form that has all the documents that we

10  have.  I'm going to give it to the Deputy District

11  Attorney to make sure he has all the documents we have.

12  And he's going to give it to your Attorney to make sure

13  she has all the documents we have.  So we'll give them

14  just a bit to look through it....

15  **DEPUTY DISTRICT ATTORNEY COPE:** I have all of

16  these.

17  **PRESIDING COMMISSIONER PRIZMICH:** Okay.

18  **ATTORNEY TARDIFF:** I have the documents as well.

19  And I've submitted a couple more documents.  Nothing

20  further to submit.

21  **PRESIDING COMMISSIONER PRIZMICH:** Okay then.

22  Okay.  We'll go over that in just a sec.  Okay.  I'm

23  going to mark this as Exhibit one.  And that will be

24  entered in the record.  And that just confirms we all

25  have the same documents, okay.

1          Now, your Attorney has provided us, Commissioner

2     Morris and myself, with some additional documents.

3     Commissioner Morris has got some of those.  He will go

4     over those a little later.  Looks like there's some

5     chronos and some documents or some degrees or diplomas

6     that you got for completion of some stuff.  And I have a

7     letter that apparently you've written.  I will read this

8     into the record at a later time.  We're not going to do

9     that just at this point.

10         In addition, let's see, was there -- Is that it?

11    Is that all of it, Ms. Tardiff?

12         **ATTORNEY TARDIFF:**  Yes.

13         **PRESIDING COMMISSIONER PRIZMICH:**  Just those?

14    Okay.  All right.  Are there any preliminary -- And

15    that's all the documents you have.  Everything has been

16    turned in.  Are there any preliminary objections?

17         **ATTORNEY TARDIFF:**  No.

18         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Will the

19    inmate be speaking?  Do you have more?

20         **ATTORNEY TARDIFF:**  No, we've got those.

21         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Will the

22    inmate be speaking to us today?

23         **ATTORNEY TARDIFF:**  Yes, in everything.

24         **PRESIDING COMMISSIONER PRIZMICH:**  On all matters?

25         **ATTORNEY TARDIFF:**  Yes.

22

| | |
|---|---|
| 1 | **PRESIDING COMMISSIONER PRIZMICH:** Okay, sir. |
| 2 | Since I understand you're going to talk to us about the |
| 3 | crime and all the matters related to your parole plans |
| 4 | and all those kinds of things, your prior criminal |
| 5 | history, I need to swear you in. So if you'd raise your |
| 6 | right hand, sir, I'm going to give you an oath. |
| 7 | Do you solemnly swear or affirm that the |
| 8 | testimony you give today at this hearing will be the |
| 9 | truth, the whole truth, and nothing but the truth, sir? |
| 10 | **INMATE RUVALCABA:** Yes, Sir. |
| 11 | **PRESIDING COMMISSIONER PRIZMICH:** Okay. You can |
| 12 | out your hand down. Okay, sir, we're going to get |
| 13 | started off with a reading into the record of the facts |
| 14 | of the life crime. And if it's okay with the DA and |
| 15 | your Attorney, there's a Deputy Probation Officer's |
| 16 | report and I was going to read from page two through |
| 17 | six, but it's rather lengthy and kind of controverted, |
| 18 | but it kind of weaves through the entire crime. |
| 19 | What I would prefer to do, again, if there's no |
| 20 | objection, is to read from the Counselor's report which |
| 21 | seems to sum it up a little bit more concise. Is there |
| 22 | any objection to that? |
| 23 | **ATTORNEY TARDIFF:** I have no objection. |
| 24 | **PRESIDING COMMISSIONER PRIZMICH:** Okay. Okay, so |
| 25 | I will be reading from the Counselor's report, page -- |

1  November 2005, starting on page, I guess it's one.  Let

2  me -- Yeah, looks like page one.  And probably going to

3  page two, concluding there.  Okay.

4          "Summary of the crime.  In Spring of 1990,

5      I'm trying to get this right, sir, Ruvalcaba,

6      Ruvalcaba, okay.  Ruvalcaba and victim June

7      Hidalgo began a romance relationship.  During the

8      following two or three months, the two spent a

9      great deal of time together, evenings and

10     weekends.

11         "During this time, the two became intimate

12     physically and in late April, the defendant asked

13     the victim to marry him.  Approximately two weeks

14     later, the victim told Ruvalcaba that she no

15     longer wanted to go out with him.  Ruvalcaba

16     became extremely upset, crying, locking himself

17     in his bedroom all night.

18         "The following day, May 4th, 1990,

19     Ruvalcaba came out of his room to help his

20     brother with a stalled vehicle.  This was when

21     Ruvalcaba acquired the handgun used in the

22     attempted homicide, locating the gun in his

23     uncle's tool box.

24         "After stating -- After starting and

25     stalling the vehicle, Ruvalcaba set out to the

1    victim's home to contact the victim's

2    grandmother.  He then went to a mutual friend's

3    home, Corey, who stated that he and another

4    friend -- and other friends at the apartment were

5    waiting for June to arrive.

6         "While there, the victim called and after

7    speaking to her friends, the defendant got on the

8    telephone and asked her why she was breaking up

9    with him.  The victim told him that she no longer

10   wanted to speak to him and hung up on him.

11        "Ruvalcaba began crying and told his

12   friends 'I'm going to get that bitch' and 'Nice

13   knowing you guys.'  Those are both in quotes.  He

14   then followed Stacey Cushman, one of their mutual

15   friends from the apartment, to Mount Diablo High

16   School tennis courts, where she -- where she and

17   June had earlier agreed to meet.

18        "Upon arrival of the victim at the parking

19   lot of the high school on a motorcycle driven by

20   Ron Adams, Ruvalcaba drove up in his car, exited

21   the vehicle with the gun in his hand, and the

22   victim cried out, 'Jose, no,' end quotes, and

23   bent down, cowering and putting her -- and

24   putting her hand protective over -- probably her

25   hands protectively over her head.

1          "Ruvalcaba pulled the trigger, but no

2     bullet came out.  Then he fired three more times,

3     hitting the victim through her hands, entering

4     the rear of her head.  She collapsed and the

5     defendant then shot himself in the head as well.

6          "Both were transported to John Muir Trauma

7     Center.  The victim was in a coma for 10 days,

8     remained hospitalized for two months.  As a

9     result of the bullet wound to her head, June

10    Hidalgo sustained permanent serious visual

11    impairment.  She has no direct vision and can no

12    longer -- can no longer see shapes in detail, nor

13    can she read.

14          "Ruvalcaba sustained a head wound that

15    affected his speech, necessitating extensive

16    speech therapy.  Ruvalcaba was subsequently

17    convicted by a jury for attempted murder on

18    11/25/91."

19    Okay, sir.  Can you -- Can you describe what was

20 going through your mind when you broke up with that

21 young lady?  Why was it so devastating that you needed

22 to take these actions?

23    **INMATE RUVALCABA:**  Well, first of all, sir, I'm

24 so ashamed of what I did back in those days, you know.

25 I know that now the way I feel about life now is just

1  way to even think about the pain.  I know I remember

2  back in those days, back in that moment I had so many

3  problems in my house and I was getting legalized and all

4  those things has got into my mind and at that moment, I

5  didn't care for life and she got me upset and problems

6  that were in my house.  All those things made me lose my

7  head.

8        I know I can't believe I did it, you know.  It's

9  so hard for me to even think that I'd go and hurt a

10  person at that time when I was still -- I was still

11  solely immature.  Now that I'm totally mature, I think

12  -- Now I think that, God, it was so -- It was just  --

13  Think about it, it just makes me drop down and get --

14        I know she doesn't deserve no pain of any kind,

15  not even just like I was talking to my Attorney that,

16  you know, today was going to be -- I was going to watch

17  Oprah today because the husband go out there beating on

18  the wife today and that was -- That was just me thinking

19  how bad a person, going to hurt on the wife in the house

20  and she wasn't even never my wife anyway.  And I go and

21  try to hurt her, it's just so difficult for me to even

22  express myself in front of you, sir, and to a whole

23  community, to a whole world.

24        **PRESIDING COMMISSIONER PRIZMICH:**  What was going

25  on in your house that you -- in the house environment

1  itself?

2  **INMATE RUVALCABA:** Not in the little moment, but

3  through my life since I was a little kid. I always get

4  hit by my elders, you know, and my dad getting drunk and

5  always, you know, whether I did it wrong or did it

6  right, it was be hitting on me and hitting on my mom and

7  all those things just got to me, to thinking life. I

8  wasn't even -- I was thinking in that moment when she

9  broke with me and I said well, life is not even worth

10  it. But she --

11  **PRESIDING COMMISSIONER PRIZMICH:** Why would you

12  --

13  **INMATE RUVALCABA:** I still -- I still don't think

14  she was -- she was -- It wasn't for me to go and hurt

15  anyone. I probably in the little moment I could have

16  just not cared for my own life.

17  **PRESIDING COMMISSIONER PRIZMICH:** As I understand

18  it, sir, she broke up with you and this emotional

19  downturn lasted several days until from the time she

20  said I don't want to talk to you anymore, don't want to

21  have anything to do with you, until the shooting; is

22  that -- Is that correct?

23  **INMATE RUVALCABA:** That happened the night

24  before, sir.

25  **PRESIDING COMMISSIONER PRIZMICH:** Okay, you

1   locked yourself in a room though.  In your room for how

2   long?

3           **INMATE RUVALCABA:**  Just a night.

4           **PRESIDING COMMISSIONER PRIZMICH:**  Just that

5   night?

6           **INMATE RUVALCABA:**  Yeah.  I was -- I wasn't --

7           **PRESIDING COMMISSIONER PRIZMICH:**  What were you

8   -- What were you --

9           **INMATE RUVALCABA:**  I wasn't even -- I wasn't

10  really thinking much of it.  I just -- I was just losing

11  my head in the little moment, thinking and trying to go

12  to sleep and --

13          **PRESIDING COMMISSIONER PRIZMICH:**  So when you

14  left to help your brother push start the car, where did

15  -- How did you run across the gun?

16          **INMATE RUVALCABA:**  My mind was thinking wrong and

17  my little devils got into me of trying to go and speak

18  to her and I went to her house and I remember that part,

19  going to see -- to go and see her in her house and mama,

20  June Tippet, she used to call me.  I used to call her

21  grandpa.  It's grandma.  So the short of the time that I

22  was with June, I was getting very close to the family.

23          **PRESIDING COMMISSIONER PRIZMICH:**  How long did

24  you go with the victim in this case?

25          **INMATE RUVALCABA:**  For about four months, three,

1    four months.

2         **PRESIDING COMMISSIONER PRIZMICH:**   Four months and

3    you'd asked her to marry you.

4         **INMATE RUVALCABA:**   Yeah.

5         **PRESIDING COMMISSIONER PRIZMICH:**   How did you --

6    When you came across the gun, as I recall, it was in a

7    tool box; is that correct?

8         **INMATE RUVALCABA:**   Yeah, well, by the --

9         **PRESIDING COMMISSIONER PRIZMICH:**   Your uncle's

10   toolbox?

11        **INMATE RUVALCABA:**   Where the boiler -- Where the

12   boiler in the house and the little aisle, there was one

13   of my uncles left a toolbox in there with petty stuff.

14   He used to work in an (indiscernible) over there in

15   Martinez and I kind of, you know, I've already seen the

16   gun before, but I wasn't even paying attention because I

17   didn't care for guns because that wasn't even me.

18        **PRESIDING COMMISSIONER PRIZMICH:**   So you saw the

19   -- You saw the gun prior to this event.

20        **INMATE RUVALCABA:**   Yeah, well, when I picked it

21   up and I was thinking of doing myself, something in

22   front of her, but I wasn't -- When I used those words in

23   front of my friends back before I committed my action

24   and I -- and I -- and I used that one bad word to her,

25   I'm not sure how I was feeling at that moment because --

1         **PRESIDING COMMISSIONER PRIZMICH:**  But my question

2  is so you knew the gun was in the toolbox prior to this

3  incident.

4         **INMATE RUVALCABA:**  Well, I picked it up, yeah, in

5  that little --

6         **PRESIDING COMMISSIONER PRIZMICH:**  Okay, and so

7  did you go directly to the toolbox to pick up the gun on

8  this particular day when you were help -- just before

9  you helped your brother push start the car?

10        **INMATE RUVALCABA:**  Yeah, pretty much, I --

11        **PRESIDING COMMISSIONER PRIZMICH:**  What was your

12  -- What was the thought in your mind at that time?  Were

13  you planning on doing something with the gun?

14        **INMATE RUVALCABA:**  I was probably thinking, you

15  know, the gun -- The gun was in the glove compartment.

16  So when I was -- when I was -- If I go see her, the gun

17  was already -- It wasn't even in my head no more.  If

18  she would come up to me and spoke to me the nice way,

19  the way at least, you know, look, I'm breaking up with

20  you because of this and this and that, then I would

21  probably understand it.

22        I just lost it because when I spoke to her on the

23  phone and --

24        **PRESIDING COMMISSIONER PRIZMICH:**  Hang on.  I

25  don't want get going too fast here.  So you drove there.

1   You put the gun in the glove box.

2          INMATE RUVALCABA:  The glove compartment.

3          PRESIDING COMMISSIONER PRIZMICH:  You saw --

4   Glove compartment.  You saw her there and the gun wasn't

5   in your hand at that time; is that what you're saying?

6          INMATE RUVALCABA:  No.

7          PRESIDING COMMISSIONER PRIZMICH:  And she said

8   something to you that --

9          INMATE RUVALCABA:  Moments before when I spoke to

10  her on the phone.

11         PRESIDING COMMISSIONER PRIZMICH:  Okay.  But when

12  you got out of the car --

13         INMATE RUVALCABA:  I had it in my hand.

14         PRESIDING COMMISSIONER PRIZMICH:  You had it in

15  your hand with the intent of doing what?  What were you

16  going to do?

17         INMATE RUVALCABA:  To hurt myself and hurt her

18  probably because what else --

19         PRESIDING COMMISSIONER PRIZMICH:  You thought

20  about -- At that point, you'd already made up your mind

21  you were going to hurt her and yourself.

22         INMATE RUVALCABA:  My bad spirits got to me, sir,

23  because I know what -- I know what -- I know what now

24  that I -- Time has gone through me and being here

25  incarcerated and done so many things that I know what I

1   did.   At that moment, I wasn't even thinking straight.

2   I know I wasn't thinking straight because I wasn't even

3   -- I wasn't using any drugs or any --

4          PRESIDING COMMISSIONER PRIZMICH:   Well, you

5   (inaudible).   You have any questions?

6          DEPUTY COMMISSIONER MORRIS:   Not at this time.

7          PRESIDING COMMISSIONER PRIZMICH:   Okay.   We may

8   come back and ask you some other questions regarding

9   this.

10          Sir, I'm going to talk about your personal

11   history.   You were born in Jalisco, Mexico; is that

12   where?

13          INMATE RUVALCABA:   Yes, Sir.

14          PRESIDING COMMISSIONER PRIZMICH:   Okay.   9/13/68,

15   you attended school, as you mentioned, in Mexico,

16   completing, it says eighth grade here.   Did you say

17   ninth is --

18          INMATE RUVALCABA:   Ninth grade, yes, Sir.

19          PRESIDING COMMISSIONER PRIZMICH:   You think ninth

20   grade.   You have seven brothers and sisters, sir?

21          INMATE RUVALCABA:   Yes, Sir.

22          PRESIDING COMMISSIONER PRIZMICH:   What is their

23   age range of the oldest?

24          INMATE RUVALCABA:   I got two sisters older than

25   me.

1       **PRESIDING COMMISSIONER PRIZMICH:** Okay, and then

2 yourself and there's four people --

3       **INMATE RUVALCABA:** Yeah.

4       **PRESIDING COMMISSIONER PRIZMICH:** -- younger than

5 you. Are they males or females or both?

6       **INMATE RUVALCABA:** I got two younger brothers and

7 three younger sisters.

8       **PRESIDING COMMISSIONER PRIZMICH:** Okay. Do they

9 all live in California here?

10       **INMATE RUVALCABA:** Yes, they do, Sir.

11       **PRESIDING COMMISSIONER PRIZMICH:** All of them?

12       **INMATE RUVALCABA:** Except for one. One lives in

13 my hometown.

14       **PRESIDING COMMISSIONER PRIZMICH:** Okay, down in

15 Mexico?

16       **INMATE RUVALCABA:** Mexico.

17       **PRESIDING COMMISSIONER PRIZMICH:** And is that an

18 older brother or sister?

19       **INMATE RUVALCABA:** Older sister.

20       **PRESIDING COMMISSIONER PRIZMICH:** Sister.

21       **INMATE RUVALCABA:** Older sister, yeah.

22       **PRESIDING COMMISSIONER PRIZMICH:** Okay. You came

23 to -- Your dad, is his name Pedro?

24       **INMATE RUVALCABA:** Yes, Sir.

25       **PRESIDING COMMISSIONER PRIZMICH:** Came to

*Capitol Electronic Reporting*

 1  California to work and send money back to Mexico.  Was

 2  he doing farm work or what was he doing when he came up

 3  here?

 4      INMATE RUVALCABA:  Well, he started as a farm

 5  worker and then he became a disposal company.  He works

 6  in the disposal company.

 7      PRESIDING COMMISSIONER PRIZMICH:  Okay.  All

 8  right.  So he's still alive, sir?

 9      INMATE RUVALCABA:  Yes, he is.

10      PRESIDING COMMISSIONER PRIZMICH:  And your mom?

11      INMATE RUVALCABA:  Yes, she's alive.

12      PRESIDING COMMISSIONER PRIZMICH:  They doing

13  well?  Are they okay?

14      INMATE RUVALCABA:  Yes.  My dad just retired just

15  about four or five years ago.

16      PRESIDING COMMISSIONER PRIZMICH:  Good.  Good for

17  him.  You came from Mexico at about the age of 15, you

18  think?

19      INMATE RUVALCABA:  Fifteen, yes, Sir.

20      PRESIDING COMMISSIONER PRIZMICH:  Okay.  And

21  that's when you started 10th grade and went through 11th

22  grade.  Did this incident occur at that point?

23      INMATE RUVALCABA:  No, Sir.

24      PRESIDING COMMISSIONER PRIZMICH:  Did you drop

25  out of school, sir?

1        **INMATE RUVALCABA:**  It was not me dropping.  When

2   anyone brings you from Mexico to this country, they

3   bring it to your -- They're bringing you here to work

4   and I was getting through school.  I was doing good in

5   school, but, you know, I can't say nothing to my dad.

6        **PRESIDING COMMISSIONER PRIZMICH:**  So your dad

7   wanted you to start working as opposed to going to

8   school.

9        **INMATE RUVALCABA:**  Yeah, he took me out of

10  school, so he offered me -- He got me a job where he

11  used to work, and so --

12       **PRESIDING COMMISSIONER PRIZMICH:**  And that was in

13  the fields or was that in the garbage?

14       **INMATE RUVALCABA:**  No, out there in the disposal

15  company.

16       **PRESIDING COMMISSIONER PRIZMICH:**  Disposal, okay.

17       **INMATE RUVALCABA:**  And plus, I --

18       **PRESIDING COMMISSIONER PRIZMICH:**  It says your

19  dad was abusive to you and the kids and the mother.  In

20  what respect was he abusive?

21       **INMATE RUVALCABA:**  When he was drunk.

22       **PRESIDING COMMISSIONER PRIZMICH:**  When he was

23  drunk, he would do what?  Yell at you, hit you?

24       **INMATE RUVALCABA:**  He would get out of hand just

25  being drunk.  Anything was -- Anything you did, it was

1    wrong.

2         **PRESIDING COMMISSIONER PRIZMICH:**

3    (Indiscernible).

4         **INMATE RUVALCABA:**  With alcohol.  Without alcohol

5    he was a kind man and a kind person in so many ways.

6         **PRESIDING COMMISSIONER PRIZMICH:**  You say here

7    that he physically abused you.  So he hit you and that

8    kind of stuff?

9         **INMATE RUVALCABA:**  Yeah, when I was a young kid,

10   yes.

11        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Your

12   father, you further describe your father as a macho

13   Mexican male.  So was that displayed when he was drunk

14   or all the time?

15        **INMATE RUVALCABA:**  When he was drunk.

