IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE RUVALCABA, ) | |
| ) | |
| Petitioner, ) | No. C 08-2483 CRB (PR) |
| ) | |
| vs. ) | ORDER GRANTING |
| ) | PETITION FOR WRIT OF |
| BEN CURRY, Warden, ) | HABEAS CORPUS |
| ) | |
| Respondent. ) | |
| ) | |

      Petitioner, a state prisoner incarcerated at the Correctional Training Facility in Soledad, California, has filed a pro se Petition for a Writ of Habeas corpus under 28 U.S.C. § 2254 challenging the California Board of Parole Hearings' ("BPH") May 9, 2007 decision to deny him parole on the ground that the decision does not comport with due process. Doc. #1. Per order filed on July 22, 2008, the Court found that the Petition, when liberally construed, appeared to state a cognizable claim under 28 U.S.C. § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Doc. #5. Respondent has filed and Answer and Petitioner has filed a Traverse. Doc. ## 6 & 7.

//

//

# BACKGROUND

A. <u>The Commitment Offense</u>

On May 5, 1990, Petitioner was convicted of attempted murder in Contra Costa County Superior Court and sentenced to an indeterminate term of seven-years-to-life in state prison. At his May 9, 2007 parole suitability hearing, BPH read the following summary of Petitioner's commitment offense, as derived from the first two pages of a November 2005 counselor's report.

> In Spring of 1990, . . . [Petitioner] and victim June Hidalgo began a roman[tic] relationship. During the following two or three months, the two spent a great deal of time together, evenings and weekends.
>
> During this time, the two became intimate physically and in late April, [Petitioner] asked the victim to marry him. Approximately two weeks later, the victim told [Petitioner] that she no longer wanted to go out with him. [Petitioner] became extremely upset, crying, locking himself in his bedroom all night.
>
> The following day, May 4th, 1990, [Petitioner] came out of his room to help his brother with a stalled vehicle. This was when [Petitioner] acquired the handgun used in the attempted homicide, locating the gun in his uncle's toolbox.
>
> After starting and stalling the vehicle, [Petitioner] set out to the victim's home to contact the victim's grandmother. He then went to a mutual friend's home, Corey, who stated that he and . . . other friends at the apartment were waiting for [the victim] to arrive.
>
> While there, the victim called and after speaking to her friends, [Petitioner] got on the telephone and asked her why she was breaking up with him. The victim told him that she no longer wanted to speak with him and hung up on him.
>
> [Petitioner] began crying and told his friends "I'm going to get that bitch" and "Nice knowing you guys." He then followed Stacey Cushman, one of their mutual friends from the apartment, to Mount Diablo High School tennis courts, . . . where she and [the victim] had earlier agreed to meet.

2

>Upon arrival of the victim at the parking lot of the high school on a motorcycle driven by Ron Adams, [Petitioner] drove up in his car, exited the vehicle with the gun in his hand, and the victim cried out, "Jose, no" . . . and bent down, cowering and . . . putting . . . her hands protectively over her head.
>
>[Petitioner] pulled the trigger, but no bullet came out. Then he fired three more times, hitting the victim through her hands, entering the rear of her head. She collapsed and [Petitioner] then shot himself in the head as well.
>
>Both were transported to John Muir Trauma Center. The victim was in a coma for [ten] days, remained hospitalized for two months. As a result of the bullet wound to her head, June Hidalgo sustained permanent serious visual impairment. She has no direct vision and . . . can no longer see shapes in detail, nor can she read.
>
>[Petitioner] sustained a head wound that affected his speech, necessitating extensive speech therapy. [Petitioner] was subsequently convicted by a jury for attempted murder on 11/25/91.

Doc. #6-1 at 52-54.