16        **PRESIDING COMMISSIONER PRIZMICH:**  When he was

17   drunk.  Describe your mother as the same.

18        **INMATE RUVALCABA:**  Pretty much, yes.

19        **PRESIDING COMMISSIONER PRIZMICH:**  Yeah.  And why

20   do you describe her as that?  Was she --

21        **INMATE RUVALCABA:**  She was from a -- She's from a

22   small town where all they have in their mind is just to

23   serve and have kids and be the home wife, you know, in

24   so many ways.

25        **PRESIDING COMMISSIONER PRIZMICH:**  Okay, do you

1   have -- What's the relationship with your mom and dad

2   now?

3        **INMATE RUVALCABA:**  Well, they -- Well, my dad,

4   after he had this accident where he used to work and he

5   broke his pelvis and he needs -- He's diabetic so he

6   hardly ever comes.  He's so sick, he hardly ever comes.

7        **PRESIDING COMMISSIONER PRIZMICH:**  Are they still

8   together?

9        **INMATE RUVALCABA:**  Yeah.

10       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  But your

11  mom comes.

12       **INMATE RUVALCABA:**  Yeah, my mom comes every maybe

13  once or twice a month.

14       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Well,

15  that's nice of her.  Tell me about your drinking and/or

16  drug use.  That you did not drink alcohol, that's what

17  his comment is here.

18       **INMATE RUVALCABA:**  No, I wasn't into me for --

19  I'd see how my dad would get out of hand being

20  alcoholic, you know, so being a -- his use of alcohol,

21  so for me to get into that kind of a pattern, it wasn't

22  for me to do, you know.  So that's what me coming here

23  to AA and I've been going to AA for a little bit, just

24  for me --

25       **PRESIDING COMMISSIONER PRIZMICH:**  We'll talk

38

```
 1   about that in just a minute.  But you're -- You never

 2   drank alcohol or did you ever try alcohol?  Was there

 3   any time frame early on in high school that you tried

 4   it?

 5           INMATE RUVALCABA:  No, no, Sir, no.

 6           PRESIDING COMMISSIONER PRIZMICH:  Never did.

 7           INMATE RUVALCABA:  No.

 8           PRESIDING COMMISSIONER PRIZMICH:  Okay.  Not even

 9   a drink, huh?

10           INMATE RUVALCABA:  Well, when I was a kid, I

11   tried a taste of it, but it wasn't -- I remembered all

12   my uncles and my dad, I know they were all -- They would

13   always get out of hand just being drunk.

14           PRESIDING COMMISSIONER PRIZMICH:  So it was not

15   (indiscernible).  Are your uncles up here, too?

16           INMATE RUVALCABA:  I got an uncle that visits me

17   a lot, too.

18           PRESIDING COMMISSIONER PRIZMICH:  Up here in

19   prison?

20           INMATE RUVALCABA:  Yeah.

21           PRESIDING COMMISSIONER PRIZMICH:  Okay.  Where

22   does he live?

23           INMATE RUVALCABA:  In Concord.

24           PRESIDING COMMISSIONER PRIZMICH:  In Concord,

25   okay.
```

1          **INMATE RUVALCABA:**  Yeah.

2          **PRESIDING COMMISSIONER PRIZMICH:**  Did you ever

3     try any narcotics, sir?

4          **INMATE RUVALCABA:**  No, Sir, no.

5          **PRESIDING COMMISSIONER PRIZMICH:**  No marijuana or

6     heroin or anything like that?

7          **INMATE RUVALCABA:**  No.

8          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Had you

9     seen it around?

10         **INMATE RUVALCABA:**  I've seen it in the streets,

11    but I -- It wasn't for me to touch.

12         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

13    right.  As far as your adult and juvenile record, you

14    have no juvenile arrests; is that correct, sir?

15         **INMATE RUVALCABA:**  Yes, Sir.

16         **PRESIDING COMMISSIONER PRIZMICH:**  Any traffic

17    tickets or anything?  Nothing at all?

18         **INMATE RUVALCABA:**  I did have some traffic

19    tickets, yes.

20         **PRESIDING COMMISSIONER PRIZMICH:**  All right.

21    There's a Department of Motor Vehicles list, three

22    citations, which is pretty good.  You paid the fine on

23    that.  And then this life offense was the only criminal

24    activity that you were involved in, sir.

25         Sir, you're aware that you have an INS hold on

1   you, sir?

2          **INMATE RUVALCABA:**  Yes, Sir.

3          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  What do

4   you believe the status of that is at this point?  Do you

5   have any idea what -- Is that a valid hold in your

6   opinion?

7          **INMATE RUVALCABA:**  Well, I never became a

8   resident here.  That's what was worrying me before I

9   committed and before I hurt June.  I was -- I was -- I

10  was in that little moment becoming legalized, so those

11  things got to me when the new company went and bought

12  the company where I used to work in Pleasant Hill

13  Bayshore Disposal.  BFI went and bought it.

14         So they went and asked for paperwork and I wasn't

15  legalized yet.  So I was -- I put all my data to the

16  Immigration to get legalized and --

17         **PRESIDING COMMISSIONER PRIZMICH:**  You don't know.

18         **INMATE RUVALCABA:**  Things got into my head.  I

19  loved this country so much back in those days, you know,

20  that I was just -- Make me lose it that way is just for

21  me to even -- There's no excuse for that, Sir.  That's

22  the one that pushed me to make me lose my head and not

23  care for my life, you know, and the problems I had and I

24  bottled everything up and it got to me and just losing.

25         **PRESIDING COMMISSIONER PRIZMICH:**  Let's stay on

1    course here.   Now, I understand your brothers and

2    sisters, are they legalized citizens now?  Did they go

3    through that process?

4        **INMATE RUVALCABA:**   Yeah.   I got -- I was -- A

5    little brother was born here.   One of my little brothers

6    was born here.

7        **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   Okay.

8    We're going to get to your parole plans because that may

9    have some impact on your parole plans in terms of your

10   INS hold.   But right now I'm going to turn it over to

11   the Deputy Commissioner to talk to you about some of

12   your commitment record conviction factors here.

13       **DEPUTY COMMISSIONER MORRIS:**   Okay, Mr. Ruvalcaba.

14   This is Subsequent Parole Consideration Hearing number

15   four and I'm looking back over your hearing history.

16       And it looks like the last face-to-face hearing

17   was November 16 of '04.

18       **ATTORNEY TARDIFF:**   That was a -- Yes.

19       **DEPUTY COMMISSIONER MORRIS:**   And at that time you

20   suffered a one-year denial.

21       **ATTORNEY TARDIFF:**   Right.

22       **DEPUTY COMMISSIONER MORRIS:**   And then another

23   hearing was scheduled for 6/8 of '06 and the results of

24   that was a one-year stipulation.   I believe there were

25   some parole plan issues.

1    And that brings us to the hearing today.  Okay.

2   Now, I see you got a classification score of 19 and

3   that's as low as your life crime will allow.  I do see

4   in your file here there is a copy of the GED that you

5   got in, I think the date on it is '99, March 11 of '99.

6          **INMATE RUVALCABA:**  Yes, sir.

7          **DEPUTY COMMISSIONER MORRIS:**  Okay.  I saw a

8   chrono that talked about your Olson review, so you did

9   have an opportunity to review your C-file.  You did

10   that?

11          **INMATE RUVALCABA:**  Yes, sir.

12          **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, you

13   completed that GED in '99.  I don't see any other

14   academics.  Have you not tried anything else?  Any other

15   courses, ESL, or some correspondence courses?

16          **ATTORNEY TARDIFF:**  He has a time and money

17   management.  I got out some of his prior Board reports.

18   An advanced business applications.

19          **DEPUTY COMMISSIONER MORRIS:**  But no other junior

20   college or community college courses, nothing like that?

21          **INMATE RUVALCABA:**  I just did.  I just did.  I

22   just did another computer data processing.  That's the

23   one I did after that.

24          **DEPUTY COMMISSIONER MORRIS:**  My questions still

25   is, and I'm going to assume that means no, that you

1    haven't taken any other college type courses.

2        **INMATE RUVALCABA:**  No, sir.

3        **DEPUTY COMMISSIONER MORRIS:**  Because I'm going to

4    get to all that other stuff that you're talking about, I

5    believe, but just hold on to that in case I overlook it.

6        **INMATE RUVALCABA:**  Yes, sir.

7        **DEPUTY COMMISSIONER MORRIS:**  All right.  Now,

8    with regard to some of the other vocational things and

9    courses that would give you additional skills, I do see

10   -- I saw a 2002 advanced business applications.  Is that

11   what you were talking about Counsel?

12       **ATTORNEY TARDIFF:**  No, I wasn't.  But that might

13   be what he was.

14       **INMATE RUVALCABA:**  Yeah, the computer data

15   processing, yeah.

16       **DEPUTY COMMISSIONER MORRIS:**  Yeah.  And then in

17   2003, you completed the information technologies.  Okay,

18   now, there were a lot of different components under

19   that.  Was this advanced business under that or was that

20   separate?

21       **INMATE RUVALCABA:**  That was part of it.

22       **DEPUTY COMMISSIONER MORRIS:**  That was all part of

23   it, okay.

24       **INMATE RUVALCABA:**  Yes, sir.

25       **DEPUTY COMMISSIONER MORRIS:**  So what you have is

1  at least the one certification, information

2  technologies, completed.

3       **INMATE RUVALCABA:**  Yeah.

4       **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, I also

5  saw this (indiscernible) Keys for Fatherhood.  I've got

6  that under some self-help kind of stuff.  You were

7  involved in that.

8       **INMATE RUVALCABA:**  Yes, sir.

9       **DEPUTY COMMISSIONER MORRIS:**  And how much of a

10  program was that?  How long was that?

11      **INMATE RUVALCABA:**  Just like maybe 13, 14 weeks.

12      **DEPUTY COMMISSIONER MORRIS:**  Okay.  And I did see

13  a certification talking about the completion of that.

14      I also see that you participated in that

15  Alternatives to Violence most recently.

16      **INMATE RUVALCABA:**  Yes, sir.

17      **DEPUTY COMMISSIONER MORRIS:**  On February of '07.

18      **INMATE RUVALCABA:**  Yes, sir.

19      **DEPUTY COMMISSIONER MORRIS:**  Okay.  And prior to

20  that, you also participated in or following that you

21  participated in Fatherhood, Fathers Behind Bars.

22      **INMATE RUVALCABA:**  Yes, sir.

23      **DEPUTY COMMISSIONER MORRIS:**  And I do see a

24  number of chronos speaking to that AA participation that

25  you talked about, okay.  And I also heard you talk about

45

1  your absence of alcohol or drugs in your history. My

2  question would be as a result of your work in that AA,

3  were you able to learn anything about other addictive

4  behaviors that you might have?

5      **INMATE RUVALCABA:** Well, since I've been going to

6  AA, I've been going to AA for a little bit, for about

7  close to eight, nine years. And for many times, I just

8  go and try to speak and share something that I have

9  lived with, you know. I never used drugs or any

10 alcohol, so.

11     **DEPUTY COMMISSIONER MORRIS:** I'm talking about

12 other behaviors that would be --

13     **INMATE RUVALCABA:** No, no.

14     **DEPUTY COMMISSIONER MORRIS:** That would be

15 classified as addictive or even obsessive.

16     **INMATE RUVALCABA:** No, sir. Every time I go to

17 the meetings, I like to listen to them all the time

18 because most people get up on the podium and share their

19 experiences and many things does get into my head, you

20 know, besides since I was born and raised with people

21 that used to use alcohol, I --

22     **ATTORNEY TARDIFF:** I'm not sure he quite

23 understands your question.

24     **DEPUTY COMMISSIONER MORRIS:** Okay. As a result

25 of participating in AA, did you ever think about how

1  some of those principles might apply to that obsessive

2  behavior exhibited toward the victim?

3        **INMATE RUVALCABA:**  Okay.  As on the -- on the

4  letter I wrote to June, I kind of express as far as step

5  number nine, which is when to make the recommends to

6  such people wherever possible except to do with some

7  were injured of more others.  And I got many, many steps

8  have always been helping me and I apply them into my --

9  in my life that I live here.

10       And so for things like that, I did use and apply

11 it on the writing, on the letter I wrote to June.

12       **DEPUTY COMMISSIONER MORRIS:**  So did you mail that

13 letter to her or to the DA's Office?

14       **INMATE RUVALCABA:**  I just wrote it on -- That's

15 the letter I just wrote right there.

16       **DEPUTY COMMISSIONER MORRIS:**  So you never wrote

17 the letter to her then.

18       **INMATE RUVALCABA:**  That is part of the step

19 number nine, that I don't want to go and --

20       **DEPUTY COMMISSIONER MORRIS:**  But you never sent

21 it to her.

22       **INMATE RUVALCABA:**  No, no, sir.  No, sir, no.

23       **DEPUTY COMMISSIONER MORRIS:**  And you never sent

24 it to the DA's Office for processing.  Now, she may

25 receive it or she may not.  That's an option.

*Capitol Electronic Reporting*

1        **INMATE RUVALCABA:**   Yeah.

2        **DEPUTY COMMISSIONER MORRIS:**   So, I mean that's a

3    good step.   Start bringing some of those things forward

4    and you've committed to paper.   That's a big step right

5    there.   So you might want to consider processing, going

6    to the next step and processing that letter through the

7    DA's Office to see if she would even receive it.   And

8    she may not.   But you would do the best you can.

9        **INMATE RUVALCABA:**   Yes.

10       **DEPUTY COMMISSIONER MORRIS:**   You can.   But you're

11   still participating in AA and you mentioned a couple of

12   steps, so that tells me that you are armed with

13   information and you know something about the principles.

14       Okay.   Any other self-help in the last -- since

15   the last hearing that I have not talked about?

16       **INMATE RUVALCABA:**   I'm in Anger Management now.

17       **ATTORNEY TARDIFF:**   The update there.   We got an

18   update that lists some of his -- That I gave you.

19       **DEPUTY COMMISSIONER MORRIS:**   None of this is more

20   current than what I talked about.

21       **ATTORNEY TARDIFF:**   Cage Your Rage, you got that?

22       **INMATE RUVALCABA:**   I finished it last year on

23   that one.

24       **DEPUTY COMMISSIONER MORRIS:**   Okay.   Wait a

25   minute.   My mistake.   I do -- I do have a laudatory

48

1    dated 10/5 of '06 that's in the file.  It talks about

2    Cage Your Rage.

3        **ATTORNEY TARDIFF:**  And he's on the waiting list.

4    This was in our update.

5        **DEPUTY COMMISSIONER MORRIS:**  Okay.

6        **ATTORNEY TARDIFF:**  The Alternative to Violence

7    waiting list.  It's got a chrono that he is, in fact,

8    and the Veteran's Self-help Group.  Do you have that?

9        **DEPUTY COMMISSIONER MORRIS:**  I have that.

10   September of '06?

11       **ATTORNEY TARDIFF:**  Yeah.

12       **DEPUTY COMMISSIONER MORRIS:**  I didn't mention

13   that one?  I didn't mention Veteran's Self-help?

14       **ATTORNEY TARDIFF:**  I don't know if you did or

15   not.

16       **DEPUTY COMMISSIONER MORRIS:**  I probably did.  But

17   I do have that on my -- in my list here.

18       **ATTORNEY TARDIFF:**  Okay.

19       **DEPUTY COMMISSIONER MORRIS:**  And the Alternatives

20   to Violence as well as the Cage Your Rage.  Okay.

21   Anything else, sir?  Did I miss anything else?

22       **INMATE RUVALCABA:**  No, sir.  No, sir.

23       **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now,

24   regarding laudatories, that Cage Your Rage is a

25   laudatory chrono, as well as the two, the February 1,

1   '07 chrono speaking to your work in culinary.  Any other

2   laudatory chronos since the last hearing?

3           **INMATE RUVALCABA:**  No, sir.

4           **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, are you

5   still working in culinary?

6           **INMATE RUVALCABA:**  Yes, sir.

7           **DEPUTY COMMISSIONER MORRIS:**  Okay.  And I see you

8   got past work experience or work history as a porter as

9   well.

10          **INMATE RUVALCABA:**  Yeah, I worked in the tray

11  machine in culinary, yes.

12          **DEPUTY COMMISSIONER MORRIS:**  Okay.  All right.

13  What I didn't see is, maybe I overlooked, a supervisory

14  work report.  Do you have those?  Have you received one

15  from culinary?

16          **INMATE RUVALCABA:**  Yeah, my Supervisor sent it to

17  my Counselor.  It should be in there.

18          **DEPUTY COMMISSIONER MORRIS:**  And what was your

19  rating on that?  How did the Supervisor rate you?  If

20  it's here, I'm going to find it probably before you can

21  tell me.

22          **ATTORNEY TARDIFF:**  Well, he got a 128 B dated

23  2/1/07 for his extraordinary efforts while performing

24  his job assignments.

25          **DEPUTY COMMISSIONER MORRIS:**  Tray machine?

*Capitol Electronic Reporting*

 1 | **INMATE RUVALCABA:**  Yes, sir.

 2 | **DEPUTY COMMISSIONER MORRIS:**  Okay, I'm looking at

 3 | a chrono dated January 7, '07, okay.  And you have

 4 | exceptional work reports.  I'm looking at '06 chronos.

 5 | Exceptional, exceptional.  '05, above average.  So it

 6 | looks like your work reports historically have been

 7 | above average to exceptional.  It looks like most of '06

 8 | and seven as being exceptional.

 9 | **INMATE RUVALCABA:**  I'm a hard worker, sir.

10 | **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, let me

11 | ask you about the disciplinaries.  I'm looking at the

12 | 812, the gang sheet.  There's nothing on that, so you

13 | haven't aligned yourself with any institution groups.

14 | You came to prison, you were, what, about 21?

15 | **INMATE RUVALCABA:**  Twenty-two, going on 23 I

16 | think, yes.

17 | **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now, how did

18 | you manage to avoid that north, south --

19 | **INMATE RUVALCABA:**  I never believed in that.

20 | **DEPUTY COMMISSIONER MORRIS:**  (Indiscernible.)

21 | **INMATE RUVALCABA:**  No, I don't believe in that.

22 | When I first got to prison and I see there was north and

23 | south because I lived close to Concord and I look for

24 | Martinez, I never saw any gangs of north and south, so I

25 | didn't know they existed.

1    **DEPUTY COMMISSIONER MORRIS:** Is that right.

2    **INMATE RUVALCABA:** Even though I saw many movies

3    and I saw many things, but I never really believed that

4    it was north and south.

5    **DEPUTY COMMISSIONER MORRIS:** No pressure?

6    **INMATE RUVALCABA:** No.

7    **DEPUTY COMMISSIONER MORRIS:** Okay. Well, that's

8    a good thing. Regarding disciplinaries, I see one

9    disciplinary in your file. That was in 1995 and that's

10   when you participated in a work stoppage.

11   **INMATE RUVALCABA:** Yes, sir.

12   **DEPUTY COMMISSIONER MORRIS:** And since you're not

13   a joiner, what made you join that?

14   **INMATE RUVALCABA:** It was a big group pushing

15   that. I had no other choice but to do it, you know. I

16   remember I was just start doing time and all of a sudden

17   I hear the word that we got to go down and I didn't know

18   what to do, but just to do it. And that was '94. I was

19   just two years in prison, so I didn't know how life was

20   working in (indiscernible), you know. Was getting used

21   to that kind of life in prison.

22   **DEPUTY COMMISSIONER MORRIS:** Well, it seems like

23   you've got a pretty good understanding of what goes on

24   and you've learned how to navigate these institutional

25   waters. You've been essentially disciplinary-free.

1  I've seen no negative chronos as well.  So that tells me
2  that you get along well with staff.

3       **INMATE RUVALCABA:**  I behave.  I behave good, sir.

4       **DEPUTY COMMISSIONER MORRIS:**  Okay, and you do
5  what they ask you to do.  No problems.

6       **INMATE RUVALCABA:**  Yes, sir.

7       **DEPUTY COMMISSIONER MORRIS:**  Okay.  And that's a
8  good thing.  Let me -- Let me ask you about the psych
9  report here.  There is a current psych report dated May
10 9 of '06 authored by Macomber and I'm looking at -- I'm
11 just going to speak to parts of the report.