B.  <u>The May 9, 2007 Parole Suitability Hearing and Petitioner's State Court Challenge to BPH's Decision to Deny Him Parole</u>

On May 9, 2007, Petitioner appeared before BPH for his fifth parole suitability hearing. Doc. #6-1 at 70. At that hearing, BPH again found Petitioner was not suitable for parole and would pose an unreasonable risk to society or threat to public safety if released from prison. Doc. #6-2 at 60-61. In denying Petitioner parole, BPH relied on the circumstances of the commitment offense, which it noted "was carried out in an especially cruel manner" and "demonstrate[d] disregard for human suffering." <u>Id.</u> at 61-62. BPH also cited the district attorney's opposition to Petitioner's release, as well as concern over what it termed a "little gap" in Petitioner's "understanding of the critical elements that led to the life crime." <u>Id.</u> at 66, 68 & 70. Petitioner's minimum eligible parole date was October 30, 1998. Doc. #6-1 at 3 & 32.

3

After BPH recited the facts of Petitioner's commitment offense, he was asked to explain his actions. Petitioner stated:

> Well, first of all, sir, I'm so ashamed of what I did back in those days, you know. I know that now the way I feel about life is just [no] way to think about the pain. I know I remember back in those days, back in that moment I had so many problems in my house and I was getting legalized and all those things ha[d] got into my mind and at that moment, I didn't care for life and she got me upset and problems that were in my house. All those things made me lose my head.
>
> I know I can't believe I did it, you know? It's so hard for me to even think that I'd go and hurt a person at that time . . . I was still solely immature. Now that I'm totally mature, I think – Now I think that, God, it was so – it was just – Think about it, it just makes me drop down and get –
>
> I know she doesn't deserve no [sic] pain of any kind, . . . it's just so difficult for me to even express myself in front of you, sir, and to a whole community, to a whole world.

Doc. #6-1 at 54-55.

In announcing its decision denying Petitioner parole, BPH acknowledged Petitioner's remorse, noting:

> [W]e believe there's no question in our mind that you feel horribly sorry for the events that occurred, . . . you've come to grips with this horrible crime . . . that you did. That's at least something in terms of you.
>
> Your family has suffered . . . and her family has certainly suffered. Your friends that were surrounding this have all suffered and I think you have a wonderful grasp on all that.

Doc. #6-2 at 60. Later in the decision, BPH repeated, "[t]here's no question that you've come to grips with the crime." Immediately following this statement, however, BPH noted:

> There is a little gap there what we would like you to work on for this next year that we believe is

4

|   |   |
|---|---|
| 1 | something . . . it would do you well and make us, the Parole Board, feel a little better about your ability to handle future situations that may come up, whether they be romantically based or . . . something based at work. |
| 2 | |
| 3 | |
| 4 | We want to feel absolutely sure that you're going to handle these things in an adult, mature way and . . . while we recognize you said over and over and over it would never happen again, I'm sure prior to this you never thought this would happen.  So we want to make absolutely sure that you're going to . . . have all the tools at your disposal to get through some other circumstances . . . that I will guarantee you inevitably will happen in your life, that will not be comfortable and be difficult to deal with for anybody. |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | Id. at 68-69. |
| 10 | BPH acknowledged the "extensive amount of work with regard to |
| 11 | [Petitioner's] parole plans" noting he had two "well sought after vocations" and |
| 12 | that his employment plans "seem to be viable."  Doc. #6-2 at 67.  During the |
| 13 | evidentiary portion of the hearing, BPH noted the numerous letters of support |
| 14 | Petitioner received from family members and friends, which offered Petitioner |
| 15 | employment, financial support and a place to live.  See Doc. #6-2 at 15-25. |
| 16 | In terms of his behavior prior to the commitment offense, BPH noted that |
| 17 | Petitioner had "virtually no criminal record. . . . no juvenile record, nor adult |
| 18 | record.  So there is no escalation of any pattern.  This seemed to be some form of |
| 19 | isolated event . . . ."  Doc. #6-2 at 64.  Regarding his behavior in prison, BPH |
| 20 | noted that Petitioner had "done well while in prison" and that he had accrued |
| 21 | only one serious rules violation eleven years prior.  Id. at 65.  BPH later learned |
| 22 | that this was due to Petitioner's participation in a prison work stoppage.  Id. at 80. |
| 23 | Finally, during the evidentiary portion of the hearing, BPH cited |
| 24 | extensively to Petitioner's most recent psychological evaluation.  See Doc. #6-1 |
| 25 | at 81-83; Doc. #6-2 at 2-4.  That evaluation, in relevant part, noted: |
| 26 | [Petitioner] related during the interview in an open sincere and earnest manner.  His mental status was |
| 27 | |
| 28 | 5 |