12      I'm looking at page two, section seven under
13 clinical assessment, current mental status slash
14 treatment needs.  And I'm going to go to the last
15 sentence or the last three sentences in the first
16 paragraph where the psychologist states that there is no
17 evidence of anxiety or of depression.  His memory is
18 intact.  His judgment is good.  His insight and self-
19 awareness were excellent.

20      The next line is this man has no alcohol or drug
21 issues at all.  This is not an issue in this case.

22      Under current diagnostic impressions, Axis I,
23 you're described as not having a mental disorder.  Axis
24 II, you're seen as no personality disorder.  Axis III,
25 speaks to brain injury secondary to the gunshot wound

1  that you received or was self-inflicted.  Under Axis IV,
2  speaks to the life term and incarceration.  Axis V,
3  there's a global assessment score, a global assessment
4  functioning score of 90 and that's an outstanding score.

5      On page three, section 14, assessment of
6  dangerousness, paragraph eight, the psychologist
7  continues by saying that in considering potential for
8  dangerous behavior in the institution, this man has
9  remained disciplinary-free since '94, okay.  He goes on
10  to say the disciplinary received in '94 was thoroughly
11  explained in Dr. Sexton's report.  We've just talked
12  about that as well.

13      In essence, he has remained disciplinary-free
14  throughout.  I note that the psychologist makes the
15  statement that the 115 should not be held against you.
16  The psychologist certainly cannot dismiss serious
17  disciplinary recordings and that's what that is.  And
18  that's part of your record and that will always be
19  there.

20      Now, you'll always have an opportunity to explain
21  it and try to diminish it or mitigate it in some way and
22  that's what you've done today, okay.

23      He continues by saying in essence, he's remained
24  disciplinary-free throughout his 16 years of
25  incarceration.  As a result, compared to other inmates,

1  his potential for dangerous behavior in this case is

2  definitely below average, okay.

3       Section B, talks about your behavior or the level

4  of dangerousness or potential for dangerousness when

5  released to the community.  He talks about the service

6  inventory revised that was administered.  This is an

7  actuarial measure that assesses criminal history,

8  substance abuse history, social relationships, and other

9  factors to determine current risk level on parole.

10      You obtained a score of .8, cumulative frequency

11  for prison inmates.  That means that if 100 men were

12  released on parole, you would do better than 99 of them.

13  This is an extremely low risk level.  As a result, you

14  pose no more risk to society than the average citizen in

15  the community.  In fact, based upon your self-

16  understanding, life experience, growth, and maturity

17  over the years, you probably possess less risk to

18  society than the average citizen in the community.

19  These were all comments by Macomber.

20      Under section 15, clinical observations,

21  comments, recommendations, he states that there no

22  mental or emotional problems in this case that would

23  interfere with routine parole planning.  Mr. Ruvalcaba

24  has an immigration hold and he plans to return to Mexico

25  upon his release.

| | |
|---|---|
| 1 | Have you ever lived in Mexico? |
| 2 | **INMATE RUVALCABA:**  At the age of 15. |
| 3 | **DEPUTY COMMISSIONER MORRIS:**  Okay.  Goes on to |
| 4 | say that you have a great deal of family support in |
| 5 | Mexico.  In addition to offers of residence, you also |
| 6 | have job offers.  He is an experienced mechanic and his |
| 7 | skills are highly desirable in the community. |
| 8 | Employment will not be a problem in this case. |
| 9 | The prognosis for successful adjustment in the |
| 10 | community is excellent.  These are all comments as made |
| 11 | by Macomber. |
| 12 | Let me ask you a question about this mechanic. |
| 13 | You were a mechanic on the street 16, 17 years ago. |
| 14 | Have you considered taking auto mechanics in the |
| 15 | institution, which would bring you current with all this |
| 16 | computer-driven stuff, how to operate these sensors and |
| 17 | the various electronic and the components necessary to |
| 18 | work on a car? |
| 19 | **INMATE RUVALCABA:**  Well, the latest -- The latest |
| 20 | -- |
| 21 | **DEPUTY COMMISSIONER MORRIS:**  (Indiscernible.) |
| 22 | **INMATE RUVALCABA:**  The latest that I worked on |
| 23 | cars was in Tracy.  Before I left here, I was in the |
| 24 | automotive, in both auto body and auto mechanics. |
| 25 | **DEPUTY COMMISSIONER MORRIS:**  Okay. |

56

1          **INMATE RUVALCABA:**  I finished those two trades in
2    Tracy, so.

3          **DEPUTY COMMISSIONER MORRIS:**  Okay.

4          **INMATE RUVALCABA:**  I got to the level of early
5    90s, from 94 down.

6          **DEPUTY COMMISSIONER MORRIS:**  Okay.

7          **INMATE RUVALCABA:**  As from then until now,
8    technology got so advanced on that part that I would
9    probably get into a car and through a book, I could
10   probably catch on quick.  I could probably will, you
11   know, because I was a mechanic since I was a young kid.

12         **DEPUTY COMMISSIONER MORRIS:**  Yeah.  I just -- I
13   just thought of that because you open a hood now and
14   there's nothing to see.

15         **INMATE RUVALCABA:**  I know.

16         **DEPUTY COMMISSIONER MORRIS:**  It's like a solid
17   piece.

18         **INMATE RUVALCABA:**  I know.

19         **DEPUTY COMMISSIONER MORRIS:**  I mean, the only
20   thing you can do is open it and close it.

21         **INMATE RUVALCABA:**  I get into -- I get into
22   magazines through here and I get into the cars and I
23   check how --

24         **DEPUTY COMMISSIONER MORRIS:**  Yeah.  Computers and
25   the brain system and all that.

*Capitol Electronic Reporting*

1      **INMATE RUVALCABA:**  Yeah, computers and sensors

2  and all those things, yes.

3      **DEPUTY COMMISSIONER MORRIS:**  Okay.  All right.

4  So you are aware of that and that's a good thing.

5      **INMATE RUVALCABA:**  Yes, yes, sir.

6      **DEPUTY COMMISSIONER MORRIS:**  And it is

7  sophisticated.  At any rate, these are comments as made

8  by Macomber.  Your Counsel take exception to any part of

9  that or would you like to add anything to that?

10      **ATTORNEY TARDIFF:**  The only thing I want to add

11  is just this 115 and it is explained in the prior psych

12  eval that it was an organized work stoppage involving

13  the vast majority of DVI inmates.  Over 1,000 inmates

14  participated and in the prison setting, should an inmate

15  ignore the other inmates and report to work, he would

16  most assuredly be assaulted, which is true.

17      In some cases, inmates have been seriously

18  stabbed over such issues.  So just to be viewed in that

19  light that it wasn't something that he, you know, did on

20  his -- by himself or something, but it was a prison-wide

21  work stoppage.

22      **DEPUTY COMMISSIONER MORRIS:**  And with each person

23  making a decision as to whether or not they want to

24  participate.

25      **ATTORNEY TARDIFF:**  Right, and their safety is at

1   issue.

2       **DEPUTY COMMISSIONER MORRIS:**   There were 1,000,

3   there were a lot of inmates on the yard, a lot of them

4   probably did not participate.  But at any rate, the 115

5   remains and it will be there historically.  But you'll

6   always have an opportunity to discuss the way that we

7   have.

8       And there is an issue here in my mind, remoteness

9   in time, so you're separating yourself from that

10  behavior and you've done a lot of good things and you're

11  still doing some good things it sounds like.

12      All right, we've talked a lot about the post-

13  conviction factors, things that you've done in prison

14  and particularly since your last hearing date, November

15  16 of '04.  Is there anything else we need to talk

16  about?  Did I miss anything during that period from '04

17  forward?

18      **INMATE RUVALCABA:**   I don't know if before that I

19  did the impact class on that one, too, the Victim

20  Awareness on that one.  I don't know if it's --

21      **ATTORNEY TARDIFF:**   That was in '01.

22      **INMATE RUVALCABA:**   That was in '01?

23      **ATTORNEY TARDIFF:**   Yeah, he wants between '04 and

24  now.

25      **DEPUTY COMMISSIONER MORRIS:**   Yeah.

*Capitol Electronic Reporting*

1     **ATTORNEY TARDIFF:** I think you've gotten

2  everything.

3     **DEPUTY COMMISSIONER MORRIS:** Okay. Absent

4  additional testimony, I yield to the Chair.

5     **PRESIDING COMMISSIONER PRIZMICH:** Sir, you

6  identified that you were an AA participant for eight or

7  nine years.

8     **INMATE RUVALCABA:** Yes, Sir.

9     **PRESIDING COMMISSIONER PRIZMICH:** Can you explain

10  to me why, with the lack of alcohol in your background,

11  you chose to go to AA? What is in it for you, sir?

12     **INMATE RUVALCABA:** Well, at this time, Sir, I

13  know that me being past 15 years in prison and then I

14  know that when I was a kid at the age of 15 when they

15  brought me to this country and then I see how my dad be

16  behaving with the alcohol in his body, how he react, and

17  now me going through this program and learning step by

18  step how step is about change, changing your mind.

19     And me going to AA and applying all those things,

20  that I will never go into any kind of path of using any

21  alcohol because I see how people can get out hand by

22  just using alcohol and drugs and it's going through all

23  those -- Going through all those years in AA, I've

24  learned a lot, a lot of how to behave.

25     **PRESIDING COMMISSIONER PRIZMICH:** Okay. Can I

1    just have you hold right there.  We've got to take a

2    quick break for just a second, so.

3                      (Thereupon, a recess was

4                      held off the record.)

5        **PRESIDING COMMISSIONER PRIZMICH:**  Okay, I'm sorry

6    for the interruption.  We're back on record.  It's 2:15

7    and we're back on record, correct?

8        **DEPUTY COMMISSIONER MORRIS:**  We are.

9        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  I'm

10   sorry for the interruption, sir.  I was asking you the

11   question about your involvement with Alcoholics

12   Anonymous.  Is it just Alcoholics Anonymous or is it

13   Narcotics Anonymous and. -- Is it just alcohol?

14       **INMATE RUVALCABA:**  Just Alcoholics Anonymous.

15       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Your

16   involvement with Alcoholics Anonymous for eight or nine

17   years and why you chose that and why you feel that's of

18   any benefit to you.  And you explained to me, were

19   starting to explain to me, that your father had, and I

20   guess his brothers had been, you'd seen their

21   involvement and how that changed them as a younger

22   individual.

23       And if you can carry on from there why you feel

24   that Alcoholics Anonymous is important for you in light

25   of the fact that you apparently don't have an identified

*Capitol Electronic Reporting*

1  drinking problem or narcotics problem. Can you go on

2  from there, sir?

3     **INMATE RUVALCABA:** Well, I always see people in

4  this -- in this -- in this world and especially my

5  family members, my dad and my uncles, and just plain

6  friends, when they -- When they drink, they get out of

7  hand and they get into a different kind of pattern of

8  living a normal life. They get very upset and they get

9  very either thinking that what is right is right for

10  them, whether they're using alcohol or not, you know.

11     So every time that I -- that anything -- that any

12  little petty thing that happened in my house, my dad

13  didn't like it.

14     **PRESIDING COMMISSIONER PRIZMICH:** Okay, but how

15  does that relate to why are you going to AA as a result

16  of that?

17     **INMATE RUVALCABA:** Because most of the steps do

18  apply to something like that. Some things like that

19  have had -- How to apply step by step because when I was

20  going, I went through 12 by 12 and the steps and the

21  traditions, kind of combine of things of how to live a

22  life without -- with alcohol and without alcohol, you

23  know.

24     And I always think about me going through these

25  kind of meetings is always going to help me to, if I

 1   ever released, to not even -- I never touched this or

 2   not for to touch it again because all the bad

 3   experiences that people go and speak in the meetings.

 4        **PRESIDING COMMISSIONER PRIZMICH:**  Let me just ask

 5   you, since you hear those experiences in the meetings

 6   and you've seen those experiences with regards to your

 7   dad and his uncles and you know for a fact that even

 8   when people stop drinking and go to AA that they -- that

 9   they then can relapse and go out drinking again.

10        **INMATE RUVALCABA:**  Yes.

11        **PRESIDING COMMISSIONER PRIZMICH:**  You know, do

12   you -- Do you feel that there's any possibility that

13   you, sir, may have a -- have a -- can't call it a

14   relapse because you've not really started to drink, can

15   start drinking as a result of pressures that you may

16   have?  Do you think that might be an option for you down

17   the road?  Is that a possibility for you?

18        **INMATE RUVALCABA:**  Well, I think -- I think that

19   AA is not only a program of alcohol.  It also helps me

20   to live a better life of knowing what alcohol does to a

21   person, you know, and it's for me to -- I've already

22   lived the family members in my past that here in my

23   present and my future, that if I was to get released and

24   become, be in a society where I'm not even going to

25   think about touching alcohol because touching alcohol

```
 1   would make me lose my --
 2        And it's just for me to know that alcohol can --
 3        PRESIDING COMMISSIONER PRIZMICH:  Well, I guess
 4   -- I guess --
 5        INMATE RUVALCABA:  For that -- For that part,
 6   it's helping me on that just to apply.
 7        PRESIDING COMMISSIONER PRIZMICH:  Yeah.
 8        INMATE RUVALCABA:  To apply step by step.  If I
 9   -- If I --
10        PRESIDING COMMISSIONER PRIZMICH:  You had -- You
11   had a specific emotional reaction to a romance that went
12   bad and that went beyond reason.  I mean, you wanted to
13   kill yourself and kill your one-time girlfriend.  Do you
14   think that some of that had any basis in alcoholic
15   tendencies without drinking?  Do you believe that you
16   may have some character traits within you that were
17   similar to your dad's, except your dad was dealing with
18   it via alcohol and you dealt -- you hadn't gotten there
19   yet?  Do you see any similarity?  Has AA talked about
20   any of that that you can recall, that you can put the
21   two and two together?
22        It's an extraordinary reaction on your part for
23   something that's painful.  I don't want to minimize
24   that, you know.  The breakup of a romance is certainly
25   painful.  But most people, sir, don't go to the degree
```

1  | that you did.

2  |        **INMATE RUVALCABA:** I know.

3  |        **PRESIDING COMMISSIONER PRIZMICH:** Do you see --

4  | Do you see a connection therein anyway and if so, has

5  | Alcoholics Anonymous helped you deal with that I guess

6  | is what I'm trying to get to.

7  |        **INMATE RUVALCABA:** Well, as far as I can probably

8  | say this, Sir, that as far as the defect of not

9  | understanding life and not caring for life at that

10 | moment is part of some of the steps, that even though

11 | alcohol is part of it, but I know I understand that now

12 | because if I was to get into any kind of a problem with

13 | any kind of relationship or any kind of a problem with

14 | -- I will make sure that I won't get into that pattern

15 | no more and that kind of a path because I know that what

16 | I did was totally inexcusable.

17 |        No normal person could probably go and do what I

18 | did.  I don't think so either because when I -- Since

19 | I've been living life in here in prison, I've been going

20 | through a lot of programs and seeing how life, it has

21 | changed me so much in my head right now, me knowing that

22 | what I did then was out of hand of no, like I said, no

23 | human being at that moment could have just lost.

24 |        Unless the way I lost it, I lost it of something

25 | that it could have been -- It could have been -- It

1   could have been solved in a kind way and I just lost it.

2   I snapped and lost it and didn't care for my life and

3   did not care for no one else but --

4        **PRESIDING COMMISSIONER PRIZMICH:**  What if you get

5   there again, sir?

6        **INMATE RUVALCABA:**  I'll make sure it won't get

7   there.

8        **PRESIDING COMMISSIONER PRIZMICH:**  How are you

9   going to do that?

10        **INMATE RUVALCABA:**  Because there's always --

11   there's always a way to speak to a professional in that

12   matter and at that moment when I committed my stupidity,

13   I would call it stupidity, and I didn't speak to no one,

14   sir.  I just act on myself.  I'm not thinking of -- I

15   could have think of my mom, my mom loves me so much.

16   Now that she comes and visits me once or twice a month

17   and I don't being nothing up to her because every time I

18   that I want to bring some up to her about my dad being

19   drunk and doing this and doing that, she starts crying

20   and I can't bring it up to her like that.

21        And I can't like mention what brought me, what

22   made me lose my head at that moment.  So she already, my

23   mom already every time I try not to even bring nothing

24   up to my mom ever.  She comes once or twice every month.

25        **PRESIDING COMMISSIONER PRIZMICH:**  Have you gone

1   through all 12 steps, sir?

2        **INMATE RUVALCABA:**  Yes, Sir.

3        **PRESIDING COMMISSIONER PRIZMICH:**  And what's the

4   most important step to you at this juncture?

5        **INMATE RUVALCABA:**  Well, there's a couple steps

6   that were always applied on my part and applies in my

7   life, you know, and as far as the step one, admitting,

8   no, that doesn't apply to me because admitted to what,

9   because I never used anything, you know.  Just I go to

10  the meeting because it's helping me to live a better

11  life.

12       The step four, the (indiscernible) moral

13  inventory of ourselves, I know.  I know what I did.  I

14  hurt so many people.  I know I hurt so many people.  I

15  hurt her, I hurt her whole family, I hurt my own family,

16  I hurt the whole society, sir.  Imagine how I've been

17  feeling through the years I've been in prison, you know.

18       I know what I did is wrong.  I know it.  I know

19  that me even think -- Just looking at someone doing what

20  I did, looking at any kind of person that did what I

21  did, it just like I was telling my Attorney.  You know,

22  I was to watch Oprah today because these drunk people,

23  this drunk guy was hitting on the wife, you know.

24       And I find there was a time where I was in the

25  street.  A buddy of mine was hitting on his wife.  I got

1  so upset with him, I broke the -- He was about real

2  close to hurting the person, hurting the wife.  I got in

3  the middle.  He got so upset and made with me and he was

4  my friend supposedly.  You know, he was so drunk and he

5  was ready to beat the wife and that was like in that

6  little moment I went and stopped it because I know

7  what's right and what's wrong.

8       I know what I did.  I was a -- Even though I

9  wasn't a young kid when I hurt June and when I hurt

10 myself and I hurt everybody, it's just something that at

11 that moment, I didn't care for my life.  And it wasn't

12 her to get (indiscernible) through day by day, moment by

13 moment when I think of it, of hurting her, you know,

14 forget about me or any.

15      Just hurting her.  She was so loveable.  Her

16 whole family loved me so much, too.

17      **PRESIDING COMMISSIONER PRIZMICH:**  Yeah.  Well,

18 that's something that you certainly need to live with.

19      **INMATE RUVALCABA:**  And I --

20      **PRESIDING COMMISSIONER PRIZMICH:**  Sir, do you

21 have something?  Are you turning something over to us

22 here?  Is the -- No, this right here.  Is that for us?

23      **ATTORNEY TARDIFF:**  No.

24      **INMATE RUVALCABA:**  No.  The letters are all over

25 there.

1          **PRESIDING COMMISSIONER PRIZMICH:**   Okay.  All

2     right.

3          **INMATE RUVALCABA:**   I'll make sure it won't happen

4     again, Sir.  I know that for sure because it's just

5     after I got out of the hospital, my uncle that comes and

6     visits me, he comes and visits me maybe once or twice,

7     three or four times a year, and he tells me how come you

8     didn't come up to me and tell me that you had problems.

9          And I said come on, uncle, you know I'd be having

10    problems with your brother, you know, which is my dad,

11    and this --

12         **PRESIDING COMMISSIONER PRIZMICH:**   You dad still

13    drinking now, sir?

14         **INMATE RUVALCABA:**   My dad, no.  He's so sick.

15    He's diabetic.

16         **PRESIDING COMMISSIONER PRIZMICH:**   He's not

17    drinking anymore?

18         **INMATE RUVALCABA:**   And he got into -- He got into

19    his bad accident that he broke his hips and so he's

20    hardly -- He's just barely living on medication, so he

21    don't drink at all.

22         **PRESIDING COMMISSIONER PRIZMICH:**   Okay.  I'm

23    going to read into the record some of these letters that

24    are in support of you, sir.  And we'll save your letter

25    to the last and then I want to get into your parole

*Capitol Electronic Reporting*

1   plans, if you don't mind.