> within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. English is his second language. However, he communicates quite well in English. He actually has achieved his GED, which is remarkable. He stated that sometimes under stress he has difficulty expressing himself in English. Sometimes in the BPH hearing this occurs to him. However, under normal conditions, he communicates very well. His eye contact was good. His affect was appropriate. There was no evidence of anxiety or of depression. His memory was intact. His judgment was good. His insight and self-awareness were excellent.
>
> This man has no alcohol or drug issues at all. This is not an issue in this case.
>
> Before coming to prison, he was experienced as an automobile mechanic. He has participated for three years at [Deuel Vocational Institution] in auto mechanics, earning a certificate of completion. In addition, he has spent three years working in autobody. He has excellent skills in this field. He has job offers in Mexico, where he plans to go as a mechanic.

See Doc. #1-2 at 25. The psychologist further observed Petitioner as having no mental disorder and no personality disorder. Id.

In reviewing Petitioner's life crime, the psychologist noted:

> [Petitioner] accepts full responsibility for the commitment offense. He accepts the written version of the commitment offense. He has reviewed this offense at length with Dr. Sexton in the 10/11/04 report. In addition, he has also reviewed the dynamics associated with this offense with this writer. Since this information has been reviewed at length, it will only be summarized at this point. At the time [of the commitment offense, Petitioner] was under a great deal of emotional stress. Family dynamics outlined in the previous report resulted in his desire to support his family, but at the same time to leave his family and become independent. At the time, the family dynamics were overwhelming to him, and he felt quite trapped. He had put all of his hopes, dreams and expectations into the relationship with the victim. He was planning on marriage. At the same time, he was under pressure at work,

> because they demanded papers that he had obtained legal residency or he would lose his job. In the midst of all this stress, the victim, his fiancee broke off his relationship abruptly without any explanations. The result was that he lost complete control, and he was overcome with feelings of hurt, rejection, anger and jealousy, as well as confusion.
>
> [Petitioner] expresses deep feelings of sorrow and remorse about his actions at that time. He was 21 years of age, and he was totally overwhelmed by his situation. At the time he felt that he had nothing more for which to live. As a result, he also attempted suicide. Looking back at it now as a mature adult at the age of 37, he realizes how bad his choices were. He expresses deep feelings of sorrow, shame and remorse at the injury he caused to his fiancee. His feelings of remorse appear to be quite sincere and genuine.
>
> [Petitioner] has explored the commitment offense and the underlining [sic] causes at length. I agree with Dr. Sexton's assessment that his explanation of the causes related to this offense is outstanding. He totally understands what motivated him to become involved in this offense at the time. He continues to be remorseful and bothered by this action. He does not need to participate in any further counseling, therapy or self-help groups in order to understand himself and his actions better at that time.

Doc. #1-2 at 25-26; see also id. at 28-33 (October 11, 2004 report of Dr. Sexton).

In his assessment of Petitioner's dangerousness, the psychologist observed:

> In considering potential for dangerous behavior when released to the community . . . [the results of Petitioner's psychological testing] means that if 100 men were released on parole, he would do better on parole than 99 of them. This is an extremely low risk level. As a result, he poses no more risk to society than the average citizen in the community. In fact, based upon his self-understanding, life experiences, growth and maturity over the years, he probably poses less risk to society than the average citizen in the community.

Doc. #1-2 at 26.

7

The psychologist's clinical conclusion reads as follows:

> There are no mental or emotional problems in this case that would interfere with routine parole planning. [Petitioner] has an immigration hold, and he plans to return to Mexico upon his release. He has a great deal of family support in Mexico. In addition to offers of residence, he also has job offers. He is an experienced mechanic, and his skills are highly desirable in the community. Employment will not be a problem in this case. The prognosis for successful adjustment in the community is very excellent.