2        There's a letter dated -- In this letter, I want

3   to note, in many of these letters, and I'll try to

4   identify each one that is -- has been translated.  This

5   one hasn't.  But some of these letters here, and I'll

6   identify which ones they are, have been translated from

7   Spanish to English because in talking to you before,

8   sir, you said most of your family is up here in

9   California.  You only have an older sister in Southern

10  California or in Mexico.

11       And I note that there was some commentary

12  regarding you have a number of family members supportive

13  in Mexico, so I'm assuming that's what maybe part of

14  this is.  So if you would just bear with me, I'm going

15  to recap.  I'm not going to read the entire letter.  I'm

16  going recap what the letters are about.

17       A letter dated 3/18/07 from two individuals, Rudy

18  and Sara Ruvalcaba.

19       **INMATE RUVALCABA:**  Yes, Sir.

20       **PRESIDING COMMISSIONER PRIZMICH:**  Sorry.  It's a

21  letter of support and this is not a translated letter,

22  so Rudy and Sara are concerned about -- These are

23  brothers and sisters of yours?

24       **INMATE RUVALCABA:**  He's the little brother that

25  was born here.

| | |
|---|---|
| 1 | **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  So it's |
| 2 | a letter of support.  He misses being with you.  My |
| 3 | family includes my wife Sara, our recently born daughter |
| 4 | Ashley, that apparently, obviously you have not seen as |
| 5 | yet, so they write a letter of support for you, sir. |
| 6 | And they're living in Soledad. |
| 7 | A letter dated March 13, 2007 from Umberto |
| 8 | Martinez and Corina.  Is that what it is, Corina? |
| 9 | **INMATE RUVALCABA:**  That's my little sister. |
| 10 | **PRESIDING COMMISSIONER PRIZMICH:**  Okay, Martinez, |
| 11 | so she's married to Umberto? |
| 12 | **INMATE RUVALCABA:**  Yes, Sir. |
| 13 | **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  It's a |
| 14 | letter from those two, a letter to confirm our |
| 15 | unconditional support for Jose.  It's a letter of |
| 16 | support, wishing that we allow him to be paroled.  It |
| 17 | says in here we have two properties in Mexico available |
| 18 | for him as well as here in California.  We are retired |
| 19 | and very anxious to have our son with us.  This is your |
| 20 | mom and dad? |
| 21 | **INMATE RUVALCABA:**  Yes, Sir. |
| 22 | **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  I didn't |
| 23 | identify that one.  I skipped over that.  I'm sorry. |
| 24 | That's Pedro and Auroa? |
| . 25 | **INMATE RUVALCABA:**  Yes, Sir. |

71

1          **PRESIDING COMMISSIONER PRIZMICH:**  And that's

2   dated March 13, 2007.  So your mom and dad have property

3   in Mexico?

4          **INMATE RUVALCABA:**  Yes, Sir.

5          **PRESIDING COMMISSIONER PRIZMICH:**  And is there a

6   house on that property?

7          **INMATE RUVALCABA:**  Yes, Sir, yes.

8          **PRESIDING COMMISSIONER PRIZMICH:**  What kind of a

9   house?  What does it look like, what size?

10          **INMATE RUVALCABA:**  It's a full house.  It's got

11   about seven rooms.

12          **PRESIDING COMMISSIONER PRIZMICH:**  Anybody living

13   in it?

14          **INMATE RUVALCABA:**  My sister.

15          **PRESIDING COMMISSIONER PRIZMICH:**  Your sister,

16   your older sister.

17          **INMATE RUVALCABA:**  My older sister, yes.

18          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  And then

19   we get to Umberto and Corina.  And Corina is your

20   younger sister.

21          **INMATE RUVALCABA:**  Yes, Sir.

22          **PRESIDING COMMISSIONER PRIZMICH:**  And they live

23   in Soledad.

24          **INMATE RUVALCABA:**  No, actually she lives in

25   Martinez.

72

| | |
|---|---|
| 1 | **PRESIDING COMMISSIONER PRIZMICH:**  I'm sorry.  I |
| 2 | gave you the letter.  I gave the address as the -- |
| 3 | **ATTORNEY TARDIFF:**  The prison. |
| 4 | **PRESIDING COMMISSIONER PRIZMICH:**  The prison, I'm |
| 5 | sorry.  Silly me.  She lives in Martinez. |
| 6 | **INMATE RUVALCABA:**  Yes. |
| 7 | **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  This is |
| 8 | a letter of support.  It says they can't commit to get |
| 9 | him a job.  They're starting their own business, so I'm |
| 10 | sure they're pretty involved in that. |
| 11 | **ATTORNEY TARDIFF:**  It says I can commit to get |
| 12 | him a job. |
| 13 | **PRESIDING COMMISSIONER PRIZMICH:**  He can.  I'm |
| 14 | sorry.  Thank you for correcting that.  Dyslexia strikes |
| 15 | again.  My husband and I can commit to getting him a |
| 16 | job.  So what kind of a job would that be, sir? |
| 17 | **INMATE RUVALCABA:**  My brother-in-law, he's a |
| 18 | welder, so I'm a welder, too.  I can weld, too, with the |
| 19 | -- |
| 20 | **PRESIDING COMMISSIONER PRIZMICH:**  What training |
| 21 | do you have in that, sir? |
| 22 | **INMATE RUVALCABA:**  Well, in the auto body and |
| 23 | auto mechanics, I learned the -- |
| 24 | **PRESIDING COMMISSIONER PRIZMICH:**  (Inaudible.) |
| 25 | **INMATE RUVALCABA:**  Yeah, I learned how to weld on |

1  that part, too.

2      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

3  right.  Do you have a -- Do you have a certificate for

4  that or --

5      **INMATE RUVALCABA:**  I already knew it from when I

6  was in the street.  When I worked for the disposal

7  company, I used to use weld a lot.  I used to weld a lot

8  of stuff.

9      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  February

10  22nd, 2007 is from Concord.  This is Jose.  Is this your

11  brother, too?

12      **INMATE RUVALCABA:**  No, he's my uncle.

13      **PRESIDING COMMISSIONER PRIZMICH:**  He's your

14  uncle.  And Maria, support for your nephew Jose.  You're

15  named after him I assume, huh?

16      **INMATE RUVALCABA:**  Yes, Sir.

17      **PRESIDING COMMISSIONER PRIZMICH:**  Let's see.

18  Said he would help you with every step in any way.  For

19  moral support, now we have a -- We're happy to help him

20  with housing and job placement.  It's not a specific job

21  offer, but I guess they'll let you move into their

22  place.  Is that --

23      **INMATE RUVALCABA:**  Yes, Sir.

24      **PRESIDING COMMISSIONER PRIZMICH:**  What kind of a

25  house do they have in Concord?

1          **ATTORNEY TARDIFF:**  He's got two properties in

2     Mexico.

3          **INMATE RUVALCABA:**  And he has two houses, too, in

4     Concord, too.

5          **ATTORNEY TARDIFF:**  In Concord.

6          **PRESIDING COMMISSIONER PRIZMICH:**  In Concord,

7     okay.

8          **INMATE RUVALCABA:**  Yeah.

9          **PRESIDING COMMISSIONER PRIZMICH:**  So would you

10    live with them or --

11         **INMATE RUVALCABA:**  I would do anything good in

12    any kind of society, sir, whether in here or in Mexico.

13         **PRESIDING COMMISSIONER PRIZMICH:**  I do note that,

14    yeah, he does have two properties in Mexico.

15         **INMATE RUVALCABA:**  Yeah.

16         **PRESIDING COMMISSIONER PRIZMICH:**  And are they --

17    Are they -- Do they have houses on the properties as

18    well?

19         **INMATE RUVALCABA:**  Yes, Sir.

20         **PRESIDING COMMISSIONER PRIZMICH:**  Is there

21    anybody in the houses?

22         **INMATE RUVALCABA:**  At this time, it's some family

23    members are using them right now because they live up

24    here, so some family members are --

25         **PRESIDING COMMISSIONER PRIZMICH:**  He travels back

75

1 and forth.

2     **INMATE RUVALCABA:** Yeah, yeah. He travels once a

3 year.

4     **PRESIDING COMMISSIONER PRIZMICH:** Okay. And then

5 a letter dated February 2007 from Augustina Gonzales

6 Torrez.

7     **ATTORNEY TARDIFF:** Aunt in Mexico.

8     **PRESIDING COMMISSIONER PRIZMICH:** That's an aunt.

9 And she's offering you a home and support in any way.

10 Do you know is that your family place of residence?

11     **INMATE RUVALCABA:** That's from my -- That's from

12 my mom's side, yeah.

13     **PRESIDING COMMISSIONER PRIZMICH:** Okay, this is

14 your aunt from your mom's side.

15     **INMATE RUVALCABA:** Yes.

16     **PRESIDING COMMISSIONER PRIZMICH:** Okay. A letter

17 and this is -- This letter was translated from a letter

18 that was originally written in Spanish, so I appreciate

19 the work that you've gone through to translate that for

20 our behalf. I'm sure you can read it, can't you?

21     **INMATE RUVALCABA:** Yes, Sir.

22     **PRESIDING COMMISSIONER PRIZMICH:** A letter dated

23 February 2007 from Theresa Gonzales Torrez. This one

24 also has been translated. This is in Jalisco, Mexico as

25 well. Unconditional support for my nephew Jose. Hard

1  working, wan to offer my home. So she's offering --

2  You've got more homes than a (indiscernible) has pills,

3  I think. You've got several up here and a number down

4  in Mexico. A very nice family it sounds like.

5        A letter dated, and again, that was translated, a

6  letter dated -- Here's another translated letter dated

7  February 2007. Confirms my unconditional support for my

8  nephew, offering her home, and this is Esther Gonzales

9  Torrez. She is an aunt to you, sir? And that's in

10  Jalisco, Mexico as well and again, that was translated.

11        A letter from February 2007. This is also

12  translated, from engineer Edgar Hernandez Gonzales. He

13  is --

14        **INMATE RUVALCABA:** He's my cousin.

15        **PRESIDING COMMISSIONER PRIZMICH:** Cousin, it

16  doesn't -- Yeah, okay. I'd like to offer employment and

17  housing when he comes to Mexico. What kind of

18  employment, sir?

19        **INMATE RUVALCABA:** Well, he's an engineer.

20  Mechanic would be part of my job if I -- if I were --

21        **PRESIDING COMMISSIONER PRIZMICH:** Mechanic, yeah,

22  like working on cars?

23        **INMATE RUVALCABA:** Working on cars, yes.

24        **PRESIDING COMMISSIONER PRIZMICH:** (Indiscernible

25  cars, okay. All right. Okay. He offers a home and

1    does he own his own business, sir?

2         **INMATE RUVALCABA:**  I'm not sure at this time, but

3    he's been working in that company for a while.

4         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.

5         **INMATE RUVALCABA:**  So he probably is.

6         **PRESIDING COMMISSIONER PRIZMICH:**  He has the

7    authority, I guess, to make an offer, a job offer?

8         **INMATE RUVALCABA:**  Yes.  Yes, Sir.

9         **PRESIDING COMMISSIONER PRIZMICH:**  A letter dated

10   February 2007 from, this is also translated for us,

11   license Arcelia Corina Gonzales Ruvalcaba.

12   Unconditional support of Jose related, honest,

13   hardworking person, offer support of housing.  Is this

14   your aunt as well?

15        **INMATE RUVALCABA:**  No, she's another -- She's

16   another cousin, too.

17        **PRESIDING COMMISSIONER PRIZMICH:**  Another cousin.

18   Okay, she's offering a house and she lives in Jalisco as

19   well?

20        **INMATE RUVALCABA:**  Yes, Guadalajara.

21        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  That was

22   a translated letter.  Letter dated February 2007.

23   Sincerely, Josephina Gonzales Torrez.  Who is she to

24   you, sir?

25        **INMATE RUVALCABA:**  She's my mom's sister, my

1  other aunt.

2      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Offer

3  him my home and my support in any way to integrate into

4  society.  She's in Guadalajara, too?

5      **INMATE RUVALCABA:**  Yes, Sir.

6      **PRESIDING COMMISSIONER PRIZMICH:**  And that's a

7  translated letter.  Is that all the letters besides this

8  one that you have on your behalf?

9      **INMATE RUVALCABA:**  Yes, Sir.

10      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  So this

11  is -- Do you want to read this at the end?  Would you

12  like to do that?  This is your letter to the victim in

13  this case.

14      **INMATE RUVALCABA:**  Yes, Sir.

15      **PRESIDING COMMISSIONER PRIZMICH:**  Would you like

16  to read that at the end?  It might be more appropriate

17  for you to read it than me.  We'll be -- I'll be happy

18  to look it over, but I'm going to paraphrase it.  That

19  is, I'm not going to read the whole thing.  I'm going to

20  -- You may want to read the whole thing.

21      **INMATE RUVALCABA:**  I can't send it to June?

22      **PRESIDING COMMISSIONER PRIZMICH:**  Well, that'll

23  be between you and the District Attorney's Office.

24  We're not in the position to offer that.  I understand

25  your motivation, but you know, as you know in the 12

79

 1    steps of Alcoholics Anonymous, you can make amends as

 2    long as it doesn't hurt somebody in the process.

 3            **INMATE RUVALCABA:**  Yeah.

 4            **PRESIDING COMMISSIONER PRIZMICH:**  So you know,

 5    all that stuff has to be thought through before you just

 6    --

 7            **ATTORNEY TARDIFF:**  You have to go -- You can't

 8    contact the victim directly.

 9            **INMATE RUVALCABA:**  For that reason, I never --

10    For that, Sir, for that reason, I never -- Many times it

11    got into my head to write a letter to June.  From the

12    beginning, from the beginning.  But I always read, since

13    I've been going to AA and I started seeing how steps go,

14    how applied to people and when step nine and certain

15    steps that tells me not to even touch.

16            **PRESIDING COMMISSIONER PRIZMICH:**  Yeah, your role

17    in life is to clean your life up.

18            **INMATE RUVALCABA:**  Yes.

19            **PRESIDING COMMISSIONER PRIZMICH:**  Not to create

20    more wreckage.

21            **INMATE RUVALCABA:**  Yes, Sir.  Yes, Sir.

22            **PRESIDING COMMISSIONER PRIZMICH:**  Is that

23    correct?  The last three steps, I think, deal with

24    maintaining the good life.

25            **INMATE RUVALCABA:**  Yes.

| | |
|---|---|
| 1 | **PRESIDING COMMISSIONER PRIZMICH:** All the stuff |
| 2 | leading up to that is getting yourself cleaned up. So |
| 3 | you don't want to create more wreckage -- |
| 4 | **INMATE RUVALCABA:** No, Sir, no. |
| 5 | **PRESIDING COMMISSIONER PRIZMICH:** -- by trying to |
| 6 | clean up your life. So those are -- We understand your |
| 7 | heart in this thing and what your motivation is, but |
| 8 | you, you know, you need to and the DA will closely look |
| 9 | at the, you know, the injury that that may cause to a |
| 10 | woman who is currently blind as a result of your |
| 11 | actions, you know. And then she may not want to deal |
| 12 | with it any longer, so. Got it? |
| 13 | So what I'm going to do, sir, is I'm going to |
| 14 | give this back to you and you can read this at the end, |
| 15 | at the end, at your statement. Would that be all right? |
| 16 | **ATTORNEY TARDIFF:** If he wants to. I mean, I |
| 17 | don't know what he wants to do with this. |
| 18 | **INMATE RUVALCABA:** Is it proper though? |
| 19 | **PRESIDING COMMISSIONER PRIZMICH:** Well, it's -- |
| 20 | This hearing is, sir, for to determine whether you're |
| 21 | suitable for parole. |
| 22 | **INMATE RUVALCABA:** Yes, Sir. |
| 23 | **PRESIDING COMMISSIONER PRIZMICH:** And you know, |
| 24 | part of it is our evaluation of you, but part of it is |
| 25 | who it is that you want to give us. And if you think |

1   this is important for us to hear about you, then read it

2   into the record.  Or paraphrase it.  I can do it.  I

3   mean, I can do it if you'd like, but I, you know --

4       **INMATE RUVALCABA:**  If it's easy for you guys,

5   it's probably better on my part.

6       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Why

7   don't I just -- I'm just going to cover part of this, so

8   no point in talking about it any longer, but we do

9   appreciate, you know, the effort you made.  You know, at

10  some point, either us or you are going to give it to the

11  DA for him to make an evaluation, but typically, you

12  know, what's done is done and while we understand, you

13  know, the motivation on your part, we're -- I'll read

14  part of this into the record.

15      It says with great shame of myself, I write this

16  letter to you, and this is to June, hoping that your

17  health and your well being is allowing you to live an

18  okay life.  Probably my words don't mean much to you,

19  but I'm very sincere.  This whole time that I've been

20  incarcerated, I think -- incarcerated, I always -- I've

21  always been thinking about your health.

22      June, my bad actions towards you, it was never an

23  excuse to go to you and hurt you.  I almost took your

24  life.  I'm so sorry for all this, all the pain I

25  inflicted to you, your whole family.  My bad judgment

1   and stupid, sad mind and my weakness pushed me and
2   allowed me to make the worst and wicked mind of me at
3   that moment.

4       June, I know that in this world we live in,
5   people like me that make this kind of mistake like me,
6   to be forgiven, I know -- I know it would be hard, I
7   think you're trying to say.  I know it would be hard,
8   but all this, I'm so ashamed of myself and I'm so hard.
9   It's so hard for me to ask for forgiveness.

10      Says that you fell in love with her in the short
11  time you were together.  When you broke the
12  relationship, you couldn't handle it and you acted in a
13  stupid way.  I had small or big problems when I was in
14  the streets.  I had problems with my family, with my
15  residence, I think is what you're saying, my work here
16  in the USA, part of all this, these things, and the
17  breakup, the breaking from you made me lose my head.

18      Even though there are no excuses for me to hurt
19  you and almost take your life, I'm sorry for my stupid
20  actions.  Mention that you've been going to AA and
21  that's been helpful for you.  You again mention that
22  you're sorry for ruining her life, all the suffering and
23  pain that you've inflicted her and yourself as well, and
24  your family.

25      June, I know that you do not want to see me close

| | |
|---|---|
| 1 | to you.  I understand very clear.  One of the steps of |
| 2 | AA tells me to make direct amends to such people |
| 3 | wherever possible, except when to do so would injure |
| 4 | them or others.  I think that this step tells me to make |
| 5 | only restitution complete disclosures to them or others |
| 6 | more harm than good, so for this, I do understand the |
| 7 | damage I did to you and your whole family. |
| 8 | You close it by saying June, I'm so ashamed of |
| 9 | all of it and so sorry and remorseful for everything, |
| 10 | your whole family.  Please forgive me.  Okay.  Did I |
| 11 | cover that adequately enough for you, sir? |
| 12 | **INMATE RUVALCABA:**  Yes, Sir. |
| 13 | **PRESIDING COMMISSIONER PRIZMICH:**  Right now, |
| 14 | right now, sir, I'm going to turn it to the DA.  He's |
| 15 | going to ask you whatever questions he may and then |
| 16 | we'll go to your Attorney, sir. |
| 17 | **DEPUTY DISTRICT ATTORNEY COPE:**  Would you like me |
| 18 | to go through you, Commissioner, or are you going to -- |
| 19 | **PRESIDING COMMISSIONER PRIZMICH:**  Typically what |
| 20 | we do, I think it'll be fine this way, just talking to |
| 21 | him directly, but typically what we do, sir, is we go |
| 22 | this way and that's just to create a little bit more |
| 23 | order.  But I think, is it going to be a long series of |
| 24 | questions? |
| 25 | **DEPUTY DISTRICT ATTORNEY COPE:**  Five or six |

84

1  probably.

2       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Why

3  don't you just ask him directly and if there's a

4  problem, I'll jump in.

5       **DEPUTY DISTRICT ATTORNEY COPE:**  Sure.  Mr.

6  Ruvalcaba, do you remember having a good friend named

7  Corey Warfield?

8       **INMATE RUVALCABA:**  Yes, sir.

9       **DEPUTY DISTRICT ATTORNEY COPE:**  You told the

10 Panel earlier that you didn't know very much about guns,

11 but didn't you brag to Mr. Warfield that, prior to the

12 shooting, that you were able to get any kind of gun you

13 wanted?

14      **INMATE RUVALCABA:**  I didn't brag that to him,

15 sir.

16      **DEPUTY DISTRICT ATTORNEY COPE:**  And that you, in

17 fact, took him to your friend, your Mexican friend's

18 house in Pittsburgh and showed him Uzis, Mac 10s, AK-

19 47s, and you even let him hold one of those machine

20 guns.