Doc. #1-2 at 26.

Petitioner challenged BPH's May 9, 2007 decision in the California Supreme Court, which summarily denied relief on March 19, 2008. Doc. #6-3 at 2. On May 15, 2008, Petitioner filed the instant Petition for a Writ of Habeas Corpus.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." White v. Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d). Under this deferential standard, federal habeas relief will not be granted "simply because [this] [C]ourt concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

When the state court decisions do not provide a reasoned opinion, as in this case, the Court "must conduct an independent review of the record to determine whether the state court's decision was objectively unreasonable." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006).

## DISCUSSION

A.  Due Process and the "Some Evidence" Standard for Parole Suitability Determinations

The Fifth and Fourteenth Amendments prohibit the government from depriving a prisoner of life, liberty or property without due process of law. U.S. Const. Amends. V & XIV. It is now settled that California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007) (citing Sass, 461 F.3d at 1128); Biggs v.

9

Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillon v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002). It does not matter that a parole release date has not been set for the prisoner because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, 334 F.3d at 915. Due process accordingly requires that a parole board premise its decision regarding a petitioner's parole suitability on "some evidence in the record" such that the decision is not arbitrary. Sass, 461 F.3d at 1128-29 (quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)). The "some evidence" standard is clearly established federal law in the parole context for purposes of 28 U.S.C. § 2254(d). Sass, 461 F.3d at 1129.

The Supreme Court set forth the "some evidence" standard in Hill, which concerned the revocation of "good time" credits towards parole resulting from prisoner misconduct. Hill, 472 U.S. at 455. The Court rested its holding upon the procedural due process foundation it laid in Wolff v. McDonnell, 418 U.S. 539, 563-67 (1974). As the Court noted, Wolff required, among other things, that a prisoner receive "a written statement by the fact finder of the evidence relied on and the reasons" for the deprivation of his good time credits. Hill, 472 U.S. at 454 (citing Wolff, 418 U.S. at 565). The Court then added to the foundation it laid in Wolff: "[R]evocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record." Hill, 472 U.S. at 455 (quoting Wolff, 418 U.S. at 558).

The "some evidence" standard does not permit the Court to "reweigh the evidence." Powell v. Gomez, 33 F.3d 39, 42 (9th Cir. 1994). Instead, the inquiry is "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Hill, 472 U.S. at 455-56. While this test is

not stringent, it must at minimum protect a prisoner's "strong interest in assuring that the loss of [parole] is not imposed arbitrarily." Id. at 454.

Due process also requires that the evidence underlying the parole board's decision have some indicium of reliability. Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904. Relevant to this inquiry is whether the prisoner was afforded an opportunity to appear before, and present evidence to, the board. See Pedro v. Oregon Parole Bd., 825 F.2d 1396, 1399 (9th Cir. 1987). If BPH's determination of parole unsuitability is to satisfy due process, there must be some reliable evidence to support the decision. Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005).

B.  California Law Regarding Parole Suitability Determinations

When assessing whether a state parole board's suitability determination was supported by "some evidence," the Court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. Irons, 505 F.3d at 850. Under California law, prisoners serving indeterminate life sentences, like Petitioner, become eligible for parole after serving minimum terms of confinement required by statute. In re Dannenberg, 34 Cal. 4th 1061, 1069-70 (2005). At that point, California's parole scheme provides that BPH "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Cal. Pen. Code § 3041(b). Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a). In making this determination, BPH must consider

11

various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release.  See Cal. Code Regs. tit. 15, § 2402(b)–(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Cal. Code Regs. tit. 15, § 2402(c)(1).  The factors to be considered in making that determination include:  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

Under California law, the "core determination" regarding a prisoner's threat to public safety "involves an assessment of an inmate's *current* dangerousness."  See In re Lawrence, 44 Cal. 4th 1181, 1205 (2008) (emphasis in original) (citing In re Rosenkrantz, 29 Cal. 4th 616 (2002) and In re Dannenberg, 34 Cal. 4th 1061 (2005)).  According to the state supreme court,

> to the extent our decisions in Rosenkrantz and Dannenberg have been read to imply that a particularly egregious commitment offense *always* will provide the requisite modicum of evidence supporting the Board's or the Governor's decision, this assumption is inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole that we recognized in Rosenkrantz.