21      **INMATE RUVALCABA:**  No, no, sir, that's --

22      **DEPUTY DISTRICT ATTORNEY COPE:**  That's not true?

23      **INMATE RUVALCABA:**  That's totally wrong there.

24      **DEPUTY DISTRICT ATTORNEY COPE:**  It's all wrong

25 except for the fact that you did have a friend named

1  Corey Warfield?

2      **INMATE RUVALCABA:** I used to go out with him a

3  lot.

4      **DEPUTY DISTRICT ATTORNEY COPE:** Were you aware

5  that he told that to the police, about your familiarity

6  with guns?

7      **INMATE RUVALCABA:** That's new to me, sir, that's

8  very new to me.

9      **DEPUTY DISTRICT ATTORNEY COPE:** Did you have

10  Mexican friends in Pittsburgh that had guns?

11      **INMATE RUVALCABA:** As far as -- As far as back in

12  those days, I didn't see no one using a gun and when I

13  was -- I had a lot of friends in Pittsburgh because

14  that's the Mexican friends, they were from my hometown

15  that I used to go and speak to them, but they never

16  showed me any guns. They never show any weapons of any

17  kind.

18      **DEPUTY DISTRICT ATTORNEY COPE:** Did you know that

19  the gun you used in this case was a stolen gun?

20      **INMATE RUVALCABA:** I found out later in the

21  court, sir.

22      **DEPUTY DISTRICT ATTORNEY COPE:** You didn't know

23  it was stolen beforehand?

24      **INMATE RUVALCABA:** No, sir.

25      **DEPUTY DISTRICT ATTORNEY COPE:** Did you know

1  anything about how it was stolen?

2      **INMATE RUVALCABA:**  No, sir.

3      **DEPUTY DISTRICT ATTORNEY COPE:**  You told the

4  Commissioner earlier that you lived in Concord in 1990

5  and you didn't know anything about Hispanic gangs in

6  Concord?

7      **INMATE RUVALCABA:**  I lived in Martinez, sir.

8      **DEPUTY DISTRICT ATTORNEY COPE:**  All right,

9  Martinez, even though, had you even been on Monument

10  Boulevard in Concord?

11      **ATTORNEY TARDIFF:**  I'm going to object.  This is

12  argumentative.  This is argumentative with --

13      **PRESIDING COMMISSIONER PRIZMICH:**  Sir, could you

14  just -- Were you aware of gangs in Concord or Martinez

15  at the time that you were out in --

16      **INMATE RUVALCABA:**  The people that I used to go

17  out with or hang out with, they were never no gang

18  members of any kind.

19      **PRESIDING COMMISSIONER PRIZMICH:**  Okay, but the

20  question is were you aware of gang members?  Was there

21  gang -- Did that enter -- Was that something that you

22  were aware of, that there were gangs out there in the

23  area?  Not that you associated with necessarily.

24      **INMATE RUVALCABA:**  Whether they existed or not, I

25  never paid much attention because I wasn't -- It wasn't

*Capitol Electronic Reporting*

1  part of my life when I was living in the street.

2         **PRESIDING COMMISSIONER PRIZMICH:**  Okay.

3         **DEPUTY DISTRICT ATTORNEY COPE:**  Well, I'm

4  shifting gears, Commissioner, if you want me to now go

5  though.

6         **PRESIDING COMMISSIONER PRIZMICH:**  Yeah, just go

7  through.

8         **DEPUTY DISTRICT ATTORNEY COPE:**  There's some

9  indication from Mr. Warfield, his friend, also that he'd

10 had a difficult breakup with a girl just prior to the

11 victim and that messed him up somehow.

12        **PRESIDING COMMISSIONER PRIZMICH:**  Okay, was there

13 was there another female that you had been involved

14 with prior to June that you had -- you broke a

15 relationship with and had an emotional roller coaster

16 over that, sir?

17        **INMATE RUVALCABA:**  No, Sir, I went out with many

18 girls before June and when the relationship broke, I

19 never really -- I understood things, you know, because

20 --

21        **PRESIDING COMMISSIONER PRIZMICH:**  You never had

22 -- You never had a difficult breakup then?

23        **INMATE RUVALCABA:**  No, Sir, no.

24        **PRESIDING COMMISSIONER PRIZMICH:**  All right.

25        **DEPUTY DISTRICT ATTORNEY COPE:**  In the police

*Capitol Electronic Reporting*

1  report that actually the Board gave me today, it says a

2  Mr. Warfield told the police that the inmate had been

3  screwed over by another girl just previous to his

4  relationship with June and that caused him to be very

5  possessive.  I wonder if he would agree with that

6  statement or disagree with that.

7      **PRESIDING COMMISSIONER PRIZMICH:**  Do you recall

8  in terms of June, it does sound to me and I'll ask you

9  this question, does it sound to you like you were pretty

10 possessive about her?

11     **INMATE RUVALCABA:**  This is -- This is, for my

12 part, this is new to me, sir, because --

13     **PRESIDING COMMISSIONER PRIZMICH:**  No, but that's

14 not the question I asked.  Were you possessive over

15 June?  Was there some possession?

16     **INMATE RUVALCABA:**  Not really, Sir, because ever

17 time her and I went out, we went out because I work all

18 morning until five o'clock.

19     **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

20 right.

21     **INMATE RUVALCABA:**  And so I go call her in the --

22     **PRESIDING COMMISSIONER PRIZMICH:**  You don't feel

23 as though you were more possessive --

24     **INMATE RUVALCABA:**  No, I don't think I felt --

25     **PRESIDING COMMISSIONER PRIZMICH:**  Or it was as a

1    result of --

2        **INMATE RUVALCABA:**  I don't think I felt -- No,

3    Sir, I don't think so.

4        **PRESIDING COMMISSIONER PRIZMICH:**  Well, you know,

5    let me just tell you.

6        **INMATE RUVALCABA:**  Yeah.

7        **PRESIDING COMMISSIONER PRIZMICH:**  It seems to me

8    that when you try to take someone's life and you take

9    your own, that has to do with some possession.

10        **INMATE RUVALCABA:**  Yeah, yeah.

11        **PRESIDING COMMISSIONER PRIZMICH:**  You're

12    eliminating her from (indiscernible).

13        **INMATE RUVALCABA:**  Yeah, I know, I know.  I

14    understand that part.  I understand that part very

15    clearly, Sir.  Very clearly.

16        **PRESIDING COMMISSIONER PRIZMICH:**  But what as a

17    -- Were there other females that hurt you that gave rise

18    to perhaps a little bit more possession with June

19    because you loved her a little bit more than the other

20    girls?  Were there other relationships that caused you

21    maybe to be a little bit more possessive regarding June?

22    Can you comment on that?

23        **INMATE RUVALCABA:**  For my part, Sir, before June

24    I went out with many girls and I had relationships with

25    many girls.  And as far as any kind of breakage of a

1   relationship, nothing go out of hand, you know, because

2   it was --

3       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  All

4   right.

5       **INMATE RUVALCABA:**  It's just what you are saying,

6   Sir, that it also was brought on court, when I was going

7   to court that I was very possessive.  Me hurting her,

8   that probably puts the, you know, puts that I was very

9   possessive over her.  It's hard for me to understand

10  things, but what happened back then and me making the

11  stupidity of hurting her and hurting myself is not

12  really being possessive over a girl.  It was possessive

13  over my own life.

14       And I understand it.  I understand that me

15  hurting her is -- I don't even think about myself, but

16  back in those days, back in that moment when I hurt her

17  and I hurt myself, at that time I didn't care for life

18  and I -- And I --

19       **PRESIDING COMMISSIONER PRIZMICH:**  Okay, we got

20  that part.

21       **INMATE RUVALCABA:**  I just went wild and bad evil

22  got to me because I'm not -- I've been going -- I've

23  been going to --

24       **PRESIDING COMMISSIONER PRIZMICH:**  I got you.

25  Okay.  Sir, any other questions?

1      **DEPUTY DISTRICT ATTORNEY COPE:**  Just one last

2   area that I wanted to clarify and it has to do with the

3   sequence of when the breakup was in conjunction to when

4   the shooting.  Again, the police reports that you gave

5   me show that at least three separate people, in the

6   hours and maybe as much as a day before the shooting,

7   heard the defendant say things like nice knowing you,

8   I'm going to, quote, "shoot the bitch and then I'm going

9   to shoot myself."  And this was hours or maybe even a

10  day before.

11      So my question would be along the lines of when

12  did he make those statements.  Did he make them.

13      **PRESIDING COMMISSIONER PRIZMICH:**  Do you recall

14  making those statements, Jose?

15      **INMATE RUVALCABA:**  At that little moment, Sir.

16  When I --

17      **PRESIDING COMMISSIONER PRIZMICH:**  So you had

18  resolved in your own mind --

19      **INMATE RUVALCABA:**  When I went to see grandma and

20  then I called Stacey through the phone.  I called and

21  then I asked her hey, where's June at.  She said she's

22  not here right now, but she'll be coming here in a

23  minute.  So I go and see Corey.  When I went -- When I

24  went to see Corey, she wasn't there yet.

25      But when she called her on the phone and I'm

1   right there on the bottom, it was a two (indiscernible).

2   I think it was an apartment with the second floor and

3   she's on the second floor and she's speaking to June on

4   the phone, and then I got to her on the phone and at

5   that time, that's where all those words came out of my

6   mouth.

7        **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   We're

8   just trying to get that you did say those things.

9        **INMATE RUVALCABA:**   Yeah, at that little moment.

10       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.

11       **INMATE RUVALCABA:**   I'm not going to change

12  nothing, Sir, because what happened I --

13       **PRESIDING COMMISSIONER PRIZMICH:**   Nobody's asking

14  you.

15       **INMATE RUVALCABA:**   I know, Sir.

16       **PRESIDING COMMISSIONER PRIZMICH:**   We're just

17  trying to get it clarified.   (Indiscernible.)

18       **DEPUTY DISTRICT ATTORNEY COPE:**   I'm finished,

19  thank you.

20       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   Ms.

21  Tardiff, please.

22       **ATTORNEY TARDIFF:**   I have no questions.

23       **PRESIDING COMMISSIONER PRIZMICH:**   Okay.   We have,

24  sir, sent out what are called PC section, Penal Code

25  section 3042 notices and what those are, they're

1    requests or notifications of various agencies that have

2    an interest in the case, like the Police Department that

3    may have investigated or whatnot.

4         And I do want to note and you're fully aware that

5    the District Attorney from Contra Costa County is here

6    to address this matter and I don't have any other

7    written and/or obviously no one else is here to address

8    it, so I wanted to at least put that on the record that

9    the notices were sent out.  The DA from Contra Costa

10   County is here and we'll turn it over to him first to

11   make a closing statement, your Attorney, and then you,

12   sir, to make a closing statement.

13        Mr. DA.

14   **DEPUTY DISTRICT ATTORNEY COPE:**  Thank you.  And

15   I'll just take a couple of minutes.  I know that the

16   Panel, Commissioner, you folks have the very difficult

17   assignment.  You have to sit there and be absolutely

18   impartial and basically in a case like this have to

19   determine the inmate's sincerity in what he's doing and

20   saying and I have the luxury of not having to do your

21   job and I can be -- I don't have to be so impartial and

22   I can say what I'm thinking a little bit.

23        But I am here to oppose the release and as I

24   don't know how you're going to take -- These are

25   official police reports with statements of these

1  witnesses that talk about him and his familiarity with
2  guns and we know that the gun in this case was stolen.

3       This is a very serious crime in which a young
4  lady is never going to be able to read that letter
5  because she's blind.  It's a horrible thing that
6  happened.  I don't know if the inmate is just telling us
7  what we want to hear.  He's very good at what he's
8  saying and what he's saying is very appropriate and I'm
9  hoping that it's sincere.

10      But there's one area that bothers me and
11  Commissioner, you started to touch on it and I think
12  that everybody recognized it because even in the
13  psychological reports where they say he's got great
14  insight into what the crime was, I have to disagree with
15  that.  He knows that this girl broke up with him and he
16  knows that that made him upset and he went and shot her,
17  her and himself.

18      But there's that whole step in between because
19  normal people don't do that with girlfriends that break
20  up with them.  He can't explain.  He even one time said
21  it's hard for me to understand because it's not easily
22  explainable and I can't do it because I haven't gone
23  through what he's gone through.

24      But he hasn't gained that type of insight.  He
25  keeps saying things like I just lost my head in the

1   moment.  The jury found him guilty of premeditated and

2   deliberate attempted murder.  And we know for the hours

3   and the days before he was making statements saying,

4   telling people that he was going to do it.

5        And then he went and got a gun.  It wasn't just

6   in the moment.  He just doesn't understand it and he's

7   trying to gloss over the part that he doesn't

8   understand, but he still doesn't understand and that's

9   bothersome to me because when he goes back out in the

10  frustrating world, whether it's because -- I'm not even

11  suggesting that he's going to drink alcohol or anything

12  like that.  He's going to get into relationships with

13  people and people are going to break them off with him.

14       And if he's got a possession issue or something

15  that happened in his life that causes that problem, it

16  scares me and it's concerning to us in the public that

17  have to take care of the public safety.

18       So I'll cut this short, but those are the basic

19  reasons that I thought of and why we are opposing his

20  release.  And the hard job is yours, so thank you.

21       **PRESIDING COMMISSIONER PRIZMICH:**  Thank you, sir.

22  Ms. Tardiff.

23       **ATTORNEY TARDIFF:**  Thank you.  First of all, a

24  couple comments about the District Attorney's

25  statements.  I saw in the reports about going over to

1 these people's houses where they had guns, but other

2 then that, it doesn't sound as if he had a familiarity

3 with guns other than he knew these people that had guns.

4     And to further bolster that is the fact that

5 there's numerous statements by many people that he never

6 had a gun and okay, Pedro is his brother.  Jose does not

7 own a gun and he had no idea where Jose may have gotten

8 the weapon.  Pedro said that Jose does not drink or use

9 drugs and he's not a violent person, that this is

10 totally out of character for Jose to have a gun or to

11 use it.

12     And then we've got a statement by another.  I

13 believe that this was Cushman.  And that was the

14 victim's best friend and the suspect, Mr. Ruvalcaba, is

15 a good friend.  And she stated that she had never known

16 the suspect, meaning my client, to have a gun.  She

17 believed the gun was his father's, Mr. Ruvalcaba's

18 father's gun.

19     She said that he doesn't do drugs.  He drinks

20 occasionally, yet not to excess.  She said that his

21 actions was totally out of character for him.  She had

22 never known him to be violent.  He is normally level

23 headed, holds a steady, well paying job for Baypoint

24 Garbage Company, and she said she trusted him and that

25 he'd always been one to stop fights as opposed to

1   starting them.  And that's the victim's best friend.

2        And then I have Warfield said that Mr. Ruvalcaba

3   is usually very level headed and that his behavior for

4   the past couple of days was very much out of character

5   for him.  So I think that the District Attorney is

6   trying to build or build up that Mr. Ruvalcaba was this

7   enraged person for a long, long time.

8        Also, he alluded to that my client had prior

9   breakups that were distraughtful.  And there may be

10  testimony regarding that, but there's also Corey

11  Warfield, and this is on page five of, I guess this is,

12  the Probation Officer's report, testified that in

13  general the defendant was a happy guy and always had

14  girls willing to go out with him.

15       He said he had never previously seen the

16  defendant frustrated over a girlfriend.  And this was

17  his best friend.

18       So to me, that there is ample evidence that Mr.

19  Ruvalcaba was not distraught over some prior breakup,

20  that he may have known people that had guns and that's

21  it, but there's no evidence to show that he had

22  familiarity.  In fact, to the contrary, people testified

23  that he'd never had a gun, never was violent, was always

24  a nice guy.

25       This was obviously something that was totally out

1    of character.  Additionally he had a psychological

2    evaluation done at that time.  And this goes to the

3    premeditation.  This was done by Dr. Lossy or Lossy, L-

4    O-S-S-Y, dated 6/28/91.

5        It seems unlikely that if he actually obtained a

6    gun with the intent of shooting June and himself.

7    Anyway, it goes on how he would have done that and goes

8    through some of the facts and then it says some of these

9    details tends to confirm Jose's allegations he had no

10   conscious intent to shoot June at the time he went to

11   Corey and Stacey's apartment, although he did hope to

12   find June there.

13       It appears that the intent to use the gun on

14   himself and on June probably did not form in his

15   distraught mind until the end of his unsuccessful

16   telephone contact with June.  It probably formed out of

17   his helpless rage after she hung up on him and she

18   begged -- and he begged her to give reasons for breaking

19   up with him.

20       And I'm not in any way condoning what he did.

21   But I'm just countering the fact of some of these things

22   that I believe that were made by the District Attorney

23   tend to characterize my client as, you know, this

24   jealous person who had had prior jealous relationships

25   and, you know, that this is a pattern, so to speak.

99

1        I submit that, in fact, it's not a pattern, but
2   in fact was totally out of character based on the people
3   who knew him.

4        It concludes these emotional reactions and the
5   history given by Mr. Ruvalcaba are clearly not those of
6   a sociopathic individual.  So I just wanted to clear
7   that up.

8        In terms of his pre-incarceration history, it is
9   supportive.  He came from an intact family.  He had a
10  good work history.  No substance abuse issues and
11  absolutely no criminal arrests or convictions at all.

12       Since he's been incarcerated, he's obtained two
13  vocations, auto body and auto mechanic.  He's upgraded
14  himself educationally by getting a GED, further courses
15  particularly in computers and information technology.
16  He's participated in self-help throughout his entire
17  incarceration, taking a lot of Anger Management and AA
18  and NA.

19       I do think that he has difficulty maybe
20  understanding some of the questions, particularly about
21  the use of AA for himself personally and I know he
22  wasn't able to answer that very good, but what I can
23  submit on his behalf is the fact that he could take the
24  step and write the letter and know about making amends.
25  He does apply these steps in his life.  He does use it.

1    Also, there's many times not that much stuff
2    available and they take -- and an inmate will take AA or
3    NA as a way of getting some sort of self-help in.   And
4    lots of times then, instead of like saying why are you
5    doing AA or NA, you're not an alcoholic, the Panels say
6    well, do AA or NA, even if you aren't an alcoholic.   So
7    you know, it just seems like you can't win.
8        He's participated in the Laubach tutoring.   He
9    helps -- has helped other inmates.   He's had only one
10   115.   That was 11 years ago.   It should no longer be
11   used as an unsuitability factor.   It was a work
12   stoppage.   No force or violence at all.
13       I submit that the crime was he was operating
14   under significant stress and I'll go into that in a
15   minute and it's unlikely to reoccur because the scenario
16   is just not going to come up.
17       His psych evals are favorable, not only the most
18   current one, but the prior one.   And what was not read
19   into the record on the most current one, I'd like to
20   place into the record that he was open, sincere, and
21   earnest.
22       He accepts full responsibility for the commitment
23   offense.   At the time he was under a great deal of
24   emotional stress.   Family dynamics outlined in the
25   previous report resulted in a desire to support his

1  family, but at the same time to leave his family and
2  become independent.

3      He was under pressure at work because apparently
4  the owners at work had changed and they were demanding
5  that he either produce papers as to being a citizen or
6  that he was legally here and he didn't have that.  He
7  was afraid he was going to lose his job.

8      And it goes on, in the midst of all this stress,
9  the victim broke off this relationship abruptly without
10  any explanations.  The result was that he lost complete
11  control and he was overcome with feelings of hurt,
12  rejection, anger, and jealousy, as well as confusion.
13  Again, I'm not condoning the crime.

14      States he expressed deep feelings of sorry and
15  remorse.  They're quite sincere and genuine.  And then
16  it goes on to state, and this is to his insight, he's
17  explored the commitment offense and the underlying
18  causes at length.  I agree with Dr. Sexton's assessment
19  that his explanation of causes related to this offense
20  is outstanding.  He totally understands what motivated
21  him to become involved in this offense at the time.

22      He continues to be remorseful and bothered by
23  this action.  He does not need to participate in any
24  further counseling, therapy, or self-help groups in
25  order to understand himself and his actions better at

*Capitol Electronic Reporting*

1  that time.

2      And then of course, we have the level of the

3  service inventory, which is extremely low, .8, low risk.