12

Lawrence, 44 Cal. 4th at 1191 (emphasis in original). The court continued:

> In some cases, such as this one, in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide "some evidence" *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety.

Id. (emphasis in original).

C.  Ninth Circuit Law Regarding Parole Suitability Determinations

A critical issue in parole denial cases concerns BPH's use of evidence about the crime that led to the conviction. A trio of Ninth Circuit cases guide the application of the Superintendent v. Hill "some evidence" standard in determining whether or not a particular prisoner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison, taking into account the circumstances of the commitment offense: Biggs, 334 F.3d 910, Sass, 461 F.3d 1123, and Irons, 505 F.3d 846. The first case, Biggs, explained that the value of the criminal offense fades over time as a predictor of parole suitability:

> The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

Biggs, 334 F.3d at 916-17. Although the court in Biggs upheld the initial denial of a parole date based solely on the nature of the crime and the prisoner's conduct before incarceration, it cautioned that "[o]ver time . . ., should Biggs continue to

13

demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916.

Next came Sass, which criticized the court's statements in Biggs as improper and beyond the scope of the dispute before the court. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See Sass, 461 F.3d at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).

The last of the three cases, Irons, determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner sixteen years into his seventeen-to-life sentence. Irons emphasized, however, that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853. The court, citing Biggs, then expressed "hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Id. at 854.

D.     Analysis of Petitioner's Due Process Claim

Petitioner seeks federal habeas corpus relief from BPH's May 9, 2007 decision finding him not suitable for parole, and denying him a subsequent

14

hearing for one year, on the ground that the decision does not comport with due process.  Specifically, Petitioner claims that BPH's decision is not supported by the evidence in the record and instead is based on the unchanging facts of his commitment offense.  Doc. #1.  Respondent answers that Petitioner has not demonstrated that the state court decision was contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, and that therefore he is not entitled to relief.  Doc. #6 at 4.

After a careful independent review of the record, the Court finds that the state court's implicit determination that BPH's decision to deny Petitioner parole was supported by "some evidence" was objectively unreasonable.  See 28 U.S.C. § 2254(d); Sass, 461 F.3d at 1127.

At his 2007 parole suitability hearing, BPH found Petitioner was not suitable for parole and would pose an unreasonable risk to society or threat to public safety if released from prison.  Doc. #6-2 at 60-61.  BPH based its decision primarily on the circumstances of the commitment offense, but also relied on what it viewed as a "little gap" in Petitioner's "understanding of the critical elements that led to the life crime."  Id. at 66, 68 & 70.  Neither factor constitutes some reliable evidence in support of BPH's decision to deny Petitioner parole.

According to the psychologist who evaluated Petitioner prior to his 2007 hearing, Petitioner posed "no more risk to society than the average citizen in the community.  In fact, based upon his self-understanding, life experiences, growth and maturity over the years, he probably poses less risk to society than the average citizen in the community."  Doc. #1-2 at 26.  The psychologist concluded that Petitioner's "prognosis for successful adjustment in the community is very excellent."  Id.  And regarding Petitioner's "understanding of the critical

15

elements that led to the life crime," the psychologist directly contradicted BPH's finding, observing:

> [Petitioner] has explored the commitment offense and the underlining [sic] causes at length. I agree with Dr. Sexton's assessment that his explanation of the causes related to this offense is outstanding. He totally understands what motivated him to become involved in this offense at the time. He continues to be remorseful and bothered by this action. He does not need to participate in any further counseling, therapy or self-help groups in order to understand himself and his actions better at that time.