4  There's no risk factors in this case.  He has a great

5  deal of family support and his prognosis for successful

6  adjustment to the community is very excellent.

7      The prior psych done in '04, again the Panel can

8  refer to the 115.  It goes into the dynamics that were

9  present at the time of the commitment offense.  You

10  know, he wanted to -- His father physically prevented

11  him from leaving the family home.  At other times he

12  felt the duty to his mother and his sister and felt that

13  he could not abandon his family to his father.  And he

14  had no idea how to get out of it and just felt trapped.

15      It goes into the employer again.  And then it

16  says it should be noted that for the Mexican culture,

17  the eldest male son speaking so frankly about his

18  immediate family is more than discouraged.  It says even

19  further how much this individual has grown through his

20  incarceration, that he understands that he has to come

21  to grips with his family dynamics and resulting

22  behavior, even if it means breaking a cultural taboo.

23      He views, and then it goes on, gets off of that,

24  and says he views Alcoholics Anonymous as a self-help

25  program that he uses in his daily life.  He's requested

1   therapy numerous times, first started in '97.  Requested

2   again in '02 and in '03 he made the same request, but of

3   course, it's not available to him unless you're Triple-

4   CMS.

5        So he's made every attempt to continue to get

6   self-help.  Says the inmate is clearly well oriented, no

7   Axis I or Axis II diagnoses, a high GAF score of 80 in

8   the '04.  There was four issues that the Board at that

9   time wanted addressed.  One was his violent potential in

10  the community and it says it is my assessment based on

11  his lack of previous criminality, his lack of violations

12  in CDC, and his greater maturity and understanding of

13  the commitment offense that he is no more likely to be

14  violent in the community than the general population.

15       The next question was how alcohol and drugs

16  related to the commitment offense and it says there's

17  absolutely no indication that the inmate was involved in

18  alcohol or drug abuse either before, during, or after

19  the commitment offense.

20       The third question, and this is all on page five

21  of the '04 report, was to the extent to which he's

22  explored the commitment offense and come to terms with

23  the underlying causes and it says the inmate's

24  explanation of the commitment offense and underlying

25  causes was outstanding in this clinician's opinion.

1    He clearly understands what motivated him to

2    commit the commitment offense.  He continues to be

3    troubled by it and is very remorseful.  There is little

4    more that he can do to better understand what motivated

5    him at that time.

6    And the last question that the Board wanted

7    answered was whether he needed further self-help.  And

8    it goes on to state, of course, there is no services

9    provided for a lifer.  The inmate appears to have been

10   made -- have made excellent use of the services that are

11   available.

12   And it concludes in this clinician's opinion, the

13   inmate is completely prepared to be released on parole

14   and it's my expectation that he will comply with all of

15   the conditions of parole without difficulty.

16   His parole plans are viable.  He has marketable

17   skills and a job offer in his field, mechanics, auto

18   mechanics.  He has numerous places to live, not only in

19   California, but Mexico.

20   Based on the expert's opinion, both, not just

21   one, but several, that he has explored the offense to

22   make him suitable to be released.  Further incarceration

23   at this point would only be to punish and not to assist

24   in him becoming more suitable for parole.  It appears as

25   if he is, in fact suitable at this time.  Thank you.

1          **PRESIDING COMMISSIONER PRIZMICH:**  Thank you,

2     ma'am.  Sir, it's your opportunity to make a closing

3     statement.

4          **INMATE RUVALCABA:**  Well, all I can say that, Sir,

5     that never in my wildest dreams I be thinking I'll be --

6     think I'm going to feel for what I did, Sir.  Not in my

7     wildest mind.  I know what I did was wrong, Sir.  I know

8     I was totally out of my head when I did the crime.

9          I know I probably said words that became out of

10    my head, out of my mind with the bad spirit I was

11    carrying at that moment.  I know I can't change nothing.

12    I'm so, so sad in just thinking, you know, every moment

13    when I -- when I -- when I think about what brought me

14    here, what brought me to prison.  The person I hurt,

15    Sir.  The family I -- The pain I inflicted, Sir.  You

16    think I might be feeling.

17         I'm not proud of myself.  I'm trying to do my

18    best in here to be a new person because I'm already a

19    new person.  I make the wrong mistake in my life.  I'm

20    not going to make it up again, not going to mess it up

21    again.  I'm so -- I'm so sad for her and for her whole

22    family.

23         I had -- I had -- I had nice friends in the

24    street, I mean, Corey and Stacey and Mike and all my

25    friends and all my Mexican friends in Pittsburgh.  I

1   mean, when I brought up the gangs because I was never

2   into.  My mind was never into it.  I was never into any

3   kind of bad thing in my life.  I was -- I was a person

4   that was doing everything right.  Everything was doing

5   right.  I just make the --

6        I'm so sorry that I hurt June so bad.  And as for

7   myself, I don't care about myself, you know, I just care

8   about you see how my family love me, Sir.  You can see

9   how.  They've been loving me all my life.  Just imagine

10  the moment I committed the crime knowing that I have my

11  mom right next to me and I have my --

12       I'm not proud, Sir.  I'm not proud

13  (indiscernible).  Sir, I'm not proud.  And you can say

14  whatever, Sir, but I'm not proud of what I did.  Not in

15  my wildest dreams, Sir.  I was doing good in Martinez.

16  The shorter life I lived there in Martinez, I was doing

17  good.  I know I was doing good.  I just -- I was in the

18  wrong country.  And even any country, making the mistake

19  I made is not acceptable.  I know.  I know in myself.

20  No need to explain it to you, Sir.  I know in myself.

21       So how can -- How can I change things, Sir?  A

22  far as her vision, Sir, I don't -- Can I just give my

23  eyes to her, it's so me thinking of it, you know.  God,

24  I'm so sorry, Sir.  I'm not proud of any -- of any bad

25  action I made, you know.  I know I -- I know I -- I'm

1  not depressed all the time.

2       I'll be on paper, you know, before that, that was

3  a -- I was never.  Even in the street, I was a person

4  kindest.  I was -- I was a person that made people

5  laugh.  When I used to go out with people, with Corey

6  and Tracy and Stacey and all the fellows, June and all

7  them guys, all them guys, there is nothing on paper

8  telling that I was the person that make me laugh.  I

9  make them laugh, even though English was my second

10  language.  I spoke the way that I could.  I expressed

11  myself in front of them and make them laugh through the

12  time that I was with them.

13       I know, I know that, you know, when it came to me

14  going to the court and all of a sudden I became a

15  possessive person and I -- and I just went and almost

16  took her life and all those -- Is my life was changed

17  and so bad in a short of a time and I know, as far as me

18  getting the gun at that moment in my life, back in those

19  -- in that little moment, my life had no meaning, Sir.

20  It had no meaning.

21       But I still, I shouldn't have hurt no one.  Not

22  even myself.  I understand that, Sir, very clearly.  But

23  that's what I've been -- Since I've been going, since

24  I've been in prison, I've been trying to show you guys,

25  show you and show the whole -- the whole community, the

1   whole society that I wasn't a bad person.  I know I

2   wasn't a bad person.  I know myself.  I know myself.  I

3   wasn't a bad person.

4        And I will never be a bad person neither because

5   I know myself.  I know what kind of a person I was.  I

6   was born and raised in a farm at the age of 13.  They

7   brought me here at the age of 15.  My dad became so

8   strict with me and hitting on me and hitting on my mom

9   when my mom was living here.  I didn't really care for

10  it.  I didn't like -- I didn't -- I didn't -- When I

11  look at things like that, I wouldn't have said those

12  things.

13       So when that happened to me and make me lose my

14  head, God, it's not acceptable, Sir.  I know it for

15  sure.  But I'm not going to be able to change nothing,

16  Sir.  I'm so sorry, you know.  I'm so sorry I hurt her

17  and I'm so sorry I messed up families.  I messed up a

18  lot of families, a lot of people, you know.

19       And its for me, you know.  I don't -- I'm living

20  a normal life in this kind of a -- in walls, you know,

21  and I'm getting used to this kind of life here in

22  prison.  I've been going over 15 years.  I know what

23  kind of life I got to -- I've got to put in my head if I

24  ever get released.  I know.  I know that I make sure,

25  100 percent sure, that nothing is going to get close to

1   me like that, any kind of a breakage or that pattern or

2   that path is going to take me to hurt my -- lose my

3   head.

4           That will never happen again.  I know that for

5   sure because there's always professionals to speak to.

6   There's always family members to speak to.  When you

7   start, you know, them letters of my aunts in Mexico,

8   when I was a little kid, they used to love me so much

9   every time I go and visit them in Guadalajara.  They

10  used to love me so much.  They used to care for me so

11  much.

12          And at that moment when I -- when I lost my head,

13  can you imagine I wasn't thinking of nothing.  I wasn't

14  thinking of anything but to hurt someone and hurt

15  myself.  So I'm not -- I'm not -- I'm not putting

16  nothing in anything, you know.  I'm just saying that it

17  was wrong and I can't change it, but I -- the only thing

18  I can say that I'll make sure it won't ever happen

19  again.  I know that for sure.

20          And it's so bad that I -- that I put all that

21  pain through a lot of people through life.  This is

22  through life.  This is through life because that's when

23  I -- when I come to write a letter to June or to even

24  any family member because like I told you, when I used

25  to go to that house and mama, June, she used to call me

1  -- I used to call her grandma all the time, she was so

2  kind to me and her mom and I spoke to her dad on the

3  phone many times and it was --

4      I was like getting to chain into a family because

5  I thought it was my family and at the end, I can't -- I

6  can't -- I cannot do anything like why even hurt her,

7  you know.  I can't believe it.  But I understand.  I

8  understand there's so many things can go on bad on me on

9  my part.  All bad things can because I can see I don't

10 -- I can't see no normal person doing what I did.

11     This is not acceptable because I've been watching

12 TV.  I been watching programs they've been showing

13 people.  I be watching deadlines, I be watching things

14 that would get into my head and think and when I watch

15 certain things, like when I told you I brought up Oprah,

16 because I watch things and it doesn't make me mad, it

17 just makes me think, you know, how can a person lose it

18 that bad.  How can a person do this and just when that

19 one guy in Virginia Tech, how the poor -- how the guy

20 went and lost his head that bad.

21     It's not excusable.  He had time.  I don't have

22 that time, like you said, Sir.  I wasn't a bad person.

23 I wasn't living thinking of weapons, of hurting anyone,

24 no, no.  I know that for sure because I know myself.

25 Even though the only bad part that happened to me, that

1   I was in a family with a culture of dad being so strict

2   and hurting on the wrong person, knowing that my mom was

3   my mom and he didn't have to go that level to go and

4   hurt my mom.  My mom never did nothing wrong to him.

5   All he did was just, you know, make food for him and

6   live like a mom, like a normal mom would do and any kind

7   of woman would do in a house.

8        So every time he would go and drink and loses it

9   and start to get out of hand, those things, all those

10  things, you know, it still, you know, that's when people

11  tell me.  I tried.  I try to keep everything in the

12  house and everything I did in the street, it was --

13       **PRESIDING COMMISSIONER PRIZMICH:**  Mr. Ruvalcaba,

14  you need to speak regarding why you believe your

15  suitable for parole.  I understand all this and we've

16  gone -- I don't want to cut you off here.

17       **INMATE RUVALCABA:**  Yeah, yes, Sir.

18       **PRESIDING COMMISSIONER PRIZMICH:**  We need to

19  focus on why you think you're suitable for parole.

20       **INMATE RUVALCABA:**  Well, I can tell you, Sir,

21  that I would do good in any society, Sir.  I know that

22  for sure, Sir.

23       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.

24       **INMATE RUVALCABA:**  And even though I did the

25  wrong thing in this planet, in this world we live in, I

1   make sure that will never happen again.  And if any

2   society I be living, if I ever get released, I know I'll

3   be doing all right because I know myself.  I know I'll

4   be doing okay because I know.  I know my surroundings.

5   I know how people act and how people --

6        And I won't get out of hand neither.  I won't

7   lose it.  I won't and as for me, I would never hurt no

8   one no more.  It's so bad I hurt June, but I'll make

9   sure that if I was to get released, if I was in any kind

10  of society, no problem.  I know that for sure, Sir.

11       **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  I want

12  to thank you for your comments.  We're going to recess

13  for deliberation right now.  The time is 3:34.  We'll

14  call you when we make our decision.  Thank you, sir.

15                    **R E C E S S**

16                     --o0o--

17

18

19

20

21

22

23

24

25

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3        **DEPUTY COMMISSIONER MORRIS:**  Okay, we're back on

4    the record.

5        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  The time

6    is 3:36 in the matter of Jose Ruvalcaba.

7        We reached a decision in this matter of CDC

8    number H as in Henry 21975.  Sir, I'll tell you right

9    now, we're, you know, forgo the suspense on this.  We're

10   going to deny you and we're going to deny you for one

11   year.

12       But if you would hear us out, we believe that

13   there's no question in our mind that you feel horribly

14   sorry for the events that occurred, as you should

15   because you have correctly pointed out that you

16   certainly destroyed that woman's life.  Sir, you've

17   destroyed your own life.  You have a potential that has

18   gone untapped other than you've come to grips with this

19   horrible crime, you know, that you did.  That's at least

20   something in terms of you.

21       Your family has suffered, you know, and her

22   family has certainly suffered.  Your friends that were

23   surrounding this have all suffered and I think you have

24   a wonderful grasp on all that.

25   **JOSE RUVALCABA    H-21975    DECISION PAGE 1    5/9/07**

1    But let me get to -- get to the reading of some

2  of this and then we'll get to the specifics on what we

3  think you need to do and what we think will prop you up

4  perhaps for the next hearing down the road, okay.

5    So the Panel has reviewed all information

6  received from the public and relied on the following

7  circumstances in concluding that the prisoner is not

8  suitable for parole and would pose an unreasonable risk

9  of danger to society or a threat to public safety if

10  released from prison.

11    And sir, we'll talk about the specifics of that

12  in just a second, but right now let me say that the

13  offense was carried out in an especially cruel manner.

14  Your intention was the ultimate form of possession,

15  whether you like that word or not.  It's the ultimate

16  form of possession in that you take a person's life so

17  that no one else can enjoy that life, not yourself, not

18  anyone else.

19    And then you did the same thing with regard to

20  yourself, sir.  You attempted to remove you from the

21  equation as well.  Your loving mother, who loves you to

22  this day, all the aunts and uncles that you talked

23  about, you would have, you could have removed yourself

24  from all of that.

25  **JOSE RUVALCABA    H-21975    DECISION PAGE 2    5/9/07**

1            Now, it may be painful at the time, it may be

2   painful to relive some of this, but sir, you're worth

3   more than that and so is this girl.  It was a mistake,

4   it was an accident, it was however you want to

5   characterize it, but the offense was carried out in a

6   cruel manner and it was a very selfish act.

7            And we think you've come to grips with that.

8   There were -- The offense was carried out

9   dispassionately.  If you recall, the poor girl begged

10  for her protected -- cowered down, protected herself,

11  and you fired a shot that ultimately caused significant

12  sight impairment and I think it was 10 days in a coma in

13  the hospital.  You put the gun to your head, sir, and

14  tried to end your life.  That also wasn't successful,

15  you know, and you had to go through a lot to recuperate

16  from that, you know.  And thankfully, you both have at

17  least lived through the event.

18            The offense was carried out in a manner in which

19  demonstrates disregard for human suffering.  The motive

20  was jealousy, possessiveness.  Again, maybe words that

21  you don't like, sir, but in fact, that's what occurred.

22  You tried to ultimately remove her from society and

23  remove yourself from society, which is the ultimate

24  selfish act on the part of you and we're glad to see

25  **JOSE RUVALCABA      H-21975     DECISION PAGE 3     5/9/07**

1   that you've come to grips with that because that's the

2   first part in becoming a better human being.

3       These conclusions are drawn from the Statement of

4   Facts wherein, excuse me just a minute, in the Spring of

5   1990, yourself, sir, and your girlfriend at the time,

6   June Hidalgo, became -- were romantically involved, so

7   much so that, sir, you asked her to marry you in May 4th

8   of 1990 or around that time.

9       She broke the relationship off, which is her

10  right to break it off in any way, shape, or form she

11  feels.  It may have been and probably was abrupt in your

12  mind, but that's what she has the right to do.

13      You took it upon yourself at that point to

14  immerse yourself in your own self-pity and hurt and all

15  of that.  And I can only guess that, you know, the

16  downward spiral you got yourself into, choosing to

17  remain in that rather than trying to extract yourself

18  out of it to try to understand.  You went with those

19  feelings and you allowed those feelings to carry you to

20  a point where you secured a gun that was a stolen gun

21  that you found out later on.

22      But you secured a gun and essentially hunted her

23  down.  You went several locations looking for her,

24  essentially hunting her down, ultimately seeing her on

25  **JOSE RUVALCABA     H-21975    DECISION PAGE 4    5/9/07**

1   the back of a motorcycle with another guy.  I don't know
2   if that was her intended new boyfriend.  I believe that
3   the reports talk about that, but that, no doubt, caused
4   even greater anguish on your part, at which point you
5   walked over and summarily shot her after her pleading
6   for her life.

7        And then, sir, to the horror of everyone after
8   seeing her shot, sir, you shot yourself.  That, for the
9   kids that were in area, who knows how many people that
10  saw that.  It's really difficult and I know you're
11  dealing with that and grappling with that, but the fact
12  remains that that was a horrific incident for that
13  community to deal with and certainly the individuals.

14       We note that you have virtually no criminal
15  record.  You have no juvenile record, nor adult record,
16  sir.  So there is no escalation of any pattern.  This
17  seemed to be some form of isolated event, but an event
18  that, while it may be isolated, was significant enough
19  that you attempted to take a life and, in fact, you
20  failed at that and the poor woman now lives without any
21  sight and sir, you live with some challenges yourself.

22       You've done well while in prison.  We want to
23  note that there was one 115 that was some 11 years ago.
24  We've heard your explanation as to that 115.  It sounds
25  **JOSE RUVALCABA    H-21975    DECISION PAGE 5    5/9/07**

1  reasonable.  We can't condone it since it is a

2  violation.  It didn't enter into our decision making

3  here other than just a noteworthy that it was a 115.

4      We have asked you questions.  I specifically

5  asked you questions about AA.  That seems to be the area

6  that you've devoted yourself to.  You seem to be doing

7  very well in that.  You have a good grasp on the steps.

8  Sir, we would encourage that continued work because in

9  truth, whether it be AA or NA or Gamblers Anonymous or

10  Sex Addicts Anonymous, there's a whole bunch 12-step

11  based groups right now.  They're all fundamentally based

12  in the 12 steps.

13      And sir, it ultimately is about you.  The way

14  some people deal with their inner problems is to drink

15  or is to use narcotics or is to gamble because that

16  makes them feel better about themselves.  So you're on

17  the right track with regard to looking into yourself and

18  we would encourage continuation of that.

19      Your effort to write that very sweet letter to

20  the victim we think is a, you know, is a manifestation

21  of what the 12 steps have taught you.  And that's, you

22  know, that's a good thing.  Now, it's going to be up to

23  the District Attorney, you know, to deal with, but I

24  think, sir, and I would hope you understand that you

25  **JOSE RUVALCABA    H-21975    DECISION PAGE 6    5/9/07**

1  don't want to cause any more pain in that woman's life
2  and in giving this letter to her, it may cause some more
3  problems, so that's a decision that's going to be, you
4  know, out of your hands an in someone else's

5    But we totally recognize the effort that you made
6  to clean the slate and to make your amends as the 12
7  steps call for.

8    We note in your psychological reports, the last
9  several, they seem to be favorable toward you.  There's
10 no question that you've come to grips with the crime.
11 There is a little gap there what we would like you to
12 work on for this next year that we believe is something
13 that you -- It would do you well and make us, the Parole
14 Board, feel a little bit better about your ability to
15 handle future situations that may come up, whether they
16 be romantically based or at work, something based at
17 work.

18    We want to feel absolutely sure that you're going
19 to handle these in an adult, mature way and, you know,
20 while we recognize you said over and over and over it
21 would never happen again, I'm sure prior to this you
22 never thought this would happen.  So we want to make
23 absolutely sure that you're going to -- you're going to
24 have all the tools at your disposal to get through some
25 **JOSE RUVALCABA    H-21975    DECISION PAGE 7    5/9/07**

*Capitol Electronic Reporting*

1   other circumstances, sir, that I will guarantee you

2   inevitably will happen in your life, that will not be

3   comfortable and be difficult to deal with for anybody.