Doc. #1-2 at 25-26; see also id. at 28-33 (October 11, 2004 report of Dr. Sexton). In fact, nothing in the record supports BPH's finding that there was a gap in Petitioner's understanding of the circumstances that led to his attempted murder of his former girlfriend. During the course of his parole suitability hearing, Petitioner was insightful and remorseful about the commitment offense and underlining causes, prompting BPH to comment that "[t]here's no question that you've come to grips with the crime." Doc. #6-2 at 68.

In light of the conclusion reached by the two licensed psychologists who evaluated Petitioner, and the lack of any evidence in the transcript of the May 9, 2007 parole suitability hearing or other part of the record indicating that there was a gap in Petitioner's understanding of the underlining causes to led to the crime, the Court dismisses BPH's concern that Petitioner was not yet equipped to transition successfully back into the community if he were granted parole, see Doc. #6-2 at 68-69, as not supported by some reliable evidence. See Rosas, 428 F.3d at 1232 (if BPH's determination of parole unsuitability is to satisfy due process, there must be some reliable evidence to support the decision). Also weighing heavily in favor of a finding of suitability was the solid support system that awaited Petitioner upon his release, documented by the numerous letters of

support he received from family members and friends, which included multiple firm offers of employment, financial support, as well as a place to live. See Doc. #6-2 at 15-25.

Petitioner's criminal offense was an isolated aberration in his past, "temporally remote" – committed some seventeen years earlier – and certainly mitigated by various circumstances indicating the conduct is unlikely to recur. See Lawrence, 44 Cal. 4th at 1191. At the time BPH denied Petitioner a parole date for the fifth time in 2007, he had served seventeen years on his seven-to-life sentence, almost nine years past his minimum eligible parole date. Perhaps in some cases the circumstances of a prisoner's commitment offense reasonably may continue to predict his future even in spite of a prisoner's dramatic behavioral improvement while in prison. But, where, as here, Petitioner's complete lack of a violent history, his strong and wide-spread support from family and friends, realistic parole plans that included multiple offers of employment, financial support, and a place to live, highly favorable psychological evaluations and his lack of any serious disciplinary violations throughout his entire time spent behind bars, his continued imprisonment based on the circumstances of his 1990 commitment offense rises to the level of a due process violation the Ninth Circuit envisioned. See Irons, 505 F.3d at 854 ("in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes"). Put in terms of Hill's "some evidence" standard, under the circumstances of this case, the circumstances of Petitioner's commitment offense of seventeen years ago do not constitute some evidence sufficient to support the conclusion that petitioner remains a threat to public safety. See Hill, 472 U.S. at

17

455; Lawrence, 44 Cal. 4th at 1191.

After careful review of the law and the entire record now before the Court, it is difficult, if not impossible, to reconcile BPH's decision to deny Petitioner parole with the evidence upon which it relied to make that decision. The Court finds the record was "so devoid of evidence that the findings of [BPH] were without support or otherwise arbitrary." Hill, 472 U.S. at 457. The state court's implicit determination that BPH's finding that Petitioner was unsuitable for parole and posed an unreasonable danger to society or threat to public safety if released from prison constituted "some evidence" of unsuitability was objectively unreasonable. See 28 U.S.C. § 2254(d); Sass, 461 F.3d at 1127. There simply was no reliable evidence to suggest that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released on parole. Cal. Code Regs. tit. 15, § 2402(a). Petitioner is entitled to federal habeas relief on his due process claim.

## CONCLUSION

For the reasons stated above, the Petition for Writ of Habeas Corpus is GRANTED. Within twenty (20) days of the date of this order, BPH must calculate a term for Petitioner and set an imminent date for his release in accordance with California Penal Code § 3041(a). Within ten (10) days of Petitioner's release, Respondent must file a notice with the Court confirming the date on which Petitioner was released.

The Clerk is instructed to enter judgment in accordance with this order.

SO ORDERED.

DATED: April 8, 2010

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.08\Ruvalcaba-08-2483-bph grant.wpd