4        So we do recognize that you have done an

5   extensive amount of work with regard to your parole

6   plans.  You have two vocations that are well sought

7   after vocations, although technology has a way of kind

8   of surpassing us even on a daily basis.

9        But we do recognize that your mechanics and your

10  body and fender work are something that are still in

11  demand and you still apparently have some talent and

12  still some interest in.

13       You've got plans with respect to an INS situation

14  that may come into play to live down in a number of

15  places in Mexico with relatives.  We applaud you for

16  that.  That all seems appropriate and certainly you

17  sound like you have a wonderful family that still stands

18  by you and you by them.

19       Your employment plans, and you also have plans to

20  live up here in the United States should you -- should

21  you be allowed to stay here, so those are good things,

22  your work plans seem to be viable in either location.

23  So you've done a -- We want to compliment you on your

24  efforts there.

25  **JOSE RUVALCABA    H-21975    DECISION PAGE 8    5/9/07**

1    *   The District Attorney from Contra Costa County

2    was here and opposes your release.  You know, so we want

3    to read that into the record.

4        Sir, we're giving you, as I've said, a one-year

5    denial.  And I'll ask the Deputy Commissioner if he has

6    anything to add, but basically we believe you're well on

7    your way to becoming a trustworthy, completely whole

8    human being worthy enough to be let out on parole.

9        There is one area that concerns us a bit and that

10   is whenever you talk about the events of during that

11   time, you immediately jump to a situation where there's

12   a lot of commentary with regard to your dad and how

13   strict he was and how violent he was and how that left

14   you with a feeling or a sense of hopelessness and

15   helplessness because your mother was being poorly

16   treated and you were being poorly treated.

17       And that somehow in your mind, the impression

18   that we got, weaves into a causation factor for this

19   crime.  And sir, we can't -- We can't have you looking

20   to some other circumstance and then applying that to

21   yourself and then allowing yourself to go do something.

22   This crime, and you're right on the verge of it, this

23   crime was caused by Jose.  It wasn't caused by Jose's

24   dad.  Those are all factors, but it was caused by you,

25   **JOSE RUVALCABA    H-21975    DECISION PAGE 9    5/9/07**

1  sir.  And we believe the 12 steps will get you there.

2  We believe that you need -- you need to make that

3  connection strong and firm that it's your actions.  It's

4  your decision, not as a result of anything else.  I

5  mean, when we deal with alcoholics or drug addicts, they

6  always tend to want to believe it was the alcohol, it

7  was the alcohol that did it.  It was they that did it.

8  And once they get to that point and once you get to that

9  point, we believe you'll have a firm foundation for

10  taking a responsibility, you know, and for understanding

11  that you did a very selfish thing, certainly violent,

12  but in a greater sense it was very selfish for you to do

13  that.

14  And that was you, sir.  And the growth that will

15  come as a result of everything you've done so far and

16  everything I know you'll continue to do will set you up

17  for a successful life.

18  So sir, we'd like you to have you do some more

19  self-help work, some more AA work, some more delving

20  yourself into Jose and you know, what, rather than just

21  thinking about how bad the action was, thinking about

22  and doing some work on what you can do when you meet a

23  similar, because I guarantee you will, a frustrating

24  situation.  What course of action would be more

25  **JOSE RUVALCABA    H-21975    DECISION PAGE 10    5/9/07**

*Capitol Electronic Reporting*

1    appropriate if there's no one around to talk to.  What

2    you need to do, sir, that would really be what we

3    believe you need to nail down.

4        I'm going to turn to the Commissioner here and

5    ask if he has anything to add.

6        **DEPUTY COMMISSIONER MORRIS:**  In closing, I just

7    want to just quickly (indiscernible) Mr. Ruvalcaba.

8    You're absolutely on the right track, but I'm not

9    hearing, I'm not hearing today, I'm hearing clear

10   remorse.  I'm not hearing an understanding of critical

11   elements that led to the life crime.  I don't see that

12   same kind of clarity that I've seen in remorse enough to

13   the point that I would say you're no longer a reasonable

14   or an unreasonable risk to the community.

15       I think further exploration is needed.  You're on

16   track.  You need to do that.  You're into the process,

17   okay.  You need to do a little bit more.  And I'm going

18   to say, I'm going to ask you to consider thinking beyond

19   alcohol.  Think beyond alcohol.

20       I heard a lot of I was out of my mind.  You talk

21   about the life crime, either alcohol, what my dad did,

22   or I'm out of my mind.  There are many other addictive

23   factors that I think you need to be in touch with and I

24   think my sense is that once you're able to put your

25   **JOSE RUVALCABA    H-21975    DECISION PAGE 11    5/9/07**

1   finger on some of those feelings and recognize them when
2   they well up in you, then you're truly going to be able
3   to go out into the community and control yourself, okay.

4        There are other addictive factors and I just
5   wrote down a few feelings and behavior that I heard
6   today directly related to your case as I see it.  And
7   that has to do with anger, hurt, jealousy, control,
8   feelings of hopelessness, possession, being obsessive
9   about this person, feelings of rejection.

10       I think when you start, and you're into the
11  process now, so you just got to take that next step and
12  be able to show a little bit more of an understanding
13  with regard to that, I think.  I think you're close, but
14  you're not there yet.  I encourage you to do some of
15  these things and I wish you the best.

16       **PRESIDING COMMISSIONER PRIZMICH:**  And Mr. -- I'm
17  sorry, were you done?

18       **DEPUTY COMMISSIONER MORRIS:**  I'm finished.

19       **PRESIDING COMMISSIONER PRIZMICH:**  Mr. Ruvalcaba,
20  I do want to just mention to you we are requesting,
21  because I want to clear up your sentencing issue, and so
22  we're sending a letter to Board of Parole Hearings to
23  make sure that we've got the sentencing situation
24  correct.  I believe it is, but we want to make it

25  **JOSE RUVALCABA      H-21975      DECISION PAGE 12      5/9/07**

*Capitol Electronic Reporting*

1    absolutely sure.

2         You're on the right track, sir, we're giving you

3    a one-year denial.  Work on yourself a bit more.  You

4    presented well today, so it wasn't anything you said.

5    It's just we think you need a little bit more work.

6         Sir, so we wish you all the luck in the world.

7    The time is now 3:57.  Sir, thank you and we wish you

8    all the luck in the world.

9                            --o0o--

10

11

12

13

14

15

16

17

18

19

20

21   **PAROLE DENIED ONE YEAR**

22   **THIS DECISION WILL BE FINAL ON:**___SEP 0 6 2007___

23   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24   **DATE, THE DECISION IS MODIFIED.**

25   **JOSE RUVALCABA    H-21975    DECISION PAGE 13    5/9/07**

126

# CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, HEATHER WHITTINGTON, as the Official

Transcriber, hereby certify that the attached

proceedings:

| | | |
|---|---|---|
| In the matter of the Life | ) | CDC Number:   H-21975 |
| Term Parole Consideration | ) | |
| Hearing of: | ) | |
| | ) | |
| JOSE RUVALCABA | ) | |
| | ) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9, 2007

1:06 P.M.

were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

Heather Whittington

July 17, 2007

Capitol Electronic Reporting

# EXHIBIT B
# (PSYCH REPORTS)

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
June, 2006 Lifer Calendar

CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006

| | |
|---|---|
| NAME: | RUVALCAVA, JOSE |
| CDC#: | H-29175 |
| DOB: | 9/13/68 |
| OFFENSE: | PC 187/664 ATTEMPTED MURDER |
| DATE OF OFFENSE: | 5/5/90 |
| SENTENCE: | 7 YEARS TO LIFE |
| MEPD: | 10/30/98 |
| EVALUATION DATE: | 5/9/06 |

## I.   IDENTIFYING INFORMATION:

Mr. Jose Ruvalcava is a 37 year old, first term, single, Hispanic male from Contra
Costa County. He is a Catholic. He has served 16 years in custody. He does
have a US-INS hold, and he plans to return to Mexico upon his release.

### SOURCES OF INFORMATION:

This evaluation is based upon a single one hour interview, plus review of the
central and medical files.

The psychological evaluation, dated 11/9/99, prepared for the BPT at CTF-
Soledad, by Dr. Carswell, Staff Psychologist, contains a Psychosocial
Assessment. This information was reviewed with the inmate and is still current
and valid. As a result, this information will not be repeated at this time.

A new Psychological Evaluation was requested by the BPT Panel on 11/16/04. It
was to reconcile the last two prior Psychological Evaluations. Dr. Sexton,
Consulting Psychologist at CTF-Soledad, interviewed Mr. Ruvalcava, on
10/11/04, for 90 minutes and wrote a thorough, detailed evaluation that reviewed
the inmate's explanation of the dynamics associated with his behavior in the
commitment offense. This Psychological Evaluation is still current and valid.
The reader is referred to this evaluation, written by Dr. Sexton, to gain an
understanding of this inmate's history, his disciplinary that he received in 1994,
his self-afflicted injury, when he shot himself in the head at the time of the
commitment offense, as well as an accurate analysis of the current Diagnostic
Impression and why it differed from a prior report. Dr. Sexton did a very good
job. His report is six pages long and it should be considered still relevant, current
and valid.

RUVALCAVA, JOSE
H-21975
5/9/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Ruvalcava related during the interview in an open, sincere and earnest
manner. His mental status was within normal limits. He was alert and well
oriented. His thinking was rational, logical and coherent. His speech was normal,
fluent and goal oriented. English is his second language. However, he
communicates quite well in English. He actually has achieved his GED, which is
remarkable. He stated that sometimes under stress he has difficulty in expressing
himself in English. Sometimes in the BPH hearing this occurs to him. However,
under normal conditions, he communicates very well. His eye contact was good.
His affect was appropriate. There was no evidence of anxiety or of depression.
His memory was intact. His judgment was good. His insight and self-awareness
were excellent.

This man has no alcohol or drug issues at all. This is not an issue in this case.

Before coming to prison, he was experienced as an automobile mechanic. He has
participated for three years at DVI in auto mechanics, earning a certificate of
completion. In addition, he has spent three years working in auto body. He has
excellent skills in this field. He also has job offers in Mexico, where he plans to
go as a mechanic.

### CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    Brain injury secondary to gunshot
Axis IV:     Life term incarceration
Axis V:      Current GAF 90

### XIII.    REVIEW OF LIFE CRIME

Mr. Ruvalcava accepts full responsibility for the commitment offense. He accepts
the written version of the commitment offense. He has reviewed this offense at
length with Dr. Sexton in the 10/11/04 report. In addition, he has also reviewed
the dynamics associated with this offense with this writer. Since this information
has been reviewed at length, it will only be summarized at this point. At the time
he was under a great deal of emotional stress. Family dynamics outlined in the

RUVALCAVA, JOSE
H-21975
5/9/06
PAGE 3

previous report resulted in his desire to support his family, but at the same time to leave his family and become independent. At the time, the family dynamics were overwhelming to him, and he felt quite trapped. He had put all of his hopes, dreams and expectations into the relationship with the victim. He was planning on marriage. At the same time, he was under pressure at work because they demanded papers that he had obtained legal residency or he would lose his job. In the midst of all of this stress, the victim, his fiancée broke off this relationship abruptly without any explanations. The result was that he lost complete control, and he was overcome with feelings of hurt, rejection, anger and jealousy, as well as confusion.

He expresses deep feelings of sorrow and remorse about his actions at that time. He was 21 years of age, and he was totally overwhelmed by his situation. At the time he felt that he had nothing more for which to live. As a result, he also attempted suicide. Looking back at it now, as a mature adult at the age of 37, he realizes how bad his choices were. He expresses deep feelings of sorrow, shame and remorse at the injury that he caused to his fiancée. His feelings of remorse appear to be quite sincere and genuine.

Mr. Ruvalcava has explored the commitment offense and the underlining causes at length. I agree with Dr. Sexton's assessment that his explanation of causes related to this offense is outstanding. He totally understands what motivated him to become involved in this offense at the time. He continues to be remorseful and bothered by this action. He does not need to participate in any further counseling, therapy, or self-help groups in order to understand himself and his actions better at that time.

## XIV.    ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, this man has remained disciplinary free since 1994. The disciplinary he received in 1994 was thoroughly explained in Dr. Sexton's report, and it should not be held against him. In essence, he has remained disciplinary free throughout his 16 years of incarceration. As a result, compared to other inmates, his potential for dangerous behavior in this case is definitely below average.

B. In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, social relationships and other factors to determine current risk level on parole. He obtained a score of 0.8 cumulative frequency for

RUVALCAVA, JOSE
H-21975
5/9/06
PAGE 4

prison inmates. This means that if 100 men were released on parole, he would do better on parole than 99 of them. This is an extremely low risk level. As a result, he poses no more risk to society than the average citizen in the community. In fact, based upon his self-understanding, life experiences, growth and maturity over the years, he probably poses less risk to society than the average citizen in the community.

C. There are no significant risk factors in this case.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Ruvalcava has an immigration hold, and he plans to return to Mexico upon his release. He has a great deal of family support in Mexico. In addition to offers of residence, he also has job offers. He is an experienced mechanic, and his skills are highly desirable in the community. Employment will not be a problem in this case. The prognosis for successful adjustment in the community is very excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/9/06
T:    5/10/06

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**NOVEMBER 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**OCTOBER 11, 2004**

This is an updated psychological evaluation for the Board of Prison Terms on inmate Jose Ruvalcaba, CDC# H-21975. This report is the product of a psychodiagnostic interview of the inmate on 10/11/04, lasting approximately 90 minutes. Additionally, his Central file and unit health record were reviewed in their entirety. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Ruvalcaba is a 36-year-old, Mexican male who was born in Mexico on 09/13/68. The inmate immigrated to the United States with his family when he was a child. He is not currently a legal resident. The inmate has two obvious distinguishing characteristics. First, the inmate has an obvious bullet entrance wound on his right temple. Secondly, he has obvious suture scars from significant brain surgery in the center of his forehead. The inmate does not have tattoos of any type. He has not used an alias or AKA.

Other than the commitment offense, inmate Ruvalcaba has no criminal history. Throughout his 13 years of incarceration, the inmate has received only one CDC-115, this for participating in a work strike. This rather minor infraction needs to be put in its proper perspective. In the 115 report, it indicates his absence was in conjunction with an organized work stoppage involving the vast majority of DVI inmates; "Over one thousand inmates participated in the work stoppage." Under these circumstances in the prison setting, should an inmate ignore the other inmates and report to work, he would most assuredly be assaulted. In some cases, inmates have been seriously stabbed over such issues. It could be likened to a Teamster crossing a Teamster strike in the mid-50s or '60s. As a result, although the inmate was given a CDC-115 for his behavior, he really had no choice. His transgression should be judged in this light.

When questioned about the commitment offense, the inmate began by saying that he does not want to make excuses for what he did, and that he accepts complete responsibility and is extremely remorseful about what occurred. He then went on to talk in depth about what led to the assault. He talked about his abusive father, a father who would drink excessively and abuse all members of the family. He recounted numerous stories of severe physical abuse and psychological abuse. He indicated that in his culture, as the eldest son, it was his responsibility to make up for any shortcomings of his father, and at the same time not to point those out to his father. He felt he was clearly caught in a double bind.

RUVALCABA, JOSE
CDC NUMBER: H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

Inmate Ruvalcaba recounted stories about his attempt to leave the family, and in one case, his father physically prevented him from leaving. At other times, he felt a duty to his mother and his sisters, and felt that he could not abandon his family to his father. He indicated that at times, this family dynamic was overwhelming to him. He had no idea how to get out of it and just felt trapped.

Inmate Ruvalcaba stated that when he began dating the victim in this case, they became very close, and he began to think of marriage. Marriage for him would do several things. One, it would enable him to leave the family without losing face to his mother and his sisters. At the same time, he would not have to continually confront his father, and would be alleviated of the family need to make up for his father's shortcomings. He saw a relationship with the victim as his means of escaping his dysfunctional family.

At the very same time his employer, who was very pleased with his work, and where inmate Ruvalcaba enjoyed working, changed hands. The new owners were demanding that he present paperwork consistent with either citizenship or legal residency. As he had neither, he feared he would soon be unemployed. He stated that as a result, he was putting more and more emphasis on his relationship with his girlfriend, and when she broke it off abruptly, he lost complete control, and stated, "It pushed me over the edge."

He went on to state that it is hard for him to get into the "head" of the 20-year-old that he was, as he is now 36 and much more mature. Now that he has escaped the family dynamic, it is possible for him to see how destructive it was, and how it led ultimately to his incarceration. He stated, "My thinking is so different now." Again the inmate indicated that he did not say all of these things to excuse his behavior, but only to describe and explain how he was feeling at the time of the offense. He indicated that at that time he felt he had nothing more to live; hence, the attempted murder and the attempted suicide. The inmate indicated that, aside from this one incident, he has never been suicidal, and is not currently suicidal. He again stated, "I just snapped."

It should be noted that for the Mexican culture, the eldest male son speaking so frankly about his immediate family is more than discourage. It says even further how much this individual has grown through his incarceration, that he understands that he has to come to grips with his family dynamics and resulting behavior, even if it means breaking a cultural taboo.

Inmate Ruvalcaba indicates that he has come to this self-awareness through a number of things. First, he has attended Alcoholics Anonymous for approximately nine years.

RUVALCABA        H-21975        CTF-CENTRAL        10/11/04        gmj

RUVALCABA, JOSE
CDC NUMBER: H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

Although he has never had a drug or alcohol problem, he views Alcoholics Anonymous
as a self-help program that he uses in his daily life. The inmate has also attended
parenting classes, anger management classes, and a victims' awareness class. He is
currently attending weekly anger management classes with the chaplain, and it is through
all of this that he has become so aware of his family dynamics and his role in this
criminal offense.

It should be noted that the inmate has requested therapy through the Department of
Corrections' psychological services numerous times. He first began requesting services
in 1997. The medical record indicates that he was seen approximately three times. He
again requested services in 2002, but he was placed on a waiting list. He once again
requested services in 2002, and was placed on a waiting list. In 2003, he made the same
request, and was again placed on the waiting list. Unfortunately, lifer inmates who do not
have a significant mental illness are not part of the treatment population serviced by
CDC's mental health program. At present, those services are only rendered by clinicians
who are willing to "volunteer" their services above and beyond their regular workload.
As a result, waiting lists for those services are extremely long. At present, there do not
appear to be any changes pending for lifer services in CDC.

Prior to his incarceration, inmate Ruvalcaba had no psychiatric history. Since his
incarceration, all of the psychiatric services rendered to the inmate have related to Board
of Prison Terms requests for evaluation, or the inmate's request for "therapy." Although
the previous BPT reports indicated that the inmate suffered from dysthymia, none of the
clinicians felt that the disorder was significant enough that the inmate should be referred
for psychiatric services as a psychiatric patient in the Department of Corrections.

In the previous psychiatric report for the BPT, the inmate was given the Axis I diagnosis
of dysthymia, and an Axis II diagnosis of dependent personality disorder. The Axis III
diagnosis included "previous gunshot to the head," with only minimal explanation.
However, this injury is even more significant than it sounds. The inmate shot himself in
the head with a .38 caliber revolver, the bullet entering the upper frontal lobe of the right
side of his head. The velocity of the bullet was such that it did not exit the head, and
currently remains lodged in the left side of his skull. The inmate indicates that as a result
of the self-inflicted injury, he lost the ability to speak, and lost both recent and remote
memory. He was also unable to walk. Clearly, this is a significant injury that will have
lasting effects on inmate Ruvalcaba's mental ability and emotional stability. The inmate

RUVALCABA        H-21975        CTF-CENTRAL        10/11/04        gmj

**RUVALCABA, JOSE**
**CDC NUMBER: H-21975**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE FOUR**

indicates that shortly after the injury, the doctors informed his mother that he would be "a vegetable." He indicated that the doctors were very pleasantly surprised at his progress. The inmate indicates that he attended speech therapy for approximately one year. He continues to have some difficulty, sometimes misspeaking. He indicates that although he is fluent in English, he sometimes still thinks in Spanish, and that he does not always feel that he is capable of expressing himself in language. He indicated that when he gets stressed it is sometimes difficult for him to talk. He reports that most of his long-term memory has returned, and that his short-term memory, he believes, is intact. Unfortunately, a full neurological assessment is beyond the scope of this Board of Prison Terms report. It is also beyond the scope of psychiatric services in the Department of Corrections at the present time. If the inmate could afford such services, a private psychoneurological evaluation is indicated.

Inmate Ruvalcaba indicates that he is currently in good health, although he believes the tumor that was removed on the left side of his face near his ear appears to have returned. He indicated that he will be seeking medical services to evaluate the new growth on the side of his face.

In assessing the inmate's current mental status, the standard assessment questions were asked. The inmate is clearly well-oriented. His cognition in general is intact, sufficiently so to earn a GED even after his head injury. He denied a history of psychotic symptoms. He denied a history of mood disorder, other than for the circumstances around the commitment offense. When describing the commitment offense and immediate family, he becomes teary-eyed and sometimes unable to control his emotions. Some of this is totally appropriate to this situation. His apparent, mild inability to control the emotion appears related to his head injury, and not to cyclothymia. The inmate indicates that in general when not thinking of the commitment offense and family dynamics, he is happy and well adjusted. He denies current depression, and other than the instant offense, he denies ever being suicidal. His entire presentation is completely asymptomatic. There is no clear indication that the inmate suffers from either a psychotic disorder or a mood disorder.

As a result of all of the above, the diagnostic impression is:

## CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| **AXIS I:** | V71.09 – No contributory clinical disorder. |
| **AXIS II:** | V71.09 – No contributory personality disorder. |

RUVALCABA        H-21975        CTF-CENTRAL        10/11/04        gmj

RUVALCABA, JOSE
CDC NUMBER: H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


AXIS III:    Significant brain injury secondary to gunshot.
             Apparent recurrent tumor, left side of his face.
AXIS IV:    Stressor – lifer incarceration.
AXIS V:     Current GAF = 80.

The above diagnostic impressions are significantly different than previous Board of
Prison Terms reports, so some explanation is due. For the diagnosis of dysthymic
disorder to be given, the following criteria must be met: poor appetite, insomnia, low
energy, low self-esteem, poor concentration, feelings of hopelessness. These moods must
be present most of the day, or for more days than not, as indicated by a subjective account
or observation by others. Although it has been reported in the past that this is the case, it
is clearly not indicated at present. The inmate does appear to suffer from low self-esteem
primarily as a result of his upbringing in a very dysfunctional family. As a result of all of
the above, the diagnosis of dysthymic disorder is not appropriate in this case. As was
mentioned earlier, the inmate's head injury probably accounts for the emotionality that
previous clinicians observed. At the same time, it is not at a significant level to warrant
the diagnosis of a mood disorder due to brain trauma, as it would be in the case of a more
significant mood disturbance. It appears that previous clinicians did not believe that the
inmate's "mood disorder" was significant enough to warrant treatment, as no referrals to
treatment were made. I would agree with this assessment, and as such, no referrals to
psych services is indicated.

In the Board of Prison Terms report requesting a new psychological evaluation, they
itemized four questions, the first being "what is the prisoner's violence potential in a free
community?" It is my assessment based on his lack of previous criminality, his lack of
violations in CDC, and his greater maturity and understanding of the commitment offense
that he is no more likely to be violent in the community than the general population.

The next question involved alcohol or drug abuse as it relates to the commitment offense.
There is absolutely no indication that the inmate was involved in alcohol or drug abuse
either before, during, or after the commitment offense.

The third question is the "extent to which the prisoner has explored the commitment
offense and come to terms with the underlying causes." As stated earlier, the inmate's
"explanation" of the commitment offense and underlying causes was outstanding in this
clinician's opinion. He clearly understands what motivated him to commit the
commitment offense. He continues to be troubled by it and is very remorseful. There is
little more that he could do to better understand what motivated him at that time.

The fourth question is the "need for further therapy programs while incarcerated." As
was stated earlier, there are no services provided by the Department of Corrections for
lifers' psychological needs. Some inmates are seen on a voluntary basis by clinicians, but
this is atypical. Obviously, it would be better if all lifers could meet with a therapist for
at least a few months at some time during their incarceration, but that is not currently
available. The inmate appears to have made excellent use of the services that are

RUVALCABA, JOSE
CDC NUMBER: H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

available in CDC. It would be recommended that the inmate continue to attend AA and anger management as a self-help program, not because it is currently necessary, but because the inmate appears to enjoy them.

In this clinician's opinion, the inmate is completely prepared to be released on parole, and it is my expectation that he will comply with all of the conditions of parole without difficulty.

S. Sexton, Ph.D.
Consulting Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SS/gmj

D: 10/11/04
T: 10/14/04

*D:\Word Files\BPT - 2004\RUVALCABA, JOSE   H-21975   11-04   SEXTON.doc*

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
AUGUST 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 3, 2002

Inmate Jose Ruvalcaba, CDC# H-21975, was seen for a mental
health evaluation for the Board of Prison Terms by M.
Carswell, Ph.D., Staff Psychologist at the Correctional
Training Facility (CTF), on 11/08/99 for the December 1999
Lifer Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

*Bill Zika, M.D.*

**BILL ZIKA, Ph.D.**
**Senior Supervising Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:  05/03/02
T:  05/03/02

RUVALCABA      H-21975      CTF-CENTRAL      05/03/02      gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
DECEMBER 1999 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 8, 1999

This is the third psychological evaluation for the Board of
Prison Terms on inmate Jose Ruvalcaba.  This report is the
product of a personal interview, conducted on 11/08/99, as
well as a review of his Central file and unit health record.
This single contact interview was for the express purpose of
preparing this report.

I.    IDENTIFYING INFORMATION:

      Inmate Ruvalcaba is a 31-year-old, single, Hispanic
      male.  His religious preference is Catholic.  No
      unusual physical characteristics were noted and he
      denied the use of any nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

      Inmate Ruvalcaba was the third of eight children.  He
      stated there were no prenatal or perinatal concerns or
      birth defects.  He had no abnormalities of
      developmental milestones.  All speech, language and
      motor development occurred unremarkably.  He denied any
      history of cruelty to animals or any history of arson.
      He stated he had no significant childhood medical
      history and denied any childhood history of physical or
      sexual abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

      Inmate Ruvalcaba went to public school in Mexico until
      the sixth grade.  After coming to the United States, he
      returned to public school, but quit after the 11th
      grade to go to work.  He received his GED at CTF in
      1998.  He is currently working hard to improve his
      English.

IV.   FAMILY HISTORY:

      Inmate Ruvalcaba's mother is 53 and in good health.
      His father is 56 and in fair health.  His brothers and
      sisters live in the United States and visit him.  He

RUVALCABA      H-21975      CTF-CENTRAL      11/09/99      gmj

RUVALCABA, JOSE
CDC NUMBER:   H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

described his relationship with his family as close
both historically and currently.

## V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Ruvalcaba is a heterosexual male.  He denied any
history of high-risk sexual behavior either before or
after incarceration.

## VI.   MARITAL HISTORY:

Inmate Ruvalcaba has never been married and has no
children.

## VII.  MILITARY HISTORY:

Inmate Ruvalcaba denied any history of military
service.

## VIII. EMPLOYMENT AND INCOME HISTORY:

Prior to his incarceration, inmate Ruvalcaba was
employed as a maintenance mechanic for a disposal
company for approximately five years until his
incarceration.  Since then, he has finished a vocation
in auto mechanics and a vocation in auto body.  He is
currently working in support services in the culinary.

## IX.   SUBSTANCE ABUSE HISTORY:

Inmate Ruvalcaba states that he has never had an
alcohol or drug problem.  However, he has attended
Alcoholics Anonymous for the past three years for the
support.

## X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Ruvalcaba's commitment offense was attempting to
murder his girlfriend and then commit suicide himself,
neither of which were successful.  He was left with
recurrent headaches and vision problems which have now
subsided.  He was left with recurrent headaches and
vision problems which have now subsided.  He has no
permanent disabilities, impairments nor illnesses and
is not currently on any medication.  His psychiatric
and medical history are otherwise negative.

RUVALCABA      H-21975      CTF-CENTRAL      11/09/99      gmj

RUVALCABA, JOSE
CDC NUMBER:  H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE


XI.  PLANS IF GRANTED RELEASE:

     Should inmate Ruvalcaba be given a parole date, he
     will be returning to Mexico as he is not a U.S.
     citizen.  He plans to live with his grandparents.  His
     parents state that they will be returning to Mexico as
     well.  He believes he can find work easily in Mexico as
     a mechanic.  He states that he can perform well on
     parole without any problems.

                    CLINICAL ASSESSMENT

XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

     A. Inmate Ruvalcaba was well groomed, oriented, alert and
        cooperative.  He spoke clearly, but made little eye
        contact.  His thought processes were clear and
        coherent.  There was and continues to be evidence of a
        mood disorder exhibited by expressions of hopelessness
        and despair.  He stated that he continues to find it
        difficult to confide in others, which may have
        contributed to the instant offense.  He states that now
        he feels okay about writing his feelings down and
        states that although he considered suicide before,
        support from his family gave him reason to live.
        Previous reports state that he also lacked insight into
        his past behaviors and errors in judgment.  Currently
        this insight has improved.  However, he could certainly
        benefit from continued self-examination as to why he
        feels that feeling guilt and remorse is the end result
        of introspection rather than coming up with a clear
        alternative to past maladjusted behaviors.

     B. CURRENT DIAGNOSTIC IMPRESSIONS:

        AXIS I:    Dysthymia.
        AXIS II:   Dependent Personality Disorder.
        AXIS III:  1)  Previous gunshot to the head.
                   2)  Surgery on 06/04/97 to benign tumor from
                   the left saliva gland.
        AXIS V:    GAF = 63.

        This inmate, with some further introspection and
        insight as to the cause of his believing that suicide
        and murder was the only way out of the situation, could
        possibly maintain his present gains.

RUVALCABA      H-21975      CTF-CENTRAL      11/09/99      gmj

RUVALCABA, JOSE
CDC NUMBER:   H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

## XIII.REVIEW OF LIFE CRIME:

Inmate Ruvalcaba initially stated that he was not clear
as to why he thought this crime occurred, but in
speaking with him for a while, he came to believe and
understand this woman that he was in this relationship
with, he got very involved with her very quickly and
was completely in the dark as to why she had broken off
the relationship.  He had plans of getting married and
thereby making himself legally a citizen of the United
States.   When these plans fell apart his anger was
overwhelming, although he states he does not have any
idea why he did what he did, I think with some further
clarification and introspection on his part, he may
come to understand that his dependence on one plan was
very rigid.  Although he feels very guilty and very
remorseful for what happened, his lack of options has
contributed to this offense.   The inmate's remaining
prison term could be spent wisely investigating
alternative options when plans and things don't go his
way.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.   Since this inmate had no previous criminal history,
although it states there were previous arrests for
traffic (I believe those were citations and not
arrests), and due to the fact that he has not
received a CDC-115 violation since 1994, this
inmate within a controlled Level II population
would be considered a very low risk for violence.

B.   If released to the community, this inmate should
have no more propensity for violence if he will
take further time to investigate the causes behind
this event.

C.   Significant risk factors or precursors to violence
would be should this inmate decide that the offense
just occurred and he had no control over it.

## XV.  CLINICIAN OBSERVATIONS, COMMENTS AND RECOMMENDATIONS:

A.   This inmate is responsible for his behavior.   He
maintains the ability to abide by institutional
standards.

RUVALCABA, JOSE
CDC NUMBER:  H-21975
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

> B.  This inmate has no mental health disorder which
>     would necessitate treatment either during his
>     incarceration period or after parole.
>
> C.  This inmate, not having any alcohol or drug abuse
>     problem, would probably not benefit from a self-
>     help group.  However, other types of self-help
>     programs to understand problems in relationships
>     and people's personal responsibility to maintain
>     healthy responsibility may be a very good referral
>     for this inmate upon parole.

*M. Carswell Php*

M. CARSWELL, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MC/gmj

D:  11/08/99
T:  11/09/99

## PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### SEPTEMBER, 1997, LIFER CALENDAR
### DEUEL VOCATIONAL INSTITUTION

This is the second report to the Board of Prison Terms on this 28-year-old, first-termer, Jose Ruvalcaba who is serving a seven-year-to-life sentence for attempted murder with use of a firearm. The instant offense was committed on 5/5/90 and he entered CDC 1/28/92. This psychological evaluation is based upon a 1 1/2 hour clinical interview on 7/24/97 and a review of his Central file and Medical record.

**HISTORY AND PROGRESS:** Subject stated he feels depressed most of the time because he thinks constantly of what he has done. He says he hates himself "for what happened that day" and feels he is "marked for life." He says he prays to God everyday for forgiveness for his crime. He said that he fights the depression by keeping busy with work, exercise and family visits.

In regard to Subject's self-inflicted gunshot wound to his head, he says he has occasional headaches and deteriorating vision. The bullet is still in his head.

Subject has received a certificate of completion in auto mechanics and is now training in auto body. When he finishes auto body, he plans to return to education classes to get his GED. He continues to improve his English by reading religious books each day.

Subject attends Alcoholics Anonymous three times a week. Although he has never abused drugs or alcohol, he says AA enables him to learn about himself and to think more positively. However, he stated, "In AA you make amends, but the only amends I can make is to myself." Subject participates in one Parole Recidivism Prevention Program (PRPP) and is now taking the second and third classes in the six-part series.

**MENTAL STATUS EXAMINATION:** Subject was well-groomed, oriented, alert and cooperative. He spoke clearly and made good eye contact. His thought processes were clear and coherent. There was evidence of a mood disorder, exhibited by expressions of hopelessness and despair. Subject admitted, he has always found it difficult to confide in others, which he feels contributed to the instant offense. He said he does not feel comfortable writing his feelings down, because that would hurt too much. He says he once considered suicide but the support from his family has given much reason to live. He lacks insight into his past behavior and errors in judgment.

**DIAGNOSTIC IMPRESSIONS:** As per DSM IV, the following diagnostic impressions seem appropriate for this Inmate:

| | | |
|---|---|---|
| AXIS I | 300.40 | Dysthymia. |
| AXIS II | 301.90 | Personality Disorder, NOS with Self-Defeating Features. |

**RUVALCABA, JOSE    H-21975    DVI   tvd   d: 08/05/97 f: 08/12/97   Page** 1

AXIS III                                    Surgery on 6/4/97 to remove benign tumor
                                            from left saliva gland.

AXIS IV                                     Severe Psychosocial Stressors:  Stemming
                                            from feelings regarding his commitment of
                                            instant offense.

AXIS V            GAF = 62                   Global Assessment of Functioning (on a
                                            scale of 1-100), mild symptoms of chronic
                                            depression.

**CONCLUSION AND RECOMMENDATIONS:** In the last five years Subject has pursued his
interest in working with automobiles and has done quite well in his vocational training.
Through his own efforts, he has improved his comprehension of English.   His pursuit of self-
knowledge has been limited to Alcoholics Anonymous and to an inmate self-help program.   He
experiences ongoing medical problems related to his head injury.

Subject should continue with programming that best suits his capabilities and physical
limitations.   Individual psychotherapy is recommended as a means for him to explore and
express his inner life.  Psychotherapy would also offer him the opportunity to learn the roots of
his behavior which contributed to the incident offense.

Lynda Sussman, PhD.          Noted: G. S. Dhaliwal PhD.

**Lynda Sussman, Ph. D.**          **G. S. Dhaliwal, Ph. D.**
**Staff Psychologist**             **Staff Psychologist**

## PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### JANUARY 1995, DOCUMENTATION CALENDAR
### DEUEL VOCATIONAL INSTITUTION

This is the first report to the Board of Prison Terms on this 26 year old, Hispanic male inmate, Sentenced 7 years to Life for Attempted Murder with Use of a Firearm. He entered the CDC system on January 28, 1992. This psychological evaluation is based upon a review of the inmate's Central file, medical/psychiatric record and a two and one-half hour clinical assessment interview.

**MENTAL STATUS EXAMINATION:** Inmate Ruvalcaba presented as a shy, reserved, anxious but cooperative individual who was dressed neatly in standard institutional attire. He appeared younger than his chronological age. Initially he was fairly reticent and withdrawn, however, once the interview got started he became very open, honest and forthright in his revelation of the instant offense. The inmate is in good health and has no psychiatric history.

The subject was oriented to person, place, situation and time. Attention and concentration were fair. His speech was quiet and soft but organized and goal directed with a normal rate of speed. Speech was spontaneous once the interview began. Speech content was consistent with a euthymic mood. Affect was consistent with subject content. There were no loose associations, incoherence, perseverations, hallucinations, delusions or paranoid ideations. Insight was fair. Judgment and impulse control were good to excellent. Subject is of average intellectual functioning. Thinking was literal and concrete. Short, recent and long term memory were intact. There were no homicidal or suicidal ideations. The inmate was sensitive and tearful throughout the interview.

**INMATE'S DEVELOPMENT AND PROGRESS:** This inmate received his last CDC 115 on July 5, 1994 for participating in a work strike. He has no other disciplinary action against him.

Over the last six plus months, Inmate Ruvalcaba has attended Vocational Training in Auto Mechanics. While on the streets, he spent five years as an auto mechanic for a garbage disposal company. Prior to being in Vocational Training, he was in Academics in order to bring up his grade level. He completed the 11th grade and then dropped-out to work full-time. This inmate was born and raised in Mexico until he was 14 years old when he came to the USA to be with his father. He does not participate in any other activities in prison. Periodically he will attend Chapel Services in the Catholic Chapel.

In a discussion of the instant offense, he expressed extreme regret and remorse. There is much shame and guilt over his actions and behaviors. He states he wants forgiveness from the victim and from the Lord. Due to a self-inflicted gunshot wound to the head, his story about the instant offense has some discrepancies in it. Memory was disrupted due to the

COPY SENT TO INMATE 12-23-94

gunshot wound. However, his story does follow the Probation Officer's Report and his evaluation by Dr. Lossy from May 1991.

Throughout the retelling of the situation leading up to the instant offense, the inmate was tearful, sad, confused and remorseful to the extreme. He evidenced extreme shame and guilt. He relates some of the precipitating factors leading up to the instant offense were the hurt, anger and frustration he felt from his girlfriend breaking-up with him. He states they were planning on getting married when she told him she didn't want to see him anymore. The inmate persecutes himself for the instant offense and states "he deserves punishment for what he did". He further relates that he can never forgive himself for what he did to someone that he really loved.

**DIAGNOSTIC IMPRESSIONS:** As per DSM III-R, the following diagnostic impressions appear appropriate for this inmate:

| | | |
|---|---|---|
| AXIS I | 300.40 | Dysthymia |
| AXIS II | 301.90 | Personality Disorder NOS with Self-defeating features. |
| AXIS III | | No medical problems noted or reported. |
| AXIS IV | | Extreme Psychosocial Stressors (dealing with the instant offense and his conduct and behaviors with regards to the instant offense). |
| AXIS V | | Mild symptoms of dysfunction (GAF Scale = 70). |

**CONCLUSIONS:** Due to Inmate Ruvalcaba's head injury, his present programming is compatible with his needs and abilities for adjustment within the prison system. The head injury keeps him limited as to the amount of stimuli that he can take in at any one time. He has benefited himself since he has been incarcerated with his academics improving his English and his comprehension. His work history appears to be very good. He seems to be doing very well in his vocational training and enjoys his work. With his sensitiveness and his compassion for other people, his potential for violence is considered below average for the general prison population.

**RECOMMENDATIONS:** Inmate Ruvalcaba should continue with his present programming. His extreme regret and remorse for the instant offense needs to be dealt with in a therapeutic setting. It is suggested that Inmate Ruvalcaba get into individual psychotherapy in order to deal with the instant offense and the affects it has had upon himself, the victim, the family members of the victim and his family members. He needs to deal with the shame and guilt associated with the instant offense along with the regret and remorse. Another area for psychotherapy would be his self-defeating behaviors that keep him depressed most of the time.

MICHAEL J. MORRIS, Ph.D.
Staff Psychologist

Noted: R Kotila, Ph.D.
ROGER KOTILA
Staff Psychologist

RUVALCABA, JOSE   H-21975   DVI   st   December 5, 1994   Page 2

JOSE RUVALCABA H21975
P.O. BOX 689 FW-211L
SOLEDAD, CA 93960-0689

LEGAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